484

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

UNITED STATES OF AMERICA,        :      CRIMINAL ACTION
                                 :
           Plaintiff,            :
v                                :
                                 :
OMAR MORALES COLON,              :
                                 :
           Defendant.            :      NO. 17-47-LPS-1

- - -

Wilmington, Delaware
Tuesday, September 21, 2021
*Jury Trial - Volume C*

- - -

BEFORE:   HONORABLE LEONARD P. STARK, U.S.D.C.J., and a jury

- - -

APPEARANCES:


            UNITED STATES ATTORNEY'S OFFICE
            BY:   WHITNEY CLOUD, ESQ.,
            And, JENNIFER K. WELSH, ESQ.
            Assistant United States Attorneys

                  Counsel for Government


            LAW OFFICE OF DINA CHAVAR
            BY:   DINA CHAVAR, ESQ.

                  Counsel for Omar Morales Colon


Valerie J. Gunning                Brian P. Gaffigan
Official Court Reporter           Official Court Reporter

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following jury trial was held in chambers, beginning at 9:00 a.m.)

THE COURT:  Good morning, everybody.

(The attorneys respond, "Good morning, Your Honor.")

THE COURT:  Are there any issues the government wanted to raise this morning?

MS. WELSH:  Your Honor, there is a minor issue that we have worked out between the two of us, so it's not really fair to call it an issue.

THE COURT:  Okay.

MS. WELSH:  The cooperator's plea agreement is Exhibit 300 in the binder and we have agreed for various reasons that the mandatory minimum penalty to which, you know, the -- is enumerated in the plea agreement should be redacted.

So the way that it reads right now -- and that's going to be an exhibit that I will use with this witness so I want to make sure the Court's binder reflects the redaction on Government Exhibit 300.

MS. CHAVAR:  Just because I can't hear you.  No, I'm fine.  I'm just going to stand here while you address the judge.

MS. WELSH:  Or I can talk louder.

THE COURT:  All right.  300.

MS. WELSH:  Right.  So paragraph 2 lays out the maximum penalties and also we typically put the mandatory minimum penalties that would apply, so we have redacted out "at least ten years," just those four words have been redacted.

THE COURT:  Okay.  And what is the reason for that?

MS. WELSH:  So my concern was that the charge that the defendant is facing is the same charge that the cooperator is facing and so if the jury hears about the cooperator's mandatory, they're also going to hear about the defendant's mandatory, but that is not why defense counsel agreed to it.

The reason why defense counsel agreed to it is this witness is safety valve eligible and everyone agrees that he is, so in actuality he is not even facing the ten-year mandatory, so it wouldn't be accurate to up to like confront him with the ten-year mandatory.

THE COURT:  And are you agreeable to that?

MS. CHAVAR:  I'm agreeable to it, yes.

THE COURT:  All right.  So do you intend to display the plea agreement?

MS. WELSH:  I do, and we have already redacted

it.  The only version that hasn't been redacted is Your Honor's and the witness's, which I will go do now.

THE COURT:  And then, of course, when you get the exhibits together for us to give to the jury, make sure the redacted one, that's the one that will be in evidence.

MS. WELSH:  Yes, Your Honor.

THE COURT:  Okay.  Is there anything else, issue or not issue, that the government wanted to --

MS. CHAVAR:  Can I take this moment to make sure I understand the parameters about messing any of this up is that I can certainly cross him on the penalties, but I would not mention that he has a mandatory minimum, but I can certainly talk about the maximum he is facing.  Is that the right understanding?

MS. WELSH:  Yes.  Actually, he is subject to the potential of a lifetime imprisonment and I think that is fair game to cross him about that.  I just don't want him to confront him with a ten-year mandatory that doesn't apply to him and does apply to the defendant.

MS. CHAVAR:  And actually may confuse him on the witness stand.

THE COURT:  Right.  Okay.  Is there anything else or anything at all, Ms. Chavar, this morning?

MS. CHAVAR:  No, Your Honor.

THE COURT:  All right.  With a mask it's hard to

tell, but is that Mr. Brose here?

MR. BROSE:  Yes, Your Honor.

THE COURT:  You are here about Mr. Valdez, I assume?

MR. BROSE:  I am, and I just spoke with him.

THE COURT:  So I think there was one juror we were still waiting for when I walked in.

Okay.  So all the jurors are here now.  So I think I will take a quick recess, tell them to bring Mr. Valdez up.  We'll get him settled on the witness stand. Then we'll bring the jury in and you will call him as a witness.  Understood?

MS. WELSH:  Yes, Your Honor.

THE COURT:  All right.  We'll take a short recess until we can get all that in motion.

(Brief recess taken.)

*      *      *

(Proceedings reconvened after recess.)

THE COURT:  Good morning, Mr. Valdez.

THE WITNESS:  Good morning.

THE COURT:  The jury is all ready.  We'll bring them in.

(Jury returned.)

THE COURT:  Good morning, ladies and gentlemen of the jury.  Welcome back.  Nice to see you all.

Valdez - direct

In a moment, we will introduce you to the witness who is going to testify this morning from the witness stand.

If you need to adjust your seats at all in order to see him, that will be fine.

Good morning, Ms. Welsh, Ms. Cloud, Ms. Chavar, Ms. Rossman.  Good morning, Mr. Colon.

If you are ready to proceed, you may call your witness.

MS. WELSH:  I am, Your Honor.  The government calls Roque Valdez.

... ROQUE VALDEZ, having been first duly sworn, was examined and testified as follows ...

THE COURT:  Good morning, Mr. Valdez.

THE WITNESS:  Good morning.

THE COURT:  If you wouldn't mind, if you would take your mask off while you are testifying.

THE WITNESS:  Okay.

THE COURT:  Thank you very much.  You may proceed.

DIRECT EXAMINATION

BY MS. WELSH:

Q.    Good morning, Mr. Valdez.

A.    Good morning.

Q.    Where are you from?

Valdez - direct

A.      I'm from California, Los Angeles.

Q.      How old are you?

A.      I'm 42.

Q.      How long have you lived in California?

A.      All my life.

Q.      Well, up until recently; right?

A.      Up until recently, yes.

Q.      So we'll cut to the chase.  You are in a prison uniform?

A.      Yes.

Q.      What did you get arrested for?

A.      I got arrested for possession with intent to distribute cocaine in the State of Delaware.

Q.      Did you plead guilty to conspiracy to distribute cocaine?

A.      I did.

Q.      Did you participate in a conspiracy to distribute cocaine?

A.      I did, yes.

Q.      For how long?

A.      Approximately six months.

Q.      Can you explain broadly what you did that landed you in prison?

A.      Well, I was hired to drive drugs across country from California to Delaware.

Valdez - direct

Q.      And were the drugs delivered to Delaware, I suppose?

A.      Yes.

Q.      To whom did you deliver drugs?

A.      We were, we were delivering drugs to the defendant, Mr. Colon.

Q.      Could you please -- do you see the man that you were delivering drugs to in the courtroom today?

A.      Yes.

Q.      Can you identify him by what he is wearing and where he is sitting?

A.      He is the gentlemen over by the exit door.

Q.      Are you gesturing toward the table to my left?

A.      Yes.

Q.      What is he wearing?

A.      A shirt.

Q.      What color is it?

A.      I can't -- I don't know what color it is.

Q.      Is he?

A.      Like a --

Q.      Which seat is he in?

A.      He is right in the middle.

        MS. WELSH:  All right.  Let the record reflect that the witness has identified the defendant.

        THE COURT:  The record will so reflect.

BY MS. WELSH:

Q.    Did you know the defendant by the name -- you said Mr. Colon.  Do you now know his first name?

A.    Now I do, yes.

Q.    What is his first name?

A.    Omar.

Q.    Did you know the defendant by the name Omar Colon while you were distributing drugs to him?

A.    I did not.

Q.    By the way, we both have been saying "drugs."  Which drugs did you distribute?

A.    Cocaine.  Cocaine, yes.

Q.    What did you know the defendant by?  What nickname did you know him by?

A.    We remembered to him as El Tigré, the Tiger.

Q.    That translates to "the tiger?"

A.    Yes.

Q.    Mr. Valdez, you testified that you pled guilty to conspiracy to distribute cocaine; right?

A.    Yes.

Q.    Did you do so pursuant to a plea agreement with the government?

A.    I, I would.  Yes, I would -- yes.

Q.    You have a plea agreement you signed with the government?

A.    I did, yes.  Thank you.

Valdez - direct

Q.      So would you please, there is a big binder in front of you.  And if you could please open it up to Exhibit 300?

A.      I'm sorry.  What number?

Q.      300.

A.      Okay.

Q.      All right.  Do you recognize Exhibit 300?

A.      Yes.

Q.      What is it?

A.      This is my plea agreement.

Q.      Is there -- can you turn to the last page for me.

Is your signature on there?

A.      Yeah.

Q.      And is there a certification on there from the Court as well?

A.      That's correct, yes.

Q.      Does that look to be a true and correct copy of that document?

A.      Yes.

MS. WELSH:  All right.  Your Honor, I move to enter Exhibit 300 into evidence at this time.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-300 was admitted into evidence.)

BY MS. WELSH:

Q.      Mr. Valdez, can you please turn to paragraph 5 on

Valdez - direct

page 2 of your plea agreement here?

A.      Yes.

Q.      Could you please read paragraph 5 aloud to the jury?

A.      Yes.

        For purposes of sentencing on Count One, the defendant further acknowledges knowingly, voluntarily and intelligently admits that including relevant conduct pursuant to United States sentencing guideline 1B1.3, he conspired to distribute at least 77 kilograms of a mixture and substance containing a detectable amount of cocaine.

Q.      Okay.  Who did you deliver those 77 kilograms of cocaine to?

A.      The defendant, Tigré.

Q.      Now, the last page of this agreement, you said that it's was signed by you; right?  And other people?

A.      Yes.

Q.      And me; right?  What is the date on this?

A.      The date is the 17th of October, 2017.

Q.      All right.  So you pled guilty back in 2017; is that right?

A.      Yes.  Right after I got arrested.

Q.      Mr. Valdez, as part of this plea agreement, did you agree you would cooperate with the government and you would testify?

A.      I did, yes.

Valdez - direct

Q.    And that includes testifying here at this trial, right?

A.    Correct.

Q.    Could you please turn to Exhibit 301 in your binder?

A.    Yep.

Q.    Are you there?

A.    Yes.

Q.    I'm going to ask you the same question.  Do you recognize this document?

A.    Yes.  Under seal, yes.

Q.    What is this document?

A.    The sealed plea agreement.

Q.    Is this basically the cooperation part of your plea agreement?

A.    Yes.

Q.    And if you could turn to the last page?

A.    (Witness complies.)

Q.    Is it signed by you?

A.    Yes, it is.

Q.    And by me?

A.    Yes.

Q.    Okay.  And is it certified by the Court?

A.    Yes, it is.

        MS. WELSH:  All right.  So, Your Honor, I move to admit Exhibit 301 into evidence.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-301 was admitted into evidence.)

BY MS. WELSH:

Q.    Mr. Valdez, does this document discuss the terms of your cooperation deal with the government?

A.    Yes.

Q.    And have you met with the prosecutors on this case including me several times since May of 2017?

A.    I have, yes.

Q.    Is meeting with us and providing information part of what you agreed to do under Exhibit 301?

A.    Correct.  Yes.

Q.    So could you please --

MS. WELSH:  And we can publish this, please, paragraph 2B.

BY MS. WELSH:

Q.    If you could just -- I don't need you to read it out loud, but if you could take a look at paragraph 2B.

A.    Okay.

Q.    What is your understanding of the benefit that you could derive from cooperating with the government?

A.    I could benefit from a downward departure.

Q.    What does that mean in layman's terms?

A.    I'd get a lesser term, sentence.

Valdez - direct

Q.    Less time in jail?

A.    Less time in jail, correct.

Q.    So is it fair to say you have an incentive to cooperate with the government and testify here today?

A.    Yes.

Q.    Now, when we met, what have you been told is the most important role of testifying?

A.    Tell the truth.

Q.    I want to direct your attention to paragraph 3, please, of Exhibit 301.

      Am I correct that that says, The defendant's rights under this agreement shall in no way be dependent on or affected by the outcome of this case in which he may testify?  Is that what it says?

A.    That's what it says.

Q.    What does that mean to you?

A.    It means whether he is guilty or not, it doesn't jeopardize my, my benefit.

Q.    So long as what?

A.    As long as I tell, tell the truth.

Q.    Have you been sentenced yet?

A.    No.

Q.    Who sentenced you?

A.    Mr. Stark.

Q.    Judge Stark?

Valdez - direct

A.      Judge Stark.  I'm sorry.

Q.      Did I sentence you?

A.      No.

Q.      Have you been made any promises about what is going to happen at your sentencing?

A.      No.

Q.      But if you are not truthful, what happens?

A.      My, my plea agreement voids.

Q.      And what does that mean for you?

A.      I don't get the downward departure.  I don't get the time that I want to get off.

Q.      Mr. Valdez, the cocaine conspiracy --

            MS. WELSH:  We can take that down now.  Thank you, Ms. Roca.

BY MS. WELSH:

Q.      The cocaine conspiracy that you pled guilty to, when did it start?

A.      This started December, early December of 2016.

Q.      All right.  Before early December of 2016, had you ever dealt cocaine before?

A.      I had not, no.

Q.      Had you ever dealt any drugs for that matter?

A.      No.

Q.      Who was it then who introduced you into this business?

Valdez - direct

A.    Just some wrong friends.  Right.  I was --

Q.    Which person was it?

A.    I'm sorry.  Aviles Camberos, my co-defendant.

Q.    Do you know a first name for Mr. Aviles Camberos?

A.    I know him as Frederico.

Q.    That was the name that you knew him by; right?

A.    Yes.

Q.    So it was Frederico who introduced you to cocaine trafficking?

A.    Correct.

Q.    Where did you meet Frederico, who you now know as Mr. Aviles Camberos?

A.    I met him in Los Angeles, California.

Q.    More specifically, where were you when you first spoke to him?

A.    I met him in Compton, Compton, California.  The City of Compton.

Q.    What were you doing when you met?

A.    We were at a barbecue.  We were at a barbecue.  He was there.  He approached me and he started talking to me about that he needed someone who could drive across country with him, who can help him deliver the drugs cross country.

Q.    Now, Mr. Camberos, did you know him before that barbecue?

A.    No.

Valdez - direct

Q.    Did the two of you have a mutual friend?

A.    We did, yes.

Q.    You don't have to give he the name of that person, but generally, what was that person's relationship with you?

A.    He was a friend of mine.

Q.    And had you ever done any sort of criminal activity with that person?

A.    Yes.  Yes.  Drug -- not drug.  Human smuggling.

Q.    Human smuggling?

A.    Yes.

Q.    Can you describe exactly what it is you did with that person?

A.    I live close to the border town in Southern California.  This person was doing some human smuggling and I -- I worked with him one time.

Q.    With the goal of just bringing people across the border basically?

A.    Yes, yes.

Q.    Okay.  From Mexico, I guess?

A.    From Mexico into California, yes.

Q.    How many times did you try to bring people across the border?

A.    It was once at that.  I didn't really fulfill my obligation.  It was a one-time thing.  You know, I got the three men that I was supposed to pick up, but halfway

Valdez - direct

through my journey, I aborted.  I didn't feel comfortable doing what I was doing, so I didn't follow -- I didn't go through with the plan.

Q.    Okay.  But this person then introduced you to Frederico, Mr. Camberos; right?

A.    Yes.

Q.    Did you ever try it again after you, you know, failed to bring these people across the border?

A.    No, no.

Q.    So after you met Mr. Camberos, first of all, let's talk about at the barbecue.

A.    Okay.

Q.    What did he say to you specifically about what you were going to be doing?

A.    Well, he needed someone that had a driver's license, someone that would speak fluent English, someone that could I guess have a good citizenship, meaning an American citizen, someone that could drive across country, someone that if got pulled over by a state trooper or any police authority could pretty much not have any problems.

Q.    Did he tell you where you were going?

A.    We were going to Delaware, yes.

Q.    Was it clear to you from that conversation what you were going to be delivering?

A.    Yes.  He did make it clear that it was cocaine that

Valdez - direct

we were trying to get across the country.

Q.      During that first conversation at the barbecue, did Mr. Camberos tell you to whom you were going to be delivering cocaine?

A.      Not at the time, no.

Q.      Were you going to get paid for this?

A.      Yes.  So he said it was $10,000 for every trip and it was going to be on a monthly basis.

Q.      Now, Mr. Valdez, you testified that you had never dealt drugs before this conversation with Mr. Camberos, so why did you agree to do this?

A.      I was just going through a rough patch at the time. I just recent eventually had gotten divorced.  I was in between jobs.  I wasn't really, I wasn't thinking straight.

Q.      What did he tell you about the likelihood of getting caught?

A.      He said it wasn't very likely being that he had a very good method of transporting the drugs across country.

Q.      What was the method?

A.      The method was to smuggle them into an oxygen or hydrogen tank five feet by, I don't know, 11, 12 inches in diameter, and we were going to put them in the tank and then the tanks were going to go on the back of a pickup truck and drive across country.

Q.      Did he tell you why he thought this was a safe place

503

Valdez - direct

to put cocaine in tanks?

A.    He said that I guess the K-9 units, K-9 dogs were not able to sniff them out being that there were -- they were in the cylinder behind half-inch steel.

Q.    Did, in that first conversation at the barbecue, did Mr. Camberos talk to you about what material you were going to need to make this trip to Delaware?

A.    Yes.  So the conversation went something, you know, that, yes, do you have a driver's license?  Yes.  Are you okay driving?  Yes.  Well, this is what I want to do.  I want to get some hydrogen tanks and we're going to need a lot of tools that we're going to use as decoys to put in the back of a pickup truck that I'm going to buy you that you are going to be using back and forth to drive cross country, and -- and so that was that.

Q.    Did you exchange phone numbers with him?

A.    It wasn't so much phone numbers.  He used an app that doesn't really use phone numbers, more like a log-in user.

Q.    What was the app?

A.    Telegram.

Q.    Before this conversation at the barbecue, what had you been doing for a living?

A.    I was in flooring tile.  I was a flooring contractor.

Q.    Installing tile?

A.    Yes, for flooring.

Valdez - direct

Q.      After this discussion at the barbecue, when was the next time that you talked to Mr. Camberos?

A.      It was within two days.  He called me right up.

Q.      When you say call, was it a phone call?

A.      I'm sorry.  Text.  He texted me.  Yes.

Q.      Texted you or used the app?

A.      Used the app.  I'm sorry.

Q.      Messaged you over the app?

A.      Messaged me over the app.

Q.      And what was that conversation like over the Telegram app?

A.      The conversation consisted of him going on Craig's List in the L.A. area and he was looking for the pickup truck that we were supposed to acquire and he was already looking for or searching.  He found a particular one that was in the price range that he was looking for and he pretty much told me to go online, call the owner of the vehicle and go for a test drive, check it out.

Q.      Did you do that?

A.      I did.

Q.      And what did the two of you decide about that truck?

A.      That it was a good vehicle.

Q.      And so did you decide to buy it?

A.      Yes, so we went ahead and bought it, yes.

Q.      Who bought it?  Who paid for it?

A.      Well, Aviles Camberos, he gave me the money for me to pay the money.

Q.      When you say Aviles Camberos, that's the same person?

A.      Yes.

Q.      As Frederico?

A.      I knew him as Frederico at the time.  I didn't know him by after Aviles Camberos.

Q.      But those are all the same person when we use those words?

A.      That's correct.

Q.      How much about the truck cost?

A.      $20,000.

Q.      And how did -- I think you said that Mr. Camberos gave you the money.  How did he give you the money?  Did he write you a check?

A.      No, no.  We met at someplace and he gave me $20,000 cash.

Q.      What kind of truck was it?

A.      This is a 2010 Dodge Ram 3500 diesel.

Q.      Mr. Valdez, if you could please turn in your binder to a photograph that is marked as Exhibit 1182, tab 1182 in your binder.

A.      Yes, I see it.

Q.      Got it?  What is in this photograph?

A.      This is --

Valdez - direct

Q.      Just generally.  What is this a picture of?

A.      This is a picture of the pickup truck that we bought in California.

Q.      Is this a true and accurate copy of the photograph that you took of your pickup truck?

A.      Yes.

        MS. WELSH:  Your Honor, I move to admit Government Exhibit 1182.

        MS. CHAVAR:  No objection.

        THE COURT:  Okay.  It's admitted.

        (GX-1182 was admitted into evidence.)

        MS. WELSH:  If we could please publish this photograph.

BY MS. WELSH:

Q.      Now let's be more specific.  What is this a picture of?

A.      This is a picture of the pickup truck.

Q.      The one that you were talking about that Mr. Camberos bought with cash?

A.      Yes.  Standing in the front.

Q.      That's you there?

A.      Yes.  Very cold.

Q.      After you bought the truck, what happened next?

A.      Well, we got -- we got -- we had to buy some, some tools, some equipment that we needed for, to use as decoys,

Valdez - direct

so the back of the pickup truck.

Once the tanks were loaded, we needed to make it seem like it was a work truck, like it was driving across country to go to some jobsite.  So we went shopping for -- in this case we bought two of the oxygen tanks that we needed to, for the cocaine to be stored in and then we bought some welding equipment, some tool boxes, just random general construction tools.

Q.    Mr. Valdez, do you see anything in the courtroom that looks like the tanks that you bought?

A.    I just saw them, yes.  They're right there, yes.

Q.    When you say right there, are they right in front of the podium?

A.    Yes.  Right in front of the podium, the green oxygen tanks, yes.

MS. WELSH:  For the record, Your Honor, the witness has identified Exhibit 205.

THE COURT:  Thank you.

BY MS. WELSH:

Q.    Are these the tanks that you bought or at least it looks like them?

A.    They look like them.

Q.    And besides the tanks, what other things did you buy?

A.    Well, we have a welding machine, a welding machine and some just chisels and hammers to break away the bottom

Valdez - direct

of the tank.

Q.    Because was the idea to take the bottom of the tanks off at some point?

A.    Right, yes.  So the bottom of the tanks were pretty much cut off.  The cocaine was loaded and then the bottom was just pretty much welded back on and then grinded and then was painted over so it looked like, you know, just regular good old oxygen tanks.

Q.    We're get into those specifics later, but I think you mentioned buying a welding machine?

A.    Yes.

Q.    Right?

A.    Yes.

Q.    Is that referred to as another name as well?

A.    Yes.  The Miller, the Miller brand.

Q.    Could you please turn in your -- could you please turn to Exhibit 206 in your binder.  This is a photograph that's already in evidence.

          Is that a picture of the welding machine that you purchased?

A.    That is a picture of the Miller welding machine, yes.

Q.    All right.  So after you had the tools and the truck, what happened next?

A.    It was time to drive.  We had to get to Delaware.  It was --

Valdez - direct

Q.      Let me ask it this way:  Did you at some point get the car registered and get license plates and everything like that?

A.      Yes.  So right after we got all the tools that we needed, we needed to get.  So the idea was to not have it registered in California.

Q.      Why is that?

A.      We're driving across country and according to Pedrito, in this case, personnel, it would look very suspicious for us to be driving up in the East Coast with a California driver's -- license plate.  So he asked, or he told me to go ahead and register the vehicle more closer, not so much up the East Coast, but more to, like, the mid-region, in the State of Colorado.  He told me he had family there.

So we rode up to Colorado, the Denver area, and we registered the vehicle under my name and with his family members' address down in Colorado.

Q.      Did you live in Colorado?

A.      I do not.  I have never been in Colorado.

Q.      Beside registering the truck there, was there anything else that the two of you did that made it appear that you did live in Colorado?

A.      So going back to me appearing as a worker, a driver that was driving across the country to work at some job,

510
Valdez - direct

like he told me to go ahead and just have -- just go round up the paperwork that would state that I was living in Colorado.  So what he decided for me to do is open up a bank account and then to have a state-issued ID from Denver, Colorado so that I, you know, keep in the truck in case I get pulled over.

Q.     Mr. Valdez, could you please turn to 1016, Government Exhibit 1016 in your binder?

A.     (Witness complies.)  Yes.

Q.     So this is a document that is already in evidence. Is that a photograph of the back of your truck?

A.     That is a photograph, yes.

Q.     What is the license plate on this?  You don't have to read it but what state is it from?

A.     Yes, it's Colorado.

Q.     All right.  Is this the license plate you put on the truck from Colorado?

A.     Yes.

Q.     Now, there --

        MS. WELSH:  Thank you.  I always forget that part.

BY MS. WELSH:

Q.     There are some stickers, it looks like, on the back of this truck.  So what are those all about?

A.     So those are some just decoy stickers, pretty much to

Valdez - direct

again make the truck look, seem like it's a regular work truck, to make it appear as -- well, you know, this is a work truck.  This is a company that it belongs to.  In that case, that's my phone number, the 720-590-3108.

Q.     Was this truck actually purchased to flooring?

A.     No.

Q.     Why was it purchased?

A.     Why was it purchased?

Q.     Yes.  Why was it purchased?

A.     Oh, to smuggle drugs, to bring drugs into Delaware.

Q.     So --

        MS. WELSH:  And we can take this down.

BY MS. WELSH:

Q.     You can probably close your binder.  It's taking up space.

        Mr. Valdez, when was your first trip to Delaware?

A.     The first trip to Delaware was mid-December.

Q.     How long was it between when you met Mr. Camberos, Pedrito at the barbecue and when you made the first trip?

A.     It was within a week.  So we went to Colorado, I would say like the third day after I met him.  We came back and loaded up because it was, it was -- he had some kind of urgency, like we had to get the drugs to Delaware as soon as possible.  So it was, he created urgency to get the first

Valdez - direct

trip going.

Q.     And did you successfully arrive in Delaware?

A.     We did.  We did.

Q.     Let me ask you this.  Had you ever been to Delaware before you made that trip?

A.     No.

Q.     Where did the trip start?

A.     It started in Compton, California.

Q.     What did you bring with you on your first trip to Delaware in December 2016?

A.     On the first trip, we had 20 kilos of cocaine brought in.

Q.     And where was the cocaine?

A.     It was in the gas tank, in the oxygen tank.

Q.     Sitting right in front of me?

A.     Yes.

Q.     Where did you and Mr. Camberos get the cocaine from?

A.     We got it from one of his, you know, one of his guys, some guy named Flaco.  I didn't know him.  I just met him.

Q.     Were you there when the cocaine was actually --

A.     Yes.

Q.     -- received and put into these tanks?

A.     I was driving Pedrito everywhere, so after -- you know, after we get done with the tools and buying the tanks and stuff, he told me to go down to Anaheim, California,

Valdez - direct

and that's we met El Flaco at some parking lot at a

Motel 6 and there, Flaco opened up the back of the car, the

trunk and brought out what would be like a, I don't know,

24-by-24-inch big U-Haul box, moving box, boxing or -- I'm

sorry, U-Haul moving box and in there, there was 20 kilos of

cocaine.  Flaco got it and put it in the back of truck and

said, hey, here's the 20 you requested.  And they just had a

little side conversation about how are you doing, how you

been, this and that.

Q.      Had you ever seen drugs like that before?

A.      No.

Q.      Were you there when those 20 kilos were loaded into the tanks?

A.      Yes.  So after we left Anaheim, we went back to Compton where we went to this mechanic shop.  There I met a gentleman by the -- aka, they call him El Talon, which is the helper.

So we went into the shop and then they started working away.  You know, they cut open the bottom of the tanks.  They started storing the cocaine and kilos inside the tanks.  They welded back tanks and, you know, painted them up, made it look like it's a regular old tank and that was that.  We were finished pretty late that night but, yeah, we were ready to go.

Q.      Did you get a chance to see what the cocaine looks

Valdez - direct

like?

A.     Yes.  Yeah.  I, once -- you know, I have never seen cocaine before so it was, it was intriguing to see the -- about 12 inches by 8 inch by 2 inch like triangles, all taped up.

Q.     Were they triangles?  Did they have three sides? They were triangles?

A.     I'm sorry.  Rectangles.  I'm sorry.  I'm a little nervous.

Q.     Sometimes it's the basics that we forgot; right?

A.     Yes.

Q.     So after the cocaine got put into the oxygen tanks, what did you do?

A.     After we put them, it was time to start the trip.  We went, I went to drop off Pedrito.  I was given instructions to go to a local hotel to, to check in, to sleep overnight because we were going to start our way up to Delaware the next morning.

Q.     Now, that hotel, was it in Highland, California?

A.     Yes.  It was in Highland, California.

Q.     And I know, skipping ahead, you made a couple of trips out to Delaware; right?  How many?

A.     Yes.  Well, a total of four trips.

Q.     Those four trips, were there multiple times that you stayed at that hotel in Highland?

Valdez - direct

A.    Every time, yes.  Every time.  So what Pedrito gave me instructions was to -- because the cocaine was in the back of truck, I was to stay out, like an enclosed hotel or like a, you know, very high, secure hotel where the parking lot or where the truck was pretty secure.

Q.    So if you could please turn to Exhibit 3 which is right in the front of your binder there.

A.    (Witness complies.)

Q.    You are going to have to look in your binder.

A.    Oh, I'm sorry.  I'm sorry.  Which?

Q.    Three.

A.    Yes.

Q.    Do you -- what hotel is that document from?

A.    This hotel is in Redlands, California, the Dynasty Suites.

Q.    Is that the hotel that you stayed at?

A.    That's the hotel I stayed at every time.

Q.    And does that appear to you to be a copy of the hotel bill from that hotel?

A.    Yes.

        MS. WELSH:  Your Honor, I move Exhibit 3 into evidence.

        MS. CHAVAR:  No objection.

        THE COURT:  It's admitted.

        (GX-3 was admitted into evidence.)

Valdez - direct

BY MS. WELSH:

Q.      So after you spent the night at that hotel --

BY MS. WELSH:

        And let's put that up, please.  If you could blows up the address at the top.

BY MS. WELSH:

Q.      Whose address is that?

A.      That's mine.

        MS. WELSH:  And if you could back out.

BY MS. WELSH:

Q.      The address at the top, the very top, is that the address of the hotel?

A.      That's the address I was staying at, yes.

Q.      And what is the date on this?

A.      This is January 24th, 2017.

Q.      So this isn't from your December trip?

A.      No, it's not.  This would be the second trip.

Q.      So after spending the night at this hotel, where did you go the next day?

A.      Well, in the morning, picked up Pedrito and we headed -- we broke, we drove three and a half days all the way to Delaware.

Q.      And I have asked you these questions about the December trip, but was it the same M.O. every time, basically, out in California?

A.    Every time, yes.

Q.    While you were driving from California to Delaware, did you have occasion to talk to Mr. Camberos about his cocaine customer to whom the tanks were being delivered?

A.    Yes.  I didn't know Camberos at the time when I met him at the barbecue.  Once we started driving, it just started, you know, small talk, you know, where are you from? And then, you know, what, what his plans were and pretty much started talking about our trips up here.

Q.    And what did Mr. Camberos call the defendant?

A.    So it's El Tigré, what I, I knew the defendant as.

Q.    And what did Mr. Camberos tell you about El Tigré?

A.    So he mentioned that, you know, we were going to have a lot of work and how El Tigré needed a lot of cocaine delivered, how it was going to be a constant going, you know, driving back and forth.  So to be prepared to make a lot of money, and you know, to be working a lot.

Q.    Now, you mentioned that you came out to Delaware in December of 2016 and that there were other trips.

When were the other trips?

A.    The other trips were after December, so the second trip was the end of January.  This is where the -- the hotel receipt.

And then March would be the third trip.

And then this, the May one that I got arrested.

Valdez - direct

Q.     When you came to Delaware, all four of those times, where did you stay?

A.     We stayed at the Red Roof Inn in, what is it, Newark?

Q.     Every time?

A.     Yes, every time.  Yeah.

Q.     Mr. Valdez, can I ask you to take a look, please at the exhibit that is in your binder.  It's Government's Exhibit 2.

A.     (Witness complies.)

Q.     And this one we can publish because it has been admitted into evidence.  So you could look at your screen if that is easier.

A.     Um-hmm.

Q.     Are these documents from the Red Roof Inn?

A.     Yes.

Q.     Who booked the room at the Red Roof Inn?

A.     I did.

Q.     This address here, whose address?  Is that, you know, under your name?

A.     Yes, that is my address.

Q.     Let's talk about Room 124.  You know, if you were to page through these, several times you stayed in Room 124. Why was that?

A.     Well, according to Pedrito, he wanted easy access. Room 124 is right there, right next to the parking lot.  It

Valdez - direct

was the view, you could see the truck from there.

Q.      Why was it important to see the truck?

A.      It had the drugs in it.

Q.      So let's start with page 1 here of this document, Mr. Valdez.

         According to this hotel bill, when did you stay at the Red Roof Inn?

A.      We arrived December 14th, 2016.

Q.      And is the departure date right there, December 19th?

A.      Yes, December 19th.

Q.      And is this accurate that is when you stayed at the hotel?

A.      Correct.

Q.      All right.  So let's turn to page 3, please.

         Do the same exercise here.  It's your name and address; right?

A.      Yes.

Q.      And you stayed in Room 124?

A.      Room 124.  This was the second trip.

Q.      And what are the dates for this trip?

A.      January 27th of 2017.

Q.      And when was the departure date?

A.      The departure date was the 7th of February.

Q.      And again, is this accurate, this is when you stayed at the Red Roof Inn?

Valdez - direct

A.      Yes.

Q.      Let's turn to page 7, please.

        And you might want to look at pages 7 and 8 together with respect to the March trip.  Again, your name and address is on here; right?

A.      Yes.

Q.      This time the room is 230.  What is that all about?

A.      Right.  So when we got there, 124 wasn't available. There was some guests in it, so we had no choice but to take Room 230 at the time.

Q.      And where was Room 230, was it on the first floor?

A.      It was on the second floor.

Q.      Now this first page, page 7, indicates a stay there from the 9th until the 10th.  Did you only stay one night?

A.      Yes.

Q.      On this bill?

A.      Right.  I think that's why the day after that is when Room 124 was available.

Q.      Well, if you could turn the page.

        The next page reflects a stay from the 10th to the 13th?

A.      Yes, correct.

Q.      And this one says Room 230 as well, but it's your memory that you got moved down to 124?

A.      Yes.  I think -- obviously, we stayed at 230.

521

Valdez - direct

Q.    Okay.  If you could please turn to page 9.  And by the way, let me ask you the same question.  We got the night of the 9th, and on this bill the 10th, 11th, 12th.  Is that accurate?

A.    Yes.

Q.    That's when you stayed here in Delaware?

A.    Yes.

Q.    All right.  So let's turn to page 9 now.  Is this the final time you stayed at the Red Roof Inn?

A.    This is the final time, yes.  You're right.

Q.    And this is the night of May 5th and 6th?

A.    Right, yes.

Q.    Did you spend the night of May 6th at the Red Roof Inn?

A.    We did not.

Q.    Where were you?

A.    We were in jail.

Q.    And for this trip, what room did you stay in?

A.    124.

Q.    Each of the times that you came --

        MS. WELSH:  We can take that down now.  Thank you.

BY MS. WELSH:

Q.    Each of the times that you came from California to Delaware to deliver the cocaine, did you always drive the

same vehicle?

A.    We drove the same vehicle, yes.

Q.    Which vehicle was that?

A.    The 2010 Dodge Ram 3500 diesel.

Q.    The white truck?

A.    Yes.

Q.    Each time, what was in the back of the truck?

A.    Cocaine.

Q.    What else?

A.    The gas tanks, all the tools, yes.

Q.    All right.  So that December 2016 trip, how many kilograms of cocaine did you bring in these tanks?

A.    December it was 20 kilos.

Q.    How about January of 2017?

A.    It was 20 kilos.

Q.    What about March?

A.    March was 20 kilos.

Q.    And then what about May?

A.    May we were only able to get 17 kilos.

Q.    Why not 20?

A.    Well, apparently, according to Flaco, he was short. He didn't have the inventory and he was -- he only had 17, so that's when Frederico just decided to bring the 17 that we had.

Q.    How did you find out that Flaco was short?

A.      Because he told us when we got to the hotel.

Q.      And was Camberos satisfied with the number of kilograms that you were bringing?

A.      No.

Q.      Do you know how much each kilogram of cocaine was going to be sold for to the defendant?

A.      I was, I was told -- my first trip, Camberos and I were talking, and we were talking about, you know, how many trips we were going to have and all the money he was going to make, and in that conversation he mentioned that the deal lows were being sold for $28,100 per kilo.

Q.      Now, Mr. Valdez, it has been -- I mean for the first trip it has been nearly five years since these conversations.  How do you remember that number, 28,100?

A.      I don't know.  It just seemed odd when I was driving. I remember him saying the 28,100 and it sounded more like a retail price versus a cocaine price, so it just stuck.  It just stuck.  100, why the 100?

Q.      What do you mean?  It sounded like a price a store would charge?

A.      Yes.

Q.      Because of the 100?

A.      Because of the 100, correct.

Q.      When you made that first trip in December, did you -- did you meet the person to whom you were going to bring

Valdez - direct

cocaine?

A.      Yes.

Q.      The defendant?

A.      Yes.

Q.      Was that the first time you met the defendant?

A.      That was the first time I met.

Q.      When did you meet the defendant on that trip, that December trip?

A.      We met on the next day after we arrived.

Q.      Where?

A.      At the Red Roof Inn outside of Room 124.

Q.      And what were the circumstances under which you met him?

A.      Well, so he arrived.  Camberos was in the room with me and he got up.  He said, hey, you know, let's go.  I went along.

Q.      And where did you go?

A.      We just went into the defendant's vehicle at the time.  He was just parked outside.

Q.      All right.  And in that vehicle, did you participate in a conversation?

A.      I wouldn't say participate.  It more was just listening.  I was in the back seat just minding my own business.

Q.      And did you overhear the conversation?

525

Valdez - direct

A.      Yes.

Q.      What was that conversation?

A.      The conversation went something along of there was some money that was, that was stolen or there was some money missing.

Q.      Did Mr. Camberos ask the defendant for anything during that conversation?  Let me ask you this:  Did you know where you guys were going to go to unload the tanks of cocaine?

A.      Yes.

Q.      All right.  How did you find out where you were supposed to go?

A.      We were told to go to a rental place that he had to off-load the cocaine, crack open the tanks.  It was going to get pretty, pretty loud, so we -- like an enclosed space.

Q.      Did the defendant provide an enclosed space?

A.      Yes.

Q.      During that conversation in December, the morning after you first arrived, was the plan to drive your white truck around while you were in Delaware?

A.      No, no.  The plan was to get the vehicle.  Pedrito didn't want to drive the big work truck around being that it would look very suspicious, and so we -- he asked the defendant to, you know, to loan us a vehicle.

Q.      And did he?

Valdez - direct

A.    Yes, yes.  He provided us with a rental truck, another Dodge Ram.

Q.    What color was the rental truck?

A.    A black truck.

Q.    Was that truck rented by the defendant every time that you stayed in Delaware?

A.    Every time, yes.

Q.    Was the defendant the person who actually rented the truck every time, like used his information to rent the truck?  Do you know?

A.    Yes.  I remember one time out of the four trips there was a girl, my understanding his wife or partner was there signing all the rental agreements when we arrived.

Q.    And was that at a rental car company?

A.    Yes.

Q.    Do you remember what company?

A.    I don't.  I don't recollect.

Q.    And then so it was the black truck that you used to drive around?

A.    Every time it was the same black truck.  They only had one, one truck.

Q.    Did you have to move the tanks between the white and the black truck?

A.    Yes.

Q.    Let me ask you this, having moved these around the

last couple of days:  Were they heavy?

A.      They were heavy.

Q.      What was that process like, taking them out of the truck?

A.      It was exhausting.  It was pretty cold I remember.  Yes, it was pretty exhausting.

Q.      All right.  So after you got -- did you get the rental truck usually in the beginning of your trip or near the end?

A.      We got it right that morning after we slept overnight and were ready to go.

Q.      And after getting the rental truck, what did you do next?

A.      Well, we would go and crack open the tanks and get the cocaine out so we can get it ready for the defendant.

Q.      And did you always go to the same place to crack open the tanks?

A.      The first time was a rental, some rental house, and then the other two times they were at different locations.

Q.      All right.  Where was that different location?  You don't have to be specific.  Do you know what time?

A.      I just remember it was on Marshall Street.

Q.      Let's talk about the first trip in December.  Did you and Mr. Camberos go to that rental property and do all of

Valdez - direct

this work of taking the cocaine out of the tanks?  Did you do that all by yourself or did someone else show up at some point?

A.     No.  We did that all by ourselves, yes.

Q.     At some point did the defendant come to that house?

A.     Yes.  The defendant showed up to pick up the cocaine and drop off the money that we were getting paid for.

Q.     And in what did he drop off the money?

A.     A big duffel bag, black duffel bag.

Q.     What did you see the defendant do with the cocaine?

A.     Put it in his vehicle.

Q.     That was the first trip?

A.     That was the first trip, yes, at the rental unit.

Q.     The other trips where you went to Marshall, I think you said?

A.     Yes.

Q.     Did you also see the defendant during those trips?

A.     Every time, yes.

Q.     Where did you see the defendant?

A.     So the second trip to Marshall Street.  So we would show up, you know, with the tanks.  We would get the cocaine out and then place the cocaine in what would be, like, a hamper-type like vertical and then just it in there, put some clothes, some dirty stuff over it, some umbrellas and stuff over it to kind of hide it, I guess.  And then we

529

Valdez - direct

would leave and there was a schedule between the defendant and Pedrito.  There was a scheduled time to meet, get the cocaine, get the money at a later time.

Q.      So every one of these trips, let's take May.  Every one of these trips, the cocaine went to whom?

A.      To the defendant.

Q.      And every time, who was it that gave you cash?

A.      The defendant.

Q.      These properties that you went to to unload the cocaine, how did you get into the properties?  What did you use to get inside?

A.      The first property we were given keys.

Q.      Marshall Street?

A.      This is the rental property on Marshall Street.  We were given keys each time to open up the back, the back door.

Q.      On Marshall Street, did you do the work -- what part of the house did you do the work in?

A.      The garage.

Q.      All right.

A.      The garage.

Q.      How did you get into the garage on Marshall Street?

A.      Well, again, the first few trips or the only trips, I guess, we were given keys to open up the back door of the garage, to open up the front garage door.  It's pretty

heavy.  Big garage door to back in the truck.

Q.      So when you would go to the rental property or Marshall Street, wherever you were going to empty the kilos out, after the kilos got taken out, did anything get put back into the tanks?

A.      Money after it was counted and shrink wrapped, put in the plastic shrink wrapping.

Q.      So there was a delay between when the kilos came out and the money went in?

A.      Yes.  There was a few days.  Sometimes it would take more being -- the defendant didn't have the full payment, so we had to wait around to get the full payment to load it in the tanks and close up the tanks.

Q.      Were there times where you met with the defendant more than once to get money for that reason?

A.      Yes.

Q.      And what do you remember about how long it would take for the money to come to be complete?

A.      A couple days.  A day or two at the most, yeah.

Q.      After the defendant brought the money -- cash. Right?  I'm saying money.  It was cash.

A.      Yes.

Q.      Who counted it?

A.      Pedrito.

Q.      Was that an easy process?

A.       From the looks of it, it was long.  I mean, I was pretty much there standing around bringing him coffee, bringing him food, bringing him whatever he needed.

Q.       Where did the money counting occur?

A.       124.

Q.       Or whatever room you were staying in?

A.       Correct.

Q.       Did he count it by hand or did he use tools?

A.       No, no.  The defendant was bringing another, another duffel bag, and in it it would have everything you would need to count money -- a money counter, a vacuum sealer, plastic with rubber bands on it.

Q.       Besides the defendant, was there anyone else who ever brought you and Mr. Camberos some of the cocaine money?

A.       One time I remember we were waiting on the last of the payments and I believe his wife was the one that brought us the money.

Q.       Did it appear to you to be the same woman that rented the truck?

A.       Yes, it was the same woman, correct.

Q.       Mr. Valdez, could you please open your witness binder to Exhibit 1301.  Got it?

A.       Yes.

Q.       Do you recognize that?

A.       Yes.  That's the Marshall Street house.

Valdez - direct

Q.    The picture of the Marshall Street house?

A.    Yes.

Q.    Is that a fair and accurate representation of what the Marshall Street house like when you went to visit it?

A.    Yes.

MS. WELSH:  Your Honor, I move for admission of Exhibit 1301.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-112 was admitted into evidence.)

MS. WELSH:  If we can display it, please.

BY MS. WELSH:

Q.    I know you just said it for authentication purposes, but what is this a picture of?

A.    So this is the Marshall Street house.

Q.    Okay.  And during these trips, what did you do inside this house?

A.    Well, we offloaded the cocaine and loaded the money back.  There is a new garage door.

Q.    Did you just say by the time this picture was taken, there was a new garage door?

A.    That's the new garage door, yes.

Q.    All right.

MS. WELSH:  You can take that down.

BY MS. WELSH:

Valdez - direct

Q.      Mr. Valdez, did you ever take any pictures inside of this Marshall Street house during your trip?

A.      Yes, I did.

Q.      I'd like you to please open your binder to Exhibit 1198 and 1199.  All right.  Those are a pair of pictures; right?

A.      Yes.

Q.      Let's focus on 1198.  Do you recognize that?

A.      Yes.

Q.      What is it?

A.      That's the Marshall Street kitchen.

Q.      Is that a picture that you took?

A.      Yes.

Q.      Is it a true and correct copy of the picture that you took?

A.      Yes.

             MS. WELSH:  Your Honor, I move to admit Exhibit 1198.

             THE COURT:  Is there any objection?

             MS. CHAVAR:  No objection.

             THE COURT:  It's admitted.

             (GX-1198 was admitted into evidence.)

BY MS. WELSH:

Q.      Okay.  Let's put up 1198 first.  What's this a picture of?

534

Valdez - direct

A.        That's a picture of me.

Q.        Where were you when you took this picture?

A.        At the Marshall Street.

Q.        When I say you took it, somebody else must have been holding the camera?

A.        Yes.  Pedrito was the one that took the picture.

Q.        But it was on your phone?

A.        Yes.

Q.        What are you doing?

A.        Just moving around.  You know, I had nothing to do, so I figured I'd just take a picture, make it look like I was working.

Q.        Was the house under construction when you were there?

A.        Yes.

Q.        All right.  What about -- could you take a look at Government Exhibit 1199, please.  This one is already in evidence.

          What is this a picture of?

A.        It's the same kitchen, at Marshall Street.

Q.        Okay.  If your phone data reflects these photos were taken January 28th, 2017, does that sound right to you?

A.        Yes.

          MS. WELSH:  All right.  You can take that down.

BY MS. WELSH:

Q.        Mr. Valdez, generally, during these four trips when

you were emptying as a group, you and Mr. Camberos were emptying the kilos out of the tank, who usually did that work between the two of you?

A.    Mostly Camberos.

Q.    Were you present?

A.    I was there.  I was there present, yes.  Camberos wanted to do the work.  He was very adamant about or very meticulous about opening, cracking the bottom of the tanks, so we wouldn't damage the opening.

Q.    Did you ever take a picture of Mr. Camberos doing that work?

A.    I did, yes.

Q.    If you could please turn to Government Exhibit 1262.

A.    (Witness complies.)

          MS. WELSH:  And this one is in evidence so we can publish this.

BY MS. WELSH:

Q.    Mr. Valdez, what is this a picture of?  You can look at your screen if you would like.

          What is this a picture of?

A.    This is a picture of the inside of the garage on Marshall Street.

Q.    And who is that man?

A.    That is Pedrito Camberos, and that is the rental trunk.  And right there, we are doing, I think this was

after we loaded up the money and he was, you can see the,

the top portion of the welding machine.  So he was welding

the top back on.  I should say the bottoms of the tanks back

on.

Q.    And you took this photograph?

A.    I did.

Q.    With your phone?

A.    I did, yes.

Q.    If your phone reflects the photo was taken on

March 11th around 8:00 p.m., does that sound right to you?

A.    Right, correct.

Q.    What equipment was he using to weld the tank shut?

A.    This is the Miller welding machine.

Q.    The one that you purchased?

A.    Yes.

Q.    All right.  So he is kind of doing the last step in

the process here; right?  He is closing the tanks?

A.    This is it.  He is closing up the tanks, and I was

actually excited.  That's why I took that picture because

that meant we were ready to go back to California.

Q.    So after, after the money was put in the tanks and

they were welded shut, what happened to the rental truck?

A.    So what happened was we would go back to the hotel,

figure out a way to get back the rental truck.  Most of the

time, we were just told by the defendant to leave the keys

Valdez - direct

up front at the rental place, and we just got ready for the trip to drive back to California.

Q.    Mr. Valdez, let's talk to you about a couple more photographs here.  Really just one.  If you could turn in your binder to Exhibit 1208.

A.    Um-hmm.

MS. WELSH:  And this one had has been admitted into evidence so we can publish it.

BY MS. WELSH:

Q.    Do you recognize this photograph?

A.    I do, yes.

Q.    Who is that in the photo?

A.    That's me.

Q.    You're the one that is kneeling down; right?

A.    That's me, yes.  Pedrito took that picture.

Q.    Where are you?

A.    This in Philadelphia.  I was able to convince him -- so the deal was every time you drive into Delaware, we were to stay in the hotel room the entire time, so we wouldn't be seen or -- yes, we were only here on business.  We weren't here to do any kind of touring or anything.

But this is I believe the second trip.  I convinced him otherwise and he said, you know what, let's take a trip out to Philly.  And there we are.

Q.    Is this, is this on the art museum stairs?

Valdez - direct

A.      Yes.  Yes, it is.

Q.      In Philadelphia?

A.      Yes.

Q.      This -- if the data from your phone reflects this photo was taken on March 10th, 2017, does that seem right to you?

A.      That's correct.  The third trip out.

Q.      I misspoke.  If the data is January 30th, 2017, does that seem right to you?

A.      Yes.

Q.      Are you wearing the same shirt that you were wearing in the photographs that we just looked at?

A.      I think so, yes.  Yes.

Q.      I was at the wrong place on my outline.  Let's turn to Exhibit 1257, please.

A.      (Witness complies.)

Q.      Here is our March 10th photograph.  Do you recognize this photo?

A.      I do, yes.

Q.      Was it taken on your phone?

A.      It was taken on my phone at the Red Roof Inn, yes.

Q.      Who is that in the picture?

A.      That's me in the picture.  And that's the, that's the Dodge Ram in the back.

Q.      Are you on the second floor of the hotel?

Valdez - direct

A.      That is the second floor, Room 230, yes.

Q.      What are you pointing out is that the white pickup truck is on the right-hand side of the picture; right?

A.      Correct.

Q.      At this point, had you not put the stickers on the back yet?

A.      No.  This was in March, so it was -- I don't recall which trip this was, but one of the trips we didn't have the decals on it.

Q.      All right.  So you made your final trip -- oh, let me ask you this.  Did you ever have trouble with that truck, that white truck, mechanical problems?

A.      Yes.  So when we bought it, the owner said there was some problems with the transmission and he had fixed it. But apparently he didn't, so it didn't cause any, any problems on the way up to Delaware, but when we were loaded up ready to go, drive back to California was when we had a little issue with the transmission.

Q.      Right.  Could you please turn in your binder to Exhibit 1737?

A.      (Witness complies.)

Q.      Do you recognize that document?

A.      Yes, I do.

Q.      Is that a repair bill from a dealership?

A.      This is a repair bill.  Yes, this is for the truck.

Valdez - direct

Q.     Does this look like a true and correct copy of the bill you got from the dealership for work done on the truck?

A.     That's correct.

        MS. WELSH:  Your Honor, I move to admit Exhibit 1737.

        THE COURT:  It's admitted.

        (GX-1737 was admitted into evidence.)

BY MS. WELSH:

Q.     What is the date on this repair?

A.     The date of February 6th of 2017.

Q.     So this would be during the second trip to Delaware?

A.     This would be the second trip, yes.

Q.     Near the beginning of the trip or near the end?

A.     This is at the end.  At the end.  We were headed back already.  And I turned the truck on to warm it up and get ready and sure enough it started rattling and making all sorts of noises.  So we were not going to be driving that.

Q.     And the address on this bill is in Thornton, Colorado.  Why is that?

A.     That is the address that Pedrito's family members gave me to put on my -- the state-issued ID I had.  So it's in the Denver area.

        MS. WELSH:  You can put that back down.

BY MS. WELSH:

Q.     Mr. Valdez, when did you make your final trip to

Valdez - direct

Delaware?

A.      The final trip was in May.  May 5th, we got here.

Q.      Were you there when the cocaine was loaded into the tanks in May?

A.      Yes.

Q.      Did you folks, you and Mr. Camberos, did you make an overnight stop on the way here in Ohio?

A.      We did.  We drove for about, oh, I think like two and-a-half days.  We were pretty tired.  I was doing most of the driving at this time.  I would say I was driving.  It was raining there as we were driving through somewhere in Dayton, Ohio, somewhere over there.  And he was tired, I was tired and the windshields were not working properly, so I pulled over and we stopped.  We stopped overnight.

Q.      Could you, please -- I know you are all the way in the back of the binder but could you turn all the way to the front to Government Exhibit 1, please.

A.      (Witness complies.)  Yes.

Q.      What does this appear to be, Mr. Valdez?

A.      This is a, a Holiday Inn Express room bill.

Q.      Is that for your hotel stay?

A.      This is for May 6th.  Yes.  So this is the night right before we came in.

Q.      Is that the bill for your hotel stay?

A.      This is the bill for my hotel stay, yes.

Valdez - direct

MS. WELSH:  Your Honor, I move to admit Government's Exhibit 1 into evidence.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-1 was admitted into evidence.)

BY MS. WELSH:

Q.    Mr. Valdez, here we have got a Denver, Colorado address.  What address is that?

A.    This is the same one.  9595 Pecos Street.  It's the same address.

I think this is -- the reception, we had to type it in, but it's actually Thornton, Colorado.

Q.    And is this for the night of May 4th and you departed on May 5th?

A.    Exactly, yes, because we drove all day May 5th to make it into Delaware.

MS. WELSH:  Okay.  You can take it down.

BY MS. WELSH:

Q.    So on this several-day trip out here in May, did Mr. Camberos talk to you about this cocaine delivery at all?

A.    Yeah.  Well, we would talk every time, every time we were driving up here.  We'd talk about the logistics, you know, what we were waiting on, if payment wasn't full, we were going wait more days and it was just talk about what was going on.

Valdez - direct

Q.    Did you hear Mr. Camberos talking on the phone?

A.    Yes.  So on the last trip, yeah, he got on the phone. Yes.

Q.    What was he saying?

        MS. CHAVAR:  Objection.  Hearsay.

        THE COURT:  Do you want to confer?

        MS. WELSH:  Yes.

        (Counsel confer.)

        MS. WELSH:  All right.  We're going resolve this through rephrasing.

        THE COURT:  Okay.

BY MS. WELSH:

Q.    So, Mr. Valdez, let's kind of go step by step here and only answer the question that I ask you; okay?

A.    Okay.

Q.    Did you hear Mr. Camberos talking on the phone?

A.    Yes.

Q.    Did you have an understanding based on what he told you about that conversation of who he was talking to on the phone?

A.    Yes.

Q.    Who was he talking to on the phone?

A.    The defendant.

Q.    All right.  And the subject of their conversation -- without telling me what was said, was the subject of their

544

Valdez - direct

conversation about the drug delivery?

A.     Yes.

MS. WELSH:  So, Your Honor ...

THE COURT:  Do you have another question?

MS. WELSH:  I was just going to confer and see whether we had an objection.

THE COURT:  All right.

(Counsel confer.)

MS. CHAVAR:  We're good.

MS. WELSH:  I think we're good, Your Honor.

MS. CHAVAR:  No objection, Your Honor.

THE COURT:  Okay.  Well, there is no pending question, but let's see what the next question is.

MS. WELSH:  Sure.  I don't expect an objection.

BY MS. WELSH:

Q.     So that phone conversation -- without telling me what the person on the other end of the phone said, what did you hear Mr. Camberos say during that phone call?

A.     That we only had 17 kilograms at the time.

Q.     Did he use the word "kilograms?"

A.     No.

Q.     What word did he --

A.     No, he used a code name.  He called them like table, like the tables you use, like you buy at, like, a store. Like folding tables is what he called.

Valdez - direct

Q.    Like furniture-type of tables?

A.    Yes.

Q.    And that he only had 17?

A.    Correct.

Q.    Okay.  All right.  So, Mr. Valdez, did you ultimately arrive at the Red Roof Inn for that last trip in May?

A.    We did, yes.

Q.    And did you arrive on the night of the 5th of May?

A.    We arrived on the night of the 5th, yes.

Q.    The next morning, who did you meet with?

A.    The next morning, we met with the defendant.  He arrived there, I don't know, about 8:00 in the morning or so.

Q.    When he arrived there, what did you do?

A.    Well, pretty much the same -- the same thing.  Let's go.  That let's go was for me, like, I don't see why I have to go, but here I go.

Q.    And so where did you go?

A.    So we went and got in the back of the defendant's pickup truck at the time.

Q.    What did the defendant do?

A.    So he was in the driver's side.  Frederico was in the passenger side.  I was in the back.  I was pretty much just minding my own business and they started talking and then they interrupted the conversation and told me pretty much to

Valdez - direct

get out, go back to the room.

Q.    Did the defendant pick you up in his truck and go straight to a parking spot?

A.    Yes.  Well, so we got picked up and then we drove around the parking lot in the Red Roof Inn area.  We came back around.  That's where he parked what would be two parking spaces, three parking spaces where my truck was at.

Q.    And at that point, were you a participant or witness to a conversation with the defendant?

A.    There was a conversation and that's when I saw what would be, like, a Post-It note handed to the defendant.  And it was -- I don't really -- or wasn't paying attention to what they were saying about the Post-It note.  So then after that, I was told to go back to the vehicle, go back to the room.

Q.    Let me do it this way.  Did you overhear any conversation about where you were supposed to go while you were meeting in the truck?  Did you know where you were supposed to go to unload the cocaine?

A.    Yes.  We had already arranged that it was going to be at the -- at the Marshall Street.  When we were inside of the pickup truck, he was given the garage door opener, and I remember being excited, because I was like, finally, we find a garage door, so we didn't have to pick up the big heavy one.

Valdez - direct

Q.      The big heavy garage door, you didn't have to lift it manually?

A.      Yes.

Q.      All right.  Mr. Valdez, let's display Exhibit 1050, please, which has already been admitted into evidence.

Did you recognize what is displayed in Government's Exhibit 1050?

A.      Yes.

Q.      What is it?

A.      This is a Post-It notepad that came from my truck, the white Dodge.

Q.      From your truck into the room?

A.      Into the room, yes.

Q.      Okay.

MS. WELSH:  You can take it down now.  Thank you.

BY MS. WELSH:

Q.      While you and Mr. Camberos and the defendant were having that conversation in the truck, where were the kilos of cocaine?

A.      They were in the back of the white Dodge at the time.

Q.      After you -- first of all, what did you get out of the truck with?  What were you holding?

A.      The defendant's truck?

Q.      Yes.

A.      Yes.  So when I was told to get out of the truck, I was told -- and so Frederico was back towards me.  He said, hey, I've got to talk to this guy real quick.  Can you go back to the room?  He said there's two duffel bags in the back seat.  Can you take one of them.  So I grabbed the one closest to me.  It was fairly heavy.  So he said no, no, no, not that one, take the other one.  So I grabbed the next one over, and sure enough, it was pretty empty, and it was five pounds, four pounds, five pounds.  It was pretty light compared to the other one.

Q.      After you brought -- did you bring the bag back into Room 24?

A.      Yes.  I brought the bag back into Room 24 and just waited.

Q.      We both said 24.  I think we meant 124?

A.      Correct.

Q.      After you got the bag back into 124, what happened?

A.      I waited around.  I remember the cleaning crew was walking around close to our room.  I was debating whether I should ask her to clean our room now because I remember Pedrito saying, as soon as we get the money, I've got to start counting.  I want to get back to California.  So I was debating that in my head and so I finally got the ladies to clean the room real quick while Camberos was in -- with the defendant.

Q.    So what happened next?

A.    Well, right after is when we got arrested.

Q.    Did law enforcement come into the room?

A.    Yes.

Q.    Did you tell them where the cocaine was?

A.    I did, yes.

Q.    Did you go to Marshall Street that day?

A.    We did not, no.

Q.    Okay.  Did you take law enforcement to Marshall Street that day?

A.    I did, yes.

Q.    To show them where you stored the cocaine?

A.    To show them, yes, where the garage door opener belonged to.

Q.    When you and Mr. Camberos made your trips here to Delaware, was there anyone else who you met with besides the defendant and perhaps his wife?

A.    No, there was nobody else.

Q.    Was there anyone else to whom you ever delivered cocaine?

A.    No.

Q.    A clarifying point.  When you were recounting conversations where Frederico, Camberos, is speaking, what language does he speak?

A.    He speaks Spanish.

550

Valdez - cross

Q.    Does he speak English?

A.    No, he does not.

MS. WELSH:  That's all.

THE COURT:  Okay.  We're going to have a break.

Ladies and gentlemen, during the recess, no talking about the case.  We'll get you back here shortly.

(The jury was excused for a short recess.)

THE COURT:  Okay.  We'll be in recess.

(Short recess taken.)

*    *    *

(Proceedings resumed after the short recess.)

THE COURT:  I believe we're all ready to roll. Let's bring the jury in.

(The jury entered the courtroom.)

THE COURT:  Welcome back.  We're ready to proceed.

Ms. Chavar, cross-examination.

MS. CHAVAR:  Thank you.

CROSS-EXAMINATION

BY MS. CHAVAR:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Okay.  Mr. Valdez, you testified that prior to getting involved in these cross country trips, you did flooring?

A.    Correct.

Q.    How long were you doing that?

A.    Quite a few years.  My family is in the construction field, so I've learned to do tiling, I'm going to say until --

Q.    Can you approximate?

A.    The year 2000 or so.

Q.    For all of 2000?

A.    Something like that, yes.

Q.    I missed it.  You said you lived in Los Angeles all your life?

A.    Yes.

Q.    All right.  And you did flooring until the 2000s, early 2000s, and then was your testimony that you met Mr. Valdez, I guess, in -- I'm sorry, Mr. Camberos in 2016?

A.    Correct.

Q.    So what were you doing in those 16 years that you weren't doing flooring?

A.    Well, I worked in the warehouse, working for staffing agencies, just random jobs.

Q.    So you did not have steady employment?

A.    I did not.

Q.    For 16 years?

A.    Well, yeah, I had steady employment in those

16 years, just around the time when this happened.

Q.   I asked you in the 16 years, because you said you stopped doing flooring in the early 2000s?

A.   Right.

Q.   Okay.  You did not have steady employment?

A.   I did.

Q.   You did have steady employment?  That's what you are saying now?

A.   Yes.

Q.   Okay.  Well, what was that steady employment?

A.   Well, I was working for staffing agencies and working for warehouses.

Q.   Through a temporary agency?

A.   Yes.

Q.   Okay.  And they don't keep you busy every week; right?

A.   Correct.

Q.   All right.  Camberos, his full name is Mohammed Aviles Camberos; correct?

A.   Correct.

Q.   But you called him Frederico, by his street name?

A.   Correct.

Q.   And I believe you knew him only as Frederico until the time you were arrested?

A.   That's correct.

Valdez - cross

Q.      So when you were smuggling people from Mexico into California, was that during that 16 years that you didn't have steady -- well, that you worked through a temporary agency?

A.      Yes.

Q.      Okay.  Was that in relation to Acosta Salazar?  Was that something you did for him?

A.      I'm sorry.  Who?

Q.      Make sure I get the name right.  Acosta Salazar.  Is that something that you were doing with him?

A.      Yes.

Q.      And he is associated with the Mexican cartel; isn't that correct?

A.      Yes.

Q.      I think your testimony was that you only did that once?

A.      Correct, the human smuggling.

Q.      Right.  But you aborted it halfway through?

A.      Yes.

Q.      Okay.  Why?

A.      Well, so I was told to bring -- to pick up three adults.  It was early morning.  I remember it was raining and I was instructed to go through a checkpoint that was supposed to be closed at the time, but in those minutes of me driving through it, it opened up.

Valdez - cross

Well, I was pretty much set up.  If I was to drive through it with illegal immigrants in the car, I was going to get arrested.  I told them to get out of the vehicle.

Q.     Okay.  As I understand your testimony now, what you are saying is you didn't go through with it because you thought you were going to get caught?

A.     Correct.

Q.     Okay.  So just so I'm clear, it's not what you said earlier today, that you just didn't feel good about doing it?

A.     Well, I didn't feel good because I knew the checkpoint was open.  The border patrol agents were there.

Q.     I see.  So when you talked to Salazar about that, or Acosta Salazar, and you told him that you let those three people go because you thought you were going to get caught, how soon after did you -- did he ask you to do another trip?

A.     Well, we were going to wait, so his instructions were, well, go get a hotel near the San Diego area, which was close to the Mexico border, and just, just hang out. You know, wait a few hours and see if the checkpoint clears.

But I ended up just going back home and then a couple days later is when he called me up.  I was thinking it was for the human smuggling, and he said, you

Valdez - cross

know what, I want to -- I want to meet with you.  There's a barbecue on Saturday.

Q.     I'm going to stop you there for a minute because you're getting a little bit ahead of --

A.     I'm sorry.

Q.     No, that's okay.  I just don't want to get confused myself.

So I understand what you just said, is that after you let the three individuals out of your truck, you called Acosta Salazar?

A.     Yes.

Q.     And you told him what happened?

A.     Yes.

Q.     All right.  And then he told you, okay.  Go to a hotel room and sit tight and see if things clear up.  Is that what your testimony was?

A.     Yes.

Q.     Okay.  What were you supposed to do after -- if things cleared up, what was the purpose of waiting in that hotel room?

A.     Well, the checkpoint just randomly opened up, so there's no set time for the checkpoint to open.

Q.     All right.

A.     So at the time, the border patrol, they were checking every vehicle, but they don't do it --

Valdez - cross

Q.    I understand that.  But what was the purpose --

A.    The purpose.

Q.    -- of waiting in a hotel?

A.    So the checkpoint would close, would shut down, so I could come back and get the, the vehicles to pick them up.

Q.    But you happened to know?

A.    I told them to go back to the house where I picked them up at.

Q.    I see.  And they paid you, right?, to bring them across the border?

A.    No, I was going to get paid when I was done, when I was going to bring them into San Diego, which I didn't.

Q.    By the Mexican cartel.  The Sinaloa cartel?

A.    I don't know if he works for the cartel or not.

Q.    All right.  Did you just say that you didn't know whether he worked for the cartel or not?

A.    No, I don't.

          MS. CHAVAR:  Would you give me a moment, please?

          (Pause.)

BY MS. CHAVAR:

Q.    Okay.  So do you recall meeting with the government attorneys and your lawyer prior to coming here and testifying?

A.    Yes.

Q.    Okay.  And do you recall, during one of those

Valdez - cross

meetings, telling them that Acosta Salazar was a member of the Sinola -- I don't think I'm pronouncing that --

A.      Sinaloa.

Q.      Sinaloa cartel.  Do you remember that?

A.      I remember saying I thought he was a member of the Sinaloa cartel.  I couldn't confirm or deny that.  I thought.  It was just speculation.

Q.      And you said though that everybody works for Acosta Salazar; right?  Is that what you told them during that meeting?

A.      I'm not sure who everybody is.

            MS. CHAVAR:  May I approach, Your Honor?  I want to refresh his recollection.

            THE COURT:  You may.

            MS. CHAVAR:  Thank you.  I'm just going to show you some notes of that meeting and ask you if that refreshes your recollection.

            THE COURT:  I'm not sure how you will get there.

            MS. CHAVAR:  Yes, I don't know how I'm going to get there.

            THE COURT:  Do you happen to have a hard copy?

            (Counsel confer.)

            THE COURT:  If you have a hard copy, we can't pass it to the witness.

            MS. WELSH:  I have a hard copy.

Valdez - cross

(Counsel confer.)

BY MS. CHAVAR:

Q.     Now, when you met with the government attorneys and some law enforcement agent, and your attorney was present, was your understanding that they would be taking notes --

A.     Yes.

Q.     -- of the information you were giving them?

A.     Yes.

            MS. CHAVAR:  Okay.  May I approach now?  I'd like to show you the notes from one of those sessions.

            THE COURT:  Let's put it on the record.

            MS. CHAVAR:  I think I'll hand it to one of your deputies and they could --

            THE COURT:  You can do that, but put on the record what you are going to do.

            MS. CHAVAR:  I'm going to hand you the notes of one of the sessions that occurred in 2019.

            THE WITNESS:  Okay.

            MS. CHAVAR:  Okay?

            (The laptop is handed to the witness.)

BY MS. CHAVAR:

Q.     I'm going to ask you to read those silently to yourself --

A.     Okay.

Q.     -- to see if that refreshes your recollection.

Valdez - cross

THE COURT:  Just for the record --

MS. CHAVAR:  And I'll get that back from the deputy -- I'm sorry.

THE COURT:  Ms. Chavar, just so the record is clear, you handed us what appears to be some sort of portable electronic device, like an iPad and my deputy is showing it to Mr. Valdez.

THE WITNESS:  Okay.  I remember now.  Yes.

THE COURT:  And we're handing the laptop back to Ms. Chavar.

BY MS. CHAVAR:

Q.    Now, after reading those notes, does it refresh your recollection as to the meeting that you had on that day?

A.    Yes.

Q.    Okay.  Where you told then, meaning law enforcement and the prosecutor seated at the table here today, that Acosta Salazar is a member of the Sinaloa cartel and that everybody works for him?

A.    Yes.

Q.    Okay.  And by "everybody," you mean people commit crimes for him?

A.    Right.

Q.    And, in fact -- let me back up.

I think it was your testimony that you never had any involvement with drugs or drug trafficking; correct?

A.      Correct.

Q.      But you did with Acosta Salazar, didn't you?

A.      Well, the human smuggling side.  Not the drug trafficking.

Q.      I'm not sure what that has to do with drugs, unless the people, were they bringing drugs in?

A.      No.

Q.      Okay.  I'm talking about the time that you stored drugs for him, for Acosta Salazar or the Mexican cartel in, I guess it was your home?  Do you remember doing that?

A.      No, I don't.

Q.      You don't.  Okay.  I can pull that up.

        In fact, it was the paragraphs I just asked you to read.  Let me draw your attention again to paragraph 32 and 33 and -- which I have on my portable laptop, and with the Court's permission, I would ask to indulge.

        THE COURT:  Sure.

        MS. CHAVAR:  With the assistance of your deputy to show you these two paragraphs, 32 and 33 and ask you to read them slowly.

        THE COURT:  We're passing it back to the witness.

        THE WITNESS:  Okay.  So okay.  I remember now.  As stated, I --

BY MS. CHAVAR:

Valdez - cross

Q.      Wait.  Wait until I ask you a question?

A.      Okay.

Q.      Please.

        THE COURT:  We'll bring it back to you.

BY MS. CHAVAR:

Q.      And, and I'm getting the tablet back now from the court deputy?

A.      Yes.

Q.      So you have now re-read paragraphs 32 and 33; is that correct?

A.      Yes.

Q.      Does it refresh your recollection as to the time you stored drugs?

A.      Yes.

Q.      For the Mexican cartel?

A.      Yes.

Q.      Okay.  How many other times did you do that after that time?

A.      Just that one time.

Q.      Um-hmm.  Hmm, I see.

        Are you sure?

A.      Yes.

Q.      Was that before or after you were smuggling people from Mexico into California for the cartel?

A.      Yes, this is before.

Valdez - cross

Q.    It was before.  How much, how much longer before?

A.    It was months.

Q.    Months?

A.    Probably that same year.

Q.    Okay.  So Acosta Salazar comes to your house one day.  You didn't really know him that well at that point.  How old were you then?

A.    37.

Q.    Oh, you met him when you were seven years old?

A.    No, 37.

Q.    I didn't think that --

A.    Back in 2016, I was 37.

Q.    I think you misunderstood my question.  In what year was it that you stored drugs for Acosta Salazar or the Mexican cartel?

A.    2016.

Q.    Okay.  And it was cocaine; correct?

A.    Correct.

Q.    Okay.  And the quantity?

A.    I don't remember.  He gave me a box.

Q.    How big was the box?

A.    24 inches by 18.

Q.    Well, it was a U-Haul box; right?

A.    No, it was not a U-Haul box.

Q.    I could refresh your recollection again, but would it

Valdez - cross

be fair to say that it was a -- well, let me try my other question again.

How big was the box?

A.    I'm sorry?

Q.    How big was the box?

A.    About 2 feet by 2 feet by 10 inches.

Q.    Okay.  Was it sealed?

A.    Yes.

Q.    And it was heavy, wasn't it?

A.    Yes.

Q.    Is it fair to say that it was full?

A.    Yes.

Q.    With cocaine?

A.    Yes.

Q.    And that was in 2016 and you said months later is when you did the human trafficking?

A.    Correct.

Q.    And Salazar never came to you in between that time to ask you to do anything else?

A.    No.

Q.    That's your testimony?

A.    Yes.

Q.    When he came to your house that day and he asked to store those drugs for him, did he tell you that it was drugs in the box or did you ask him?

Valdez - cross

A.    I asked him.

Q.    And he didn't hesitate, right?, to tell you what it was?

A.    Right.

Q.    He didn't give you, like, any story about it.  He just said I need you to hold this for me and you said yes.

A.    Correct.

Q.    All right.  And then some time after that is when you met Pedrito?

A.    Correct.  Yes, months after that.

Q.    Did you meet him through Salazar?

A.    No.

Q.    Now, you testified that you were at a barbecue when you met him?

A.    Correct.

Q.    But in fact you had dinner with him and discussed and is when he asked you to take these drugs across the country; correct?

A.    It was the barbecue.

Q.    Okay.  So you don't remember, then, telling law enforcement --

A.    I, I -- we met at a restaurant.  We didn't have dinner.  We met outside the restaurant.

Q.    Okay.

A.    But we never had --

Q.       You told them that's when you met him, at this restaurant, and that's when he asked you to take these trips across the country?

A.       That's not correct.

Q.       Okay.  So it was -- so you were lying when you told them that in a proffer session?

A.       Well, when we met --

MS. WELSH:  Objection, Your Honor.

THE COURT:  Yes.

MS. WELSH:  I'm not sure that we established what he said at the proffer session.

THE COURT:  I'm not sure either, so I'll sustain --

MS. CHAVAR:  I can refresh his recollection.  I can show him the proffer notes.

THE COURT:  You are free to do that.

MS. CHAVAR:  Thank you for your patience.  I will pull this up in a minute.

BY MS. CHAVAR:

Q.       All right.  Okay.  I have a report prepared of a session on December 17th, 2019 electronically that I would like to show you again and direct your attention to paragraph 4.  This report is said to be a summary of the information you provided to law enforcement that day.

MS. CHAVAR:  I'm sorry.  I will come back to

Valdez - cross

that.

THE COURT:  Okay.

MS. CHAVAR:  Because I can't get my hands on that.  I keep losing the screen.  I apologize.

THE COURT:  If the government has a hard copy, that would help.

MS. WELSH:  We don't have a hard copy.  We're looking at electronic copies, too, Your Honor.

MS. CHAVAR:  It's great to be green until you need a piece of paper.

Okay.  If we could pull that up, please.

BY MS. CHAVAR:

Q.    Okay.  Let me put it to you this way.  Is it your testimony today that you met Camberos at a barbecue?

A.    Yes.  That's where I originally --

Q.    The first time, that's where you met him?

A.    Yes.

Q.    Okay.

A.    And then we met several times after that.  Once was at that restaurant, outside a restaurant.  We didn't have dinner.

Q.    Okay.  But he asked you at the barbecue if you wanted to take a trip across the country?

A.    Right.

Q.    Okay.  To deliver drugs?

Valdez - cross

A.      Correct.

Q.      Okay.  And is your testimony today that it was at a restaurant thereafter that you asked for details?

A.      I mean, we met several other times in person in other places to, you know, to hand over the cash or to give him directions on where to go, things like that, but at the barbecue was when we talked about the trip up here.

Q.      All right.  So during one of those meetings that you had after the barbecue, was that when you discussed buying you a truck?

A.      Yes.

Q.      All right.  And that's your truck; correct?

A.      Correct.

Q.      Okay.  So when you didn't use it to buy -- to drive across country, it was parked in your driveway?

A.      Yes.

Q.      Okay.  And you used it for personal reasons?

A.      Correct.

Q.      Correct?

A.      Yes.

Q.      Okay.  When did you buy it?

A.      Mid-December of 2016.

Q.      What were you driving before that truck?

A.      I was driving a 2002 Chevy Silverado that I used for work.

568

Valdez - cross

Q.      All right.  So it's your testimony then -- Silverado is a form of a truck, isn't it?

A.      It's a truck.

Q.      Yes.  So is it your testimony that you then bought another truck?

A.      Yes.

Q.      What year was the truck you bought, the white truck, the one that went across country?

A.      They were both white.  The one I drove across country was a 2010 Dodge.

Q.      What was the Silverado?

A.      2002.

Q.      Okay.  And it was your money used to buy that truck; correct?

A.      My truck?

Q.      The white truck, the truck that went cross country, you used your own money to pay for that truck; is that correct?

A.      Not the truck that I drove across country.

Q.      Whose money was it?

A.      It was Frederico's money.

Q.      So Frederico gave you money.  How much?

A.      $20,000.

Q.      To buy a truck that was your personal truck?  So basically, he bought you a truck?

Valdez - cross

A.      Yes, you could say that, yes.  Yes.

Q.      Well, I know I can say that, but it's the truth; right?  He bought you a truck?

A.      Yes.

Q.      All right.  So in addition to whatever money you testified to that you got for making these trips, you got a truck?

A.      Correct.

Q.      Okay.  Did Frederico go with you to Colorado to get the truck registered?

A.      Yes, he did.

Q.      Okay.  And when you were there, you had to get some kind of identification in order to register that truck in Colorado; is that correct?

A.      Correct, yes.

Q.      Okay.  What did you get?  What kind of identification?

A.      I.D.  State issued I.D.

Q.      How did you do that?

A.      Well, we went to Frederico's family's residence on Pecos Street and, you know, we talked to Flores and explained to him we wanted to use the address, and we got a bill from that address and we just took it over to the DMV department and I was able to tell them that this was the address I wanted to register my I.D. at.

570

Valdez - cross

Q.    So you were at Frederico's cousin's house?

A.    I don't know --

Q.    A family member?

A.    A family member.

Q.    And you told them that you wanted to use their address, their address?

A.    Yes.

Q.    To secure fake identification basically; is that right?

A.    Well, it wasn't fake.  It was my own state issued I.D.

Q.    But you don't live in Colorado.

A.    I don't.

Q.    And you don't live at 9595 Pecos Street, Thornton, Colorado?

A.    I do not.

Q.    You never did live there?

A.    I did not.

Q.    So it was fake?  It was a false I.D.; correct?

A.    False I.D. to me means you go out, you buy it from some random guy that makes illegal documents.  This is a state issued I.D.

Q.    I understand that that is your understanding of what a fake I.D. is, but legally, a fake I.D. is an I.D. that does not reflect the truth.  So you would agree with me the

Valdez - cross

legal, that as a legal definition, you had a fake I.D.  You secured an identification card that did not truthfully reflect where you lived?

A.      Correct.

Q.      Thank you.

        And you did that by taking a piece of mail that was delivered to 9595 Pecos Street; correct?

A.      Correct.

Q.      And you went down to the Department of Motor Vehicles.  Is that the department you went to?

A.      Yes.

Q.      All right.  And you showed it to an employee there and you said, this is my address.

A.      Correct.

Q.      Okay.  So you weren't truthful with that employee, were you?

A.      Correct.

Q.      Who is that letter addressed to?

A.      I don't remember.  I don't know.  I didn't know anybody who lived at that -- at that address.

Q.      All right.  So you would have shown that address and that piece of mail and the employee would have said, let's just -- let's just say it was John Smith, that it was mailed to John Smith.  Okay?

        That employee would have said to you, are

you John Smith, sir?  Do you remember being asked when you were there that day if you were the person on that mail?

A.      No.

Q.      Okay.

A.      I was not asked.

Q.      You were not asked?

A.      Correct.

Q.      So just told them that you were living at that address.  Did you tell them that you -- I'm sorry.  So you told them you were living at that address.  Did they ask you for how long?

A.      No.  I told them that I just moved up to Denver.

Q.      Okay.  Did they require any other form of identification for you to register that vehicle?

A.      Another state issued I.D.  In that case, I had my, my California I.D. and Social Security card.

Q.      Okay.  So you showed them your California I.D.  Did your California I.D. correctly reflect where you were living at that time in California?

A.      Yes.

Q.      All right.  I guess we'll take your word for that.  It's a guess.  And then you said, but here's where I just moved to?

A.      Correct.

Q.      Okay.  Were you able to register the car there that

Valdez - cross

day in that one transaction?

A.      In that one day, yes.  We did that, and then after, after I did the I.D. transaction, I went to get the registration, or the license plate and the paperwork, to get it registered at the -- for the Colorado, the State of Colorado.  I'm sorry.  Just the process of getting the tags.

Q.      Okay.  I understand.  Let me just make sure I understand the steps of the process.  Okay?

So after you went and you secured your identification that day, you then went and had to pick up the tag or the license plate?

A.      Yes.

Q.      Where did you go do that?

A.      Somewhere in Denver.  I don't recall.  I don't remember where.

Q.      Okay.  But a different place?

A.      Yes.

Q.      Than where you went to get your identification?

A.      Correct.

Q.      Okay.  And when you went there, you again showed this false identification?

A.      Well, I didn't have it at the time.  The State of Colorado doesn't issue the actual state I.D. at the time.

Q.      Okay.

A.      You get it through the mail.

Valdez - cross

Q.      What did you show that day to secure a license plate?

A.      My California I.D.

Q.      Your California I.D.?

A.      Yes.  But at the time I showed the receipt from the DMV.

Q.      I see.  I see.

A.      Stating that I had the new address.

Q.      So you didn't have that receipt showing that if you had a new Colorado address for the fake identification, they would not have given you that plate on your California I.D.; correct?

A.      That's correct.

Q.      All right.  Then what?  What was the next step?

A.      After that is when we went to open up the bank account.  I remember it was downtown Denver.  I believe it to be a Wells Fargo bank.  Go in and ask to open up a bank account.

        What we wanted was to reflect the name on the truck, the specific home flooring name on the side of the pickup, so the fictitious name on the bank account was the same as the name on the pickup.

Q.      I see.  I see.  So when you bought the truck -- you saved me a question.  You bought the truck.  Those decals were already on it?

A.      They were not, no.

Valdez - cross

Q.      Oh, so you put those decals on it?

A.      Yes.

Q.      And you just came up with that name?

A.      Pacific Home Contractors.

Q.      Yes.

A.      Yes.

Q.      Where did you get the decals?

A.      The decals were bought in Los Angeles, California.

Q.      So did you open the bank account in Colorado when you were there to buy the truck or did you go back there a second time?

A.      No.  So I went to Colorado to get the -- to get it registered, to get the bank account.  I had already the name in my mind as to what I wanted to call the contracting name or the, you know, the business name.

Q.      Okay.

A.      So afterwards, after we were done in Colorado is when we drove back to California is when I bought the decal.

Q.      Okay.  So then if I understand your testimony, what you are telling me is before you even bought the truck, you had thought to put decals on it representing some name of the business?

A.      Well, I kind of had planned to do that on my other truck.  Since this was more of a work truck than my other truck, so I put it on, on this truck.

Q.      I want to stop you because I'm a little confused.

A.      All right.

Q.      When you were -- I mean, your testimony was that you got money from Camberos to buy a truck initially for the purpose of driving cross country with cocaine in it, which we also learned today is your personal truck and bought for you, but you had thought to put stickers on the truck that you didn't know at the time was going to be given to you, gifted to you?

A.      No.  I'm sorry.

        MS. WELSH:  I object to the form of the question.  I think that is a compound question.

        THE COURT:  It was a very long question.

        MS. CHAVAR:  I'm sorry.  It was.  It was.  Let me break that down.

        THE COURT:  Ask a single question.

        MS. CHAVAR:  Yes, okay.

BY MS. CHAVAR:

Q.      You had already been formulating names for the decals that you were going to put on the truck?

A.      Yes.  You've got to remember, I already had another truck prior to this Dodge Ram.  The other truck was a Chevy. That is the one I was intending to put the decals on.

Q.      Okay.

A.      There are two trucks.

Valdez - cross

Q.      Yes, I understand that, but the decals --

A.      Were on the Dodge Ram, not the pickup.

Q.      Yes.  Excuse me.  One moment.  But the decals on that truck that you drove -- well, remind me what the decals said on the truck that you drove cross country.

A.      Pacific Home Contractors.

Q.      That's not a business you ever owned; is that correct?

A.      No.

Q.      Okay.  So you were telling me you were going to go to the bank.  You went to the bank and you were opening an account in the name of this Pacific Homes?

A.      Yes.

Q.      That you said was a fictitious name?

A.      Fictitious name, correct.

Q.      Why did you want to have a bank account in the same name as this fictitious company that you put on the truck?

A.      So what we wanted was to have some kind of documentation on the Dodge Ram in case I would get pulled over that yes, indeed, I had -- I had an address in the Denver area.

Q.      Well, wouldn't that have been reflected on the registration for the truck?

A.      Yes.

Valdez - cross

Q.      How much money did you deposit in that bank account when you opened it?

A.      $600.

Q.      Did you make any deposits afterwards?

A.      No.

Q.      Going back to Acosta Salazar, it's my understanding there was one occasion where you stored drugs for him and you didn't really want to do that again for him; is that correct?

A.      Correct.

Q.      And you told him that?

A.      Yes.

Q.      Then you did those human smuggling thing that didn't pan out because you were going to get caught?

A.      Correct.

Q.      And you told him that?

A.      Yes.

Q.      Okay.  Why did he put money on your account, then, when you were at the Federal Detention Center?  Do know what I'm talking about by "your account" at the Federal Detention Center?

A.      No.

Q.      Okay.  Maybe you know by the term "on your books"?  Your "commissary"?

A.      Okay.

Valdez - cross

Q.    He put $200 on your commissary after you were arrested and you were at the Federal Detention Center; correct?

A.    No.

Q.    No?

A.    Not correct.

Q.    That's not correct.  All righty.  Let me pull up that and while I'm looking for that photograph to help refresh your recollection, he called your mother, too, didn't he?

A.    Several times, yes.

Q.    While you were at the Federal Detention Center?

A.    Before she died, yes.

Q.    To let her know, I guess, how you were doing; correct?

A.    Yes.

Q.    Why would he do that for you if you were not involved with him?

A.    No, I'm sorry.  I called my mother.

Q.    I'm going to stop you for a second because I'm going to locate the paragraph to refresh your recollection.

        Okay.  Again, we're at 32 and 33.  I'm sorry.

        MS. CHAVAR:  Your Honor, I have a tablet reflecting the electronic copy of the report of a meeting that Mr. Valdez had with law enforcement after his arrest, and I would like to direct his attention to paragraphs 36,

580

Valdez - cross

30 -- well, actually 36, 37, 38 -- yes, 36, 37, 38, ask him to read it and with the Court's indulgence I'll hand it --

THE COURT:  Hold on.  We'll get there.  But do you have a date for that report?

MS. CHAVAR:  Yes.  This time it is the December 2019 one?

MS. WELSH:  I'm checking.

MS. CHAVAR:  The 2017 one?

MS. WELSH:  August 23rd, 2017.

MS. CHAVAR:  Yes, here it is.  August 23rd, 2017.

THE COURT:  Okay.  Paragraphs 36 through 38.

MS. CHAVAR:  Yes.

THE COURT:  And have you -- I'm not sure if you established he doesn't have a recollection.  What is it that you are trying to do?  What is the question that you think he does not have a recollection on?

MS. CHAVAR:  I can impeach him with it also. Either way.

THE COURT:  Well --

MS. CHAVAR:  How about if I ask the deputy to show this to him.  I'd like to refresh his recollection because I think he didn't testify accurately.

THE COURT:  Is there, is there any objection?

MS. WELSH:  Yes, Your Honor.  He hasn't said he

Valdez - cross

doesn't remember, so ...

THE COURT:  Yes, I'm not quite sure what topic we're on at this point.  So, Ms. Chavar, why don't you ask some questions and see if he lacks recollection or if you are trying to impeach him.

BY MS. CHAVAR:

Q.    I'll repeat the question earlier.

THE COURT:  All right.  Can you hold on?  Can you go back to the podium so we can all hear you, please?

BY MS. CHAVAR:

Q.    You had $200 put on your commissary account by Salazar after you were arrested?

A.    That's not correct.

Q.    Okay.  During the proffer session on August 23rd, 2017 with law enforcement, is it your testimony today that you don't remember telling them that?

A.    I don't remember.

Q.    And you don't remember being confronted with that information?

A.    No.

Q.    Okay.  And you don't remember that it came back to a woman's name who put that money on your books?

A.    That's --

MS. WELSH:  Objection.  Objection.  At this point we're getting into hearsay.

Valdez - cross

THE COURT:  Ms. Chavar.

MS. CHAVAR:  I understand.  Okay.  Well, he says he does not remember.

BY MS. CHAVAR:

Q.    You say you don't remember?

A.    Salazar is my mother's maiden name.

Q.    I'm not asking you about your mother.  I am asking you about the money that was put on your books by Acosta Salazar.

A.    That's not true.  He never put money on my books.  I have never spoken to him any time after the arrest.

If you see a Salazar that was put on my books, it was my mother's last name or maiden name is Salazar.  Valdez-Salazar.

Q.    Well, you don't need to speak to someone to get money on your books.  You know that?

A.    Right.

Q.    And you don't remember telling law enforcement that Acosta Salazar used the name El Flaco to put $200 on your commissary?

A.    No, that's not true.

Q.    Well, then you were lying in that proffer?

MS. WELSH:  Objection, Your Honor.

BY THE WITNESS:

A.    I don't recall.  That's not true.  I've never said

that.  I have never spoken to this gentleman ever again.

Q.    You are telling me that you don't remember telling them, law enforcement, that he put money on your books during that proffer session.  That is what you are saying?

A.    That is what I am saying.

Q.    I would like to refresh your recollection?

          THE COURT:  You may do so.

          MS. CHAVAR:  Thank you.

BY MS. CHAVAR:

Q.    So this is the report of August 23rd.  It's an electronic copy and I would like to direct your attention to paragraph 35.  And if you would just please read through to paragraphs 38 because I think that would help refresh your recollection.

A.    Thank you.

          THE COURT:  Are you saying 2017 we were talking about a moment ago?

          MS. CHAVAR:  Yes.

          THE COURT:  Okay.  And we'll hand the device to the witness.

          MS. CHAVAR:  There we go.  Thank you, Ms. ////////.

          THE COURT:  Thank you.

          (Witness reviews electronic document.)

          (Counsel confer.)

Valdez - cross

THE WITNESS:  Okay.

BY MS. CHAVAR:

Q.      Okay.  So you had the opportunity to read paragraph 35?

A.      Yes.

THE COURT:  Let's return your device to you, Ms. Chavar.

MS. CHAVAR:  Yes.  Thank you, Your Honor.

BY MS. CHAVAR:

Q.      Having now read paragraph 35, does it refresh your recollection as to telling law enforcement that Salazar put money on your books?

A.      No, that's not Salazar.  Maria Salas is Camberos's wife.

Q.      Okay.  It says right here Acosta Salazar.

I'll move on.

A.      Okay.  I'm sorry.  That's not true.

Q.      Now, you met him, you met Acosta Salazar 2008; correct?

A.      Yes.

Q.      Okay.  And your testimony was, briefly, just he asked you to do two things, they didn't really work out; right?

A.      Right.

Q.      But when you were in the Federal Detention Center he called your mother for you?

Valdez - cross

A.      No.

Q.      You testified a few moments ago that he called her a few times?

A.      No.  No, I called my mother.

Q.      So you are telling me now that your testimony of 20 minutes ago that he called your mother a few times before she passed -- wait, that's not correct?

A.      I'm sorry.  I misunderstood you.  I thought you were saying I was calling my mother a few times from the FDC. No, no.  No.  Me, I was calling, not him.  These people have nothing to do with my mother.

Q.      Okay.  So you don't remember telling law enforcement during that same proffer session that Acosta Salazar contacted your mother for you when you were at the Federal Detention Center?

A.      Maybe I did.

Q.      Okay.  Maybe you didn't read as far as paragraph 37 of that report, is that possible?

A.      I was reading something with Maria Salas, not Acosta Salazar.

Q.      My question is why would he call your mother for you if you don't work for him?  And why would he put money on your books if you don't work for him?

A.      Right.

Q.      Can you tell me why he would do that if you don't

Valdez - cross

work for him?

MS. WELSH:  Objection, Your Honor.  He testified that he didn't put money on his books.

THE COURT:  He can answer for himself.  Ask the question that you want answered, Ms. Chavar.

BY THE WITNESS:

A.      These people have nothing to do with my mother.  I don't recall -- if I did tell the government, maybe I, I misunderstood the question, but these people have nothing to do with my mother, so ...

Q.      I'm sure they don't.  And I'm only asking you --

A.      So I guess to answer your question is he never called my mother.  He didn't have my mother's phone number.  If I told the federal agents that he did, maybe it was by mistake.  Maybe I misunderstood the question, but these people have nothing to do with my mother.

Q.      I'm sure they don't.  My question was not what your mother was doing with those people.  My question was why would they call your mother to let her know that you were arrested if you weren't working for him?

A.      Okay.  They never did that.  I --

Q.      I understand your testimony.

A.      Okay.

Q.      I'm just telling you what I'm reading.

THE COURT:  Ms. Chavar.  Ms. Chavar, ask a

Valdez - cross

question, please.

BY MS. CHAVAR:

Q.     Let's talk about the conversation you had with Camberos on the way out to Delaware.  And you said something about like the price for the cocaine.

A.     Correct.

Q.     And you said it was $28,100 per key?

A.     Correct.

Q.     Is that correct?  Is that what you said?

A.     That's what I heard, yes.

Q.     Yes.  And you said that sounded like a retail number. Do you remember saying that?

A.     Yes.

Q.     Yes.  As opposed to what?  What other kind of number?

A.     As opposed to, I don't know, buying a car at a dealership where it is $29,900.  $29,000 and this also that 100 number after the thousand.

Q.     I see.  So it was just like a -- an off number to you?

A.     Yes.

Q.     Right.

A.     Very odd, yes.

Q.     Did it sound high to you, the number?

A.     Yes.  Yes, I had never dealt with prices like that. Yes.

Valdez - cross

Q.      For that type of quantity of cocaine?

A.      Right.

Q.      Okay.  So it sounded like a retail number because it sounded like -- well, retail is a higher number than a wholesale number.  You would agree with me on that?

A.      Correct.

Q.      Okay.  So $28,100 sounded like a retail number to you as opposed to a wholesale number for cocaine; is that correct?

A.      Well, I don't know what the going price for the cocaine is or was at the time.  What I meant to say for the $28,100 is that why the $100?  Why can't you even it out as $28,000.  That is why it stuck in my head, and that is why I'm saying this, not because I knew of a price of a cocaine retail or wholesale.

Q.      Okay.  I understand.  Let me review my notes for a minute and I think, I think you are almost done.

        You had -- wait a minute.  I think you said during your testimony that Mr. Colon was busy when you, when you went, when you came to Delaware on occasion and you didn't see him much, because he was working on a home.

A.      Well, that's what he told us, yes.

Q.      Okay.  Well, you knew him to be a contractor, though, didn't you?

A.      I did not.  I did not know him personally.

Valdez - cross

Q.      Right.  So you don't remember having a conversation about him building a home or being busy building a home?

A.      Yes, I do remember the conversation.

Q.      Okay.

A.      Yes.

Q.      All righty.  And that he had a business, a contracting business?

A.      He didn't say anything about the business.  The conversation was about a rental unit that had a broken basement and the conversation was about that broken basement, how, how can a tenant live in a place where it's got a broken basement.  A broken basement is a big deal. I'm not a general contractor nor do I have a license, do I hold any kind of licensing for home inspectors.

Q.      I understand.  So you are not a general contractor?

A.      I'm not.

Q.      And tell me again what the name of the decals were that you wanted to put on the truck?

A.      Pacific Home Contractors.

Q.      And that was your idea?

A.      Correct.

Q.      But you are not a home contractor?

A.      I am not.

Q.      And it was also your testimony that you had already thought of that name because you were going to put it on a

Valdez - cross

truck that you owned; correct?

A.    Correct.

Q.    Long before you were approached to drive across country?

A.    Right.

Q.    I see?

A.    See --

Q.    That's okay.  I don't need an explanation.

Excuse me for one moment.  I think I'm done.

THE COURT:  Sure.

(Defendant and his counsel confer.)

BY MS. CHAVAR:

Q.    All right.  Now, you have never been arrested before this incident; isn't that correct?

A.    No, I have.  I have.

Q.    You have been arrested?

A.    I have.

Q.    You don't have any prior convictions, though, do you?

A.    A DUI back in 2006.

Q.    I see.  I see.

A.    Yes.

Q.    But you have friends or you have known of people who have been arrested and in federal custody?

MS. WELSH:  Objection.

BY MS. CHAVAR:

Valdez - cross

Q.      Correct?

THE COURT:  What's the objection?

MS. WELSH:  Relevance.

THE COURT:  Ms. Chavar.

MS. CHAVAR:  It goes to his credibility.

Well, I'll connect it up with the next question, but it certainly goes to his credibility.  It certainly goes to his awareness of the federal justice system and avenues that are available to people who are arrested following a charge.

THE COURT:  Ms. Welsh.

MS. WELSH:  Whether he is friends with people who are in prison is not relevant to his credibility given that he is in prison.

THE COURT:  Well, I'll -- let's see where the next question goes.

BY MS. CHAVAR:

Q.      My question was not do you have any friends at the Federal Detention Center.  I apologize if that is how it sounded.

My question was you have known of people being arrested and being in federal custody.  You had a general awareness of that prior to your arrest, haven't you?

A.      Yes.

Q.      And through that, you know that cooperation -- you

Valdez - cross

heard that term; right?  Cooperation?

A.    I have.

Q.    -- is a way to get a reduced sentence in the federal system; correct?

A.    Yes.

Q.    And that means if you sit down with law enforcement and you provide them information that is useful to them in a prosecution, that is cooperation; correct?

A.    I told them the truth.

Q.    That's not what I'm asking.  You know that to be cooperation; correct?

A.    Correct.

Q.    Thank you.  And in doing that, you get a reduced sentence, don't you?

A.    That's what I'm hoping for.

Q.    And in fact that is what your plea agreement says?

A.    Yes.

        MS. CHAVAR:  One moment, Your Honor.

        THE COURT:  Okay.

        (Defendant and his counsel confer.)

        MS. CHAVAR:  I have no further questions.  Thank you, Mr. Valdez.

        THE COURT:  Thank you Ms. Chavar.

        Ms. Welsh.

**REDIRECT EXAMINATION**

**BY MS. WELSH:**

**Q.     Mr. Valdez, you were asked a lot of questions about Mr. Salazar?**

A.     Yes.

**Q.     Is that a relative of yours?**

A.     No.

**Q.     Okay.  Just a coincidence?**

A.     It's a big coincidence, yes.

**Q.     The relationship with Mr. Salazar consisted of holding on to drugs one time and trying to smuggle people across the border unsuccessfully one time; correct?**

A.     Yes.

**Q.     No other things you tried to do for him besides those things?**

A.     No.

**Q.     The situation where you held on to the drugs, I think you said the box remained sealed; right?**

A.     Correct.

**Q.     So when was the first time you actually saw kilograms of cocaine?**

A.     When we got the first shipment in December, mid-December, is when I first saw an actual kilo of cocaine, the rectangle piece, you know, that is taped up.

**Q.     So the first kilos you ever saw were the kilos you**

were going to deliver to the defendant?

A.     Correct.

THE COURT:  Ms. Welsh, let's avoid the leading please.

MS. WELSH:  Yes, Your Honor.

BY MS. WELSH:

Q.     The holding on to the drugs for Mr. Salazar, was that something that you were -- did you tell law enforcement about that before today?

A.     I think I did way back then, back in when we first got arrested.

Q.     The truck.  You were asked about the decals on the white truck that Mr. Camberos purchased for you?

MS. WELSH:  If we can please display Government's Exhibit 1016.

BY MS. WELSH:

Q.     What is the decal on -- you can actually look at your screen, Mr. Valdez.  What does the decal on the left say?

A.     So the decal on the left is Pacific Home Contractors.

Q.     What does the decal on the right say?

A.     It's Pacific Home Flooring.  That's the decal -- that sticker was supposed to go on the other truck.

Q.     And did you, in fact, do flooring?

A.     I did, yes.

Q.     You were asked about -- you mentioned about the home

with the broken basement that the defendant was working on. What did you do in the home with the broken basement?

A.       The defendant wasn't working on that, at that home. He was not working on it.  He was renting it from what he told me or from what he told us.  That is where the first delivery happened, where the first getting drugs out of the tanks, put the money back in the tanks.  That is where it all happened, in the garage of that house.

Q.       And who took the kilograms that you emptied out of the tanks in that house?

A.       The defendant.

MS. WELSH:  No further questions.  That's all I have.

THE COURT:  That's it?

MS. WELSH:  That's all I have.  I'm sorry I didn't say that loud enough.

THE COURT:  Okay.  Thank you.

Mr. Valdez, we're done.  Thank you very much.

Ladies and gentlemen, your lunch is here.

Bear with me for a moment, Mr. Valdez.

We're going give you your lunch break at this point, so no talking about the case.  We'll bring lunch in shortly and we'll see you all after lunch.

(Jury left the courtroom.)

THE COURT:  Okay.  So you can take Mr. Valdez

out when you are ready to do that.

What is going to be the witness order after lunch, please?

MS. WELSH:  Your Honor, our next witness is Anthony Salvemini.

THE COURT:  And after that?

MS. WELSH:  Then we have three very brief witnesses:  Mark Lewis, Thomas Dillon Kashner and Gregory Simpler.

THE COURT:  Okay.  And then is there more after that from the government?

MS. CLOUD:  Yes.

MS. WELSH:  Yes, we have more people.

MS. CLOUD:  Yes, Your Honor.  After that, it will probably be Michelle Burris, who will be a relatively short witness, and then we will recall Special Agent Smith. And we have other witnesses here if there is more time.

THE COURT:  All right.  We will be in a recess. We'll try to keep it to an hour, if possible.  We will be in recess.

(Lunch recess taken.)

*     *     *

Afternoon Session, 1:28 p.m.

THE COURT:  Are you all ready to proceed?  Are you ready?

MS. WELSH:  We are, Your Honor.

THE COURT:  All right.  Call the jury back in.

(The jury entered the courtroom.)

THE COURT:  All right.  Ladies and gentlemen, we are ready to get going again.  If the government would call its next witness.

MS. WELSH:  Thank you, Your Honor.  The government calls Special Agent Tony Salvemini.

THE COURT:  Okay.  Welcome back, Agent Salvemini.

THE WITNESS:  Good afternoon.

THE COURT:  Good afternoon.  You may have a seat.

Just to remind you, you still are under oath.  Understood?

THE WITNESS:  Yes, Your Honor.

... SPECIAL AGENT ANTHONY SALVEMINI, having been previously duly sworn as a witness, was examined and testified further as follows ...

THE COURT:  Ms. Welsh, you may proceed.

MS. WELSH:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. WELSH:

Q.     Special Agent, on the wiretap, I think you testified the first time that you listened to some of the wiretap

conversations?

A.    Yes.

Q.    And read text messages as well?

A.    Yes.

Q.    So are you generally familiar with them?

A.    Yes, I am.

Q.    All right.  Let's go through some of these calls that were intercepted on the wiretap.

Did you intercept -- did agents intercept some calls between the defendant and his wife, Shakira Martinez?

A.    Yes.

Q.    And were you familiar with Ms. Martinez's voice from other calls and from the larger investigation?

A.    Excuse me.  Yes.

Q.    Are you aware of some conversations -- let's just start by drawing your attention to Exhibit 402A, please, which has already been admitted into evidence.  If we can please publish that.  Actually, you can just look at your screen.

Special Agent, does this purport to be a call between Mr. Colon and phone number 302-252-1971?

A.    Yes, that's correct, on February 8th or February 18, 2017.

Q.    Okay.  And were portions of this -- was this call, the whole call, in English?

A.      Yes.

Q.      And if it were in Spanish, would we see it in italics?

A.      That's correct.

Q.      All right.  So let's play Exhibit 402, please, which has already been admitted into evidence.

(The audiotape was played as follows.)

MARTINEZ:  Hello.

COLON:  I need a favor from you.

MARTINEZ:  What's up?

COLON:  I'm gonna send you an address.  I need you to go in there.  I need you to go there.

MARTINEZ:  Okay.

COLON:  It's in Middletown though.

MARTINEZ:  Okay.

COLON:  Where, where you at?

MARTINEZ:  I was on my way to take the baby to the park.

COLON:  Yeah, I, I need you there.

MARTINEZ:  Okay.

COLON:  I'm gonna send it to you now.

MARTINEZ:  A'right.

COLON:  Bye.

MARTINEZ:  Bye.

(Aside) (U/I) See you at the park (U/I) that

Salvemini - direct

time?

BY MS WELSH:

Q.     Special Agent, do you recognize the voices on this call?

A.     Yes.

Q.     First of all, I should have asked you this when we look at the top.  Was this recorded target telephone 5?

A.     We'll have to go back.

Q.     Let's go back to 402A, please.  Thank you.

A.     Yes.

Q.     This call was with 302-409-1713, which we've all been calling target telephone 5 --

A.     Correct.

Q.     -- I think we've been talking about whether you recognized the voices on the call.

A.     Yes, I do.

Q.     Because I had made that mistake, why don't you start over and tell us whose voices they were.

A.     So Mr. Colon and his wife, Ms. Martinez.

Q.     How are you familiar with Mr. Colon's voice?

A.     From the preceding several, several weeks of listening to calls with him.

Q.     Have you heard his voice -- without telling us in which context, have you heard his voice since then as well?

Salvemini - direct

A.      Yes.

Q.      I think you identified the other voice as being Shakira Martinez's.  How did you recognize her voice?

A.      Just the same.  Over the calls and during the course of the investigation, other dealings with her, I recognize her voice.

Q.      Was this call, Exhibit 402, was it followed by a text message?

A.      Yes.

Q.      Could you please turn -- it's admitted.  Please turn to Government Exhibit 403, please.  I believe that it is.

        Do you recognize this Exhibit 403?

A.      Yes, I do.

Q.      What is it?

A.      So almost immediately after that, that call, this text message was sent from Mr. Colon to Ms. Martinez, who says --

Q.      Well, before you tell me what it says, I just want to get to --

A.      Okay.

Q.      -- is this a true and correct copy of a text message that came over the target telephone?

A.      Yes.

            MS. WELSH:  I move for the admission of Exhibit

403.

MS. CHAVAR:  No objection.

MS. WELSH:  I will ask the witness to display it.

(GX-403 was admitted into evidence.)

BY MS. WELSH:

Q.     Is this a text message between Mr. Colon and that same phone number we just attributed to Ms. Martinez?

A.     Yes.

Q.     And what does the text message say?

A.     303 Wilmore Drive.

Q.     What is the date and time of this text message, please?

A.     It's February 18th, 2017, and the time is 2:28 p.m.

Q.     Does that address have significance to you as a result of your knowledge of this investigation?

A.     Yes, it does.

Q.     What is the significance?

A.     Mr. Hackett's address.

Q.     What is Mr. Hackett's first name?

A.     Devin Hackett.

Q.     All right.  Let us please take a look at Exhibit 404A, which was previously admitted.

       Special Agent, I'm showing you a transcript of a call, 404A.  Let's take a look at the top, please.

Salvemini - direct

Is this a call between the target telephone number, Mr. Colon's number and, again, Ms. Martinez's number?

A.    Yes, it is.  It's a couple minutes after that text message was sent.

Q.    All right.  And let's go ahead and play Exhibit 404, please.

(Audiotape played.)

MARTINEZ:  Hello.

COLON:  (U/I) Did you take the address?

MARTINEZ:  Yeah, I got it.  I'm dropping off Mio and Chelo here at the park with my, my dad and then I'm...I'm heading out.

COLON:  Okay.  Call me if anything, if you don't know where it is.

MARTINEZ:  Okay.

COLON:  It's right in Middletown.

MARTINEZ:  Okay, so I take it like if I was gonna go and pick up Mio and her cheer practice?

COLON:  Yeah, yeah, yeah, yeah...

You take that like you, if you go across the St. Georges, you go straight...you can take Route 1, too.

MARTINEZ:  Okay.

COLON:  And then they...

(Voices overlap.)

Salvemini - direct

MARTINEZ:  I was --

COLON:  Uh-huh.

MARTINEZ:  I was just gonna put it on my GPS and see.

COLON:  Okay.  I'm just trying to give you a point where it's at.

MARTINEZ:  On oh, okay.  Go ahead.

COLON:  It's where they, they built a new Wawa there and the police... Uh, Middletown Police is there.

MARTINEZ:  Middletown Police is there.  Okay. (U/I)

(Voices overlap.)

COLON:  Walgreens in there.

(Baby screaming dada.)

MARTINEZ:  Walgreens is in there, okay.  Am I picking something up?

COLON:  Had you?  Heart.

MARTINEZ:  Am I picking something up?

COLON:  Yeah, yeah, you gotta pick up some papers for me.

MARTINEZ:  Okay.

COLON:  But I need you to pick them up before 3:00 because they is gonna be gone.

MARTINEZ:  Okay.  I'm on my...

(Voices overlap.)

COLON:  He's leaving --

MARTINEZ:  ... way now.

COLON:  He's leaving for the rest of the weekend.  He no, he won't be back until Tuesday or Wednesday.

MARTINEZ:  Okay.  I got you.

COLON:  A'ight.

(Baby screaming)

MARTINEZ:  All right, bye.

BY MS. WELSH:

Q.    Do you recognize the voices on that phone call?

A.    Yes, I do.

Q.    Without getting into how, again, whose voices were they?

A.    Mr. Colon and Ms. Martinez.

Q.    Now, during that call, did you see on the transcript Mr. Colon referencing Middletown?

A.    I'm sorry?  One more time.

Q.    Was there a reference to Middletown on that call?

A.    Yes.

Q.    And is 303 Wilmore Drive, what town is that in?

A.    It's in Middletown.

Q.    All right.  So let's please display 404A, which has already been admitted.

Special Agent, this one has italics, so what

Salvemini - direct

does that mean to us?

A.      It's like most of it is in Spanish.

Q.      Looking at the top of the call, is there between target telephone 5 and Martinez again?

A.      Correct.

Q.      The same day shortly after the last conversation?

A.      Yes, that's correct.

Q.      All right.  Let's play Exhibit 405, please.

        (Audiotape played.)

        COLON:  Tell me.  Hello?  Tell me.

        MARTINEZ:  I'm here.

        COLON:  Okay, give me a minute.  It hasn't arrived... Is there a 300 parked?

        MARTINEZ:  Yes.

        COLON:  Okay, I am a going to call him now.  Go ahead.

        (Aside:  Yo, be careful there ...)

        (I am going to call him now.)

BY MS. WELSH:

Q.      Is there a reference to a 300 in this call?

A.      Yes.

Q.      And, by the way, before I ask anything further, do you recognize the voices?

A.      Yes, I do.  Same.  Mr. Colon and Ms. Martinez.

Q.      All right.  So the reference to a 300, who drove a

Salvemini - direct

300 during the investigation?

A.      Devin Hackett drove a Chrysler 300.

Q.      All right.  So let's look at Exhibit 406A, please. Let's start, as we always have, with the top of the call.

Is this between target telephone 5 and Ms. Martinez's phone shortly after the last conversation?

A.      Yes.

Q.      And there are parts of this that are in Spanish and parts in English; correct?

A.      Right.

Q.      Let's play Exhibit 406, please.

(Audiotape played as follows.)

MARTINEZ:  Hello?

COLON:  Did the guy come out?

MARTINEZ:  Yeah.

COLON:  Ugh... the beam is up, mission accomplished.

MARTINEZ:  Awesome.

COLON:  I have the washers and dryer here, but sweetie, I have a plan.  I am a going to leave this at Karina's garage.

MARTINEZ:  Okay.

COLON:  And call that lady, tell her that tomorrow, Pipo and the kid can take her and me if I am okay.

MARTINEZ:  Okay, yeah, that's not a problem. She said either Saturday or Sunday she was off.

COLON:  Tell her definitely in the morning tomorrow we will have that dropped off.

MARTINEZ:  Okay.

COLON:  All right?

MARTINEZ:  No problem.

COLON:  A'ight.

MARTINEZ:  All right.

BY MS. WELSH:

Q.    All right.  Did you recognize those voices?

A.    Yes.  Mr. Colon and Ms. Martinez.

Q.    Did you participate personally in the surveillance operation that occurred on February 18th?

A.    Yes.

Q.    Are we going to hear testimony about that from a different witness?

A.    I believe so.

Q.    Let's talk about a different conversation here.  I want to talk to you about some text messages that were intercepted over target telephone 7.

First of all, we've heard testimony about target telephone 5 attributing that to Mr. Colon.  Was target telephone 7, were calls intercepted over that phone as well?

Salvemini - direct

A.    Yes.

Q.    And do you know whose voice was participating in those conversations over target telephone 7?

A.    Yes.  It was Mr. Colon.

Q.    Mr. Colon and another person; right?

A.    Yes.

Q.    Do you recall when the wiretap started on target telephone 7?

A.    March 8th, 2017.

Q.    So talk to me about the time period of March 8th to kind of the 12th in 2017.  What was happening over the Target Telephone 5.

A.    It was mostly text messages, and it was with a handful of people.  Mostly texting and a few calls.

Q.    Were most of the text messages in Spanish or were they mostly in English?

A.    I'd have, I'd have to look and review.

Q.    Let's -- did we create a summary spreadsheet of conversations between Mr. Colon and a couple of individuals?

A.    Yes.

Q.    And were those created because the records of the wiretap were voluminous, and they will aid you in their testimony?

A.    Yes.

Q.    Okay.  So let's take a look at -- I would like for

you to take a look at Exhibit 415, please.

A.        (Witness complies.)  Okay.  I'm here.  415.

Q.        What is this a chart of?

A.        It's a chart of text messages between Mr. Colon and Mr. Hackett, between March 8th, 2017.  It goes to March 20th and then there is an April 18th as well.

MS. WELSH:  Your Honor, I move to admit Exhibit 415.

MS. CHAVAR:  Objection to the extent it's demonstrative.

THE COURT:  To the extent that it is demonstrative?

MS. CHAVAR:  It is demonstrative.  I believe that this was something prepared by the United States Attorney's Office as a summary of what they viewed and ...

MS. WELSH:  So, Your Honor, this was the subject of a motion I believe with a proposed order that says this is admissible as a 1006 summary.

THE COURT:  I believe I signed the order that you submitted.  Is that your understanding as well?

MS. WELSH:  It is my understanding, Your Honor.

THE COURT:  Ms. Chavar, do you disagree?

MS. CHAVAR:  I don't have that order in front of me.  I don't recall.

THE COURT:  Well, perhaps Ms. Cloud is able to

help us.

MS. CHAVAR:  There is something about not admitting demonstrative summaries.

(Document handed to Ms. Chavar.)

MS. CHAVAR:  Very well.  I withdraw the objection.

THE COURT:  At this point, you are offering what?

MS. WELSH:  Exhibit 415, Your Honor.

THE COURT:  Into evidence, correct?

MS. WELSH:  Yes, please.

THE COURT:  Okay.  It's admitted.

(GX-415 was admitted into evidence.)

MS. WELSH:  We can display it, please.

BY MS. WELSH:

Q.    Now, the text on this is small, so let's zoom in on the first conversation on March 8th just to orient ourselves.

Is this a conversation between Mr. Colon's Target Telephone 7 and that phone number on the right-hand side?  Whose phone number is that, that ends in 9304?

Is that a phone number we attributed to Mr. Hackett?

A.    Mr. Hackett.

Q.    And how do you know that that is Mr. Hackett's phone

Salvemini - direct

number?

A.     A couple things.  Based on the surveillance and the investigation when we did -- when we received these text messages and had surveillance out there in some of the meetings, they would coincide.  So in other words, if, for example, if Mr. Colon said I'm going to meet you in five minutes, and he sends the text message to this phone number and he shows up to meet with Mr. Hackett, we know that is Mr. Hackett.

       The other reason is because we seized this phone from Devin Hackett himself.

Q.     And was this phone number ending in 9304, was it saved in Mr. Colon's Target Telephone 9 phone when Mr. Colon's phone was extracted?

A.     It was.

Q.     What was the contact saved as?

A.     He had it saved as Devin.

Q.     So we're taking a look at this March 8th, 2017 conversation.  What does it say?  It's brief.

A.     So Mr. Hackett texted Mr. Colon at 3:42 and says: What's the word?

       Mr. Colon responds a few hours later, at 6:38 and says:  Tomorrow.

       Mr. Hackett says:  Okay.

       MS. WELSH:  Let's move on to March 9th, please.

BY MS. WELSH:

Q.    All right.  Could you recount this conversation for us, please?

A.    Sure.  It starts at 4:38 p.m.  Mr. Colon sends a text to Mr. Hackett, says:  Let me know when you home.

Mr. Hackett says:  Okay.  I'm still working.

Mr. Colon responds:  Okay.

A couple hours later, at 6:26 p.m., Mr. Hackett says to -- texted Mr. Colon:  I'm home.

A minute later, Mr. Colon responds:  Okay.

Over an hour later, Mr. Colon texted Mr. Hackett and says:  I'm outside.

And then Mr. Hackett responds:  Okay.

Q.    Do you recall the surveillance operation you participated in on this day on March 9th, 2017?

A.    Yes.

Q.    Where was that surveillance operation?

A.    It was at 303 Wilmore Drive, Mr. Hackett's residence.

Q.    And at 6:32 p.m., did a car come to the house?

A.    Yes.

Q.    What car was that?

A.    It was, it was Mr. Colon's Nissan Armada.  The green Nissan Armada.

Q.    At 6:32, did a different, did a different car come to the house?

Salvemini - direct

A.      I'm sorry.  I'm sorry.  What was the time on the first one?

Q.      6:32.

A.      Yes, Mr. Hackett arrived at the residence.

Q.      In what car?

A.      In his Chrysler 300.

Q.      And at 7:44 p.m., did another car arrive?

A.      Yes, a green Nissan Armada.

Q.      Had you seen anyone driving that green Nissan Armada throughout the investigation?

A.      Mr. Colon.

Q.      When the green Nissan Armada arrived at 303 Wilmore, what did it do?

A.      He -- it didn't go directly to the residence.  That neighborhood is -- there is quite a few turns in there and the Armada bypassed the residence at least once, made a series of turns, not in the direction of the residence and then a short while later, it arrived in close proximity to the residence.

Q.      And did the Armada park?

A.      Yes.

Q.      Did someone get out of the car?

A.      Yes.

Q.      Who was that?

A.      Mr. Colon.

Q.      Where did he go?

A.      He went into Mr. Hackett's residence at 303 Wilmore.

Q.      And three minutes later, what happened?

A.      He came back out.

MS. WELSH:  Now you can take it down.

BY MS. WELSH:

Q.      Special Agent Salvemini, I'd like to talk to you about text messages and a call between Target Telephone 7 and a phone number that has an 856 area code, 856-214-1515. Were agents able to determine whose phone number that 856 number was?

A.      Yes.

Q.      Whose was it?

A.      It was Mr. Brisco's.

Q.      How did you make that determination it was his phone number?

A.      We seized it from him.

Q.      Seized that phone with that phone number off of him?

A.      Yes.  I'm sorry.  Yes.

Q.      And similarly to how you just described agents, you know, on surveillance being able to attribute a phone, did that also happen with Mr. Brisco?

A.      Yes, it did.

Q.      Have you seen a summary chart and text messages between Mr. Colon's Target Telephone 7 phone and Mr. Brisco?

A.    Yes.

Q.    And is that Exhibit 416 in your binder?

A.    Yes, it is.

Q.    And just like your chart that was prepared about the conversations between Mr. Colon and Mr. Hackett, is this a summary of otherwise voluminous conversations that were intercepted on Target Telephone 7?

A.    Yes, from March 8th through March 12th.

MS. WELSH:  Your Honor, I move to admit Exhibit 416.

MS. CHAVAR:  No objection.

THE COURT:  Okay.  It's admitted.

(GX-416 was admitted into evidence.)

MS. WELSH:  You could display it, please.

The text on this one is a little smaller, so let's make March 9th, please, let's make that conversation larger.

BY MS. WELSH:

Q.    Does that help?

A.    Yes.

Q.    All right.  So if you could explain for us what this conversation is between Target Telephone 7 and Mr. Brisco's phone on March 9th, 2017?

A.    You want me to go through it?

Q.    Yes, please.

Salvemini - direct

A.      So on March 9th starting at 4:36 p.m., Mr. Colon texts Mr. Brisco and says:  On my way.

        Several minutes later, Mr. Brisco texted Mr. Colon and says:  Leaving now.

        At 5:31 p.m., Mr. Colon responds:  I'm here.

        5:36 p.m., Brisco corresponds:  Me too.

        And that same minute, Mr. Colon responds:  Okay.

        And then about a minute later, at 5:37, Mr. Colon said, texted -- Mr. Brisco says:  On my way.

Q.      Was there then a call between these two phone numbers, Mr. Colon's phone and Mr. Brisco's phone that has been marked as Exhibit 413A?

A.      Yes.

Q.      Have you seen the transcript before?

A.      Yes, I have.

        MS. WELSH:  If we could please display the transcript, 413A.

BY MS. WELSH:

Q.      Take a look at the top here.

        The 848-461-0921 number, is that the Target Telephone 7 number?

A.      Yes.

Q.      And the conversation with the 1515 number, that has been attributed to Mr. Brisco; right?

A.      Correct.

618

Salvemini - direct

Q.      And is this March 9th at 5:38 p.m.?

A.      Yes.

MS. WELSH:  Okay.  If we could please play Exhibit 413.

(Audio recording was played.)

BRISCO:  Yo?

COLON:  Yo, you in a minivan?

BRISCO:  I'm here.

COLON:  Where?  What car?

BRISCO:  Here in the inside.

COLON:  You inside the house?

BRISCO:  Yeah.

COLON:  Eh, come outside, man, because I've been driving ...

BRISCO:  Oh, you rode.  Oh, you rode by?  Okay. You rode right by.

COLON:  Huh?

BRISCO:  Oh.  You can't see.  You ain't see where I was parked at.

COLON:  Yeah.

BRISCO:  I'm in a driveway.  All right.  Here I come up, baby.  Aight.

COLON:  Aight.

BRISCO:  (Laughs.)

COLON:  I ain't see you.  I was like, what the

hell!

BRISCO:  (Laughs.)  Yeah, I parked in the driveway, baby.

COLON:  (Unintelligible.)  Give me a second. Yeah, I didn't know.  I was like, "Shit!"

BRISCO:  (Unintelligible.)

(Audio recording ends.)

BY MS. WELSH:

Q.    Now, Special Agent, this was a call over Target Telephone 7.  Were there only a handful of actual calls on Target Telephone 7?

A.    Yes.

Q.    Do you recognize at least one of the voices on there?

A.    Yes.

Q.    And which voice is that?

A.    Mr. Colon.

Q.    Is that the voice that was attributed to Colon on the transcript?

A.    That's correct.

MS. WELSH:  Let's go back to Exhibit 416, please.  And let's look at the text messages on March 10th, please.

BY MS. WELSH:

Q.    All right.  So, Special Agent, this is a little bit of a longer conversation, but do you mind recounting this

Salvemini - direct

for the jury, please?

A.      Sure.  I'm going to leave off the Mister and just have the name.

So at 8:57 a.m., Colon texts Brisco and says:  Get ready.

Brisco responds several minutes later and says:  Okay.

Colon says -- and then at 12:55, Colon says:  How long for you?

1:16 p.m., Brisco responds:  Ready.

At 1:22, Colon say:  Where you be at?

1:24, Brisco responds:  We can do same if you want.

1:27, Colon says:  See you there in 30.

A couple minutes later, Brisco responds:  Okay.

About a half hour later, Colon says:  I'm here.

At 2:13 p.m., Brisco says:  Two minutes.

Colon responds:  Give me 10, I when use the bathroom.

2:17, Brisco responds:  Okay, here.

And then at 2:44, Mr. Colon texts:  Here.

MS. WELSH:  Let's look at March 12th, please.

BY MS. WELSH:

Q.      Is this another conversation between Target Telephone 7 and Mr. Brisco's phone number?

Salvemini - direct

A.      Yes, it is.

Q.      Okay.  Let's not read this whole conversation.  Could you start at 459, please, and tell us what these -- what the conversation was?

A.      Yes.  I was arranging another meeting.

At 4:59, Mr. Colon says, you there?

4:59, Mr. Brisco responds, pulling up now.

At 5:02 p.m., Mr. Colon says, check the black scape.

At 5:04, Brisco responds, I see.  Colon that statement responds, anyone in it?

Brisco says, just pulled off when I pulled up.

And then at 5:05, Mr. Colon says, okay.

5:05, Brisco responds, I'm circling.

And then at 5:07, Mr. Colon texts, I'm here.

Q.      Now, at 5:02, when Mr. Colon says check the black scape, does that have any relevance to you as part of the investigation?

A.      Yes, it does.

Q.      What is that?

A.      One of our, of our agents on the surveillance that evening has a -- was driving a black Ford Escape.

Q.      Let's move on.  Let's actually go back to Exhibit 415, please, and look at some communications with

Mr. Hackett again.

So were there more text messages between Mr. Colon and Mr. Hackett that occurred on March 18th?

A.     Yes.

Q.     Why don't you recount this conversation for the jury, please.

A.     Sure.  At 1:35 p.m., Mr. Hackett texted Mr. Colon, I got them tickets.

At 1:49, Mr. Colon responds, okay.  I see if I can stop by today.

At 1:52, Hackett texts Mr. Colon and says, okay. I'm still working now, but I should be off by four.

Q.     Were there more conversations the next day?

A.     Yes.

Q.     Let's take a look at March 19th, please.

All right.  Could you please read this conversation for us?

A.     Yes.  Starting at 1:41 p.m., Mr. Colon texts Mr. Hackett, let me know when you want me to stop by.

A minute later, Mr. Hackett responds, okay.  I'm outright now.  I'll hit you up when I get home.

Mr. Colon responds to Mr. Hackett, says, okay.

And then several hours later at 7:26 p.m., Mr. Hackett texts Mr. Colon and says, my bad.  I just got home.

Q.    Was this really a three-day conversation that continued the next day?

A.    Yes, it is.

Q.    All right.  So let's look at March 20th, please.

A.    So it --

Q.    You don't need to read this whole one.

A.    Okay.

Q.    These are all very short messages; right?

A.    Yes.

Q.    What does Mr. Colon say at 8:33 p.m.?

A.    He says, I'm outside.  And Mr. Hackett responds, okay.

Q.    All right.  With the communications that are on this summary chart that were actually target telephone 9 and Mr. Hackett?

A.    Yes.

Q.    And those occurred at the bottom of the page here?

A.    Correct.

Q.    All right.  Let's take a look at the conversation from March 18th, please.

A.    April 18th.

Q.    I'm sorry.  It's April 18th.  Thank you.

A.    Okay.

Q.    What does it say?

A.    Mr. Colon, at 4:23 p.m., Mr. Colon texts Mr. Hackett,

Salvemini - direct

you good.

About 20 minutes later, Mr. Hackett says, yeah, my bad.  My peoples were hot, so they fell back.  I'll holla at you when shit cools down.

And then a little less than an hour later, Colon responds, okay.

MS. WELSH:  We can take this down now.  Thank you very much.

BY MS. WELSH:

Q.     Special Agent Salvemini, did target telephone 7 get a voicemail on March 17th, 2017?

A.     Yes.

Q.     Let's please take a look at Exhibit 419A, which has already been admitted into evidence.

Tell us what the time and date is of this voicemail, please.

A.     So it's a voicemail that came in at 6:05 p.m. on March 17th, 2017.

Q.     Is there a person identified on the other end of this voicemail, who is leaving this voicemail?

A.     I don't know that we got -- identified.

Q.     This person was never identified; correct?

A.     Correct.

Q.     Okay.  And this is a voicemail that was left on target telephone 7; right?  Mr. Colon's phone?

A.      Yes.

Q.      Okay.  All right.  Let's take a listen to Exhibit 419, please.

        Operator:  Please leave your message for 848-467-0921.

        UM:  Pop, it's me.  Let's try to see each other on Sunday, so you can bring me fish.  Let's make arrangements for Sunday, is that all right?  Around 12 -- 11:30...for tomorrow.  All right?  Give me a call.  Let me know if you heard this message.

        Operator:  To replay your message, press one. To continue recording (beep).  Your message has been sent, thank you for calling.  Goodbye.

BY MS. WELSH:

Q.      Special Agent, was there also a pertinent call on March 17th, that same day, over target telephone 5 with phone number 302-988-4603?

A.      Yes.

Q.      Let's pull up, please, Exhibit 409A, which is already in evidence.  If we could blow up the top.

        Similarly, was this person never identified?

A.      That's correct.  I believe I was the same person.

Q.      Let's play Government Exhibit 409, please.

        (Audiotape played.)

        COLON:  Hello.

Salvemini - direct

UM:  Hello, it's me.  What are you doing?  How are you?

(Voices overlap.)

COLON:  Go ahead, dude.  Just here running errands.

(Voice overlap.)

UM:  That's fine.  I left you a message on a phone.  I'm not sure if it's still the same number, but I'm calling you from this one.  Let's try to see each other on Sunday, so you can bring me fish and that --

(Voices overlap.)

COLON:  That's fine, dude.

(Voices overlap.)

UM:  Around two...

(Voices overlap.)

COLON:  That's fine, dude, no problem.

UM:  That's fine, everything is good and (U/I).

COLON:  A'right, dude.

UM:  A'right, blessings.

COLON:  A'right.  Bye.

BY MS. WELSH:

Q.     Were there similarities used between the voices on this call and the voicemail?

A.     Yes.

Q.     What were those similarities?

Salvemini - direct

A.      The greeting was the same.  Can you pull the phone call up?  They reference, they referenced Sunday.

                        MS. WELSH:  Just for the record, we can publish Exhibit 419 and 409 next to each other, please.  Can we publish that?  A, the As.

BY MS. WELSH:

Q.      So now just for the record, we have up on the screen 419A on the left and 409A on the right?

A.      Correct.

Q.      So talk to us about the similarities here, please.

A.      So on the voicemail it says, pop, it's me, and it's the same greeting on the call, on the actual call.  It says, hello, it's me.

Q.      Were there common words that were used between the two calls?

A.      Yes.

Q.      What were those words?

A.      The word fish.

Q.      In Spanish?

A.      Yes.

Q.      Are these two people both talking about meeting on Sunday?

A.      Yes.

Q.      And how many minutes apart were these calls?

A.      Three minutes.

Q.      Let's move on.  I would like to show you, and these ones side by side as well, Government 411 and 412, please, as previously admitted.

Special Agent, were these text messages received over Mr. Colon's phone, over target telephone 5?

A.      Yes.

Q.      And what does the text message say when translated?

A.      The 27th.

Q.      No.  I'm sorry.  What does it say?  What's the translation?

A.      Oh.  How are you?  This is Pedrito.  Messages are not going through on the other one.  This is FER's.

Q.      And if we could read the one on the right.  What does the second part of the message say?

A.      Call me when you can so I can say hi and then there's a little emoji there, looks like a peace sign.

Q.      Now, were these subsequent session numbers 2927 and 2928?

A.      Correct.

Q.      And what does that mean?

A.      The 2927 came in and then subsequent to that, 2928 came in.

Q.      So the March 24th notation on Government Exhibit 412, is that a typo?

A.      Yes.

Q.      All right.  What was the real date of 412?

A.      I believe it was the 27th.  Both of these happened on the same, on the same day.

Q.      Did your investigation ever reveal a Pedrito?

A.      Yes.

Q.      How?

A.      How?

Q.      Who is Pedrito?

A.      It's Mr. Aviles Camberos.

Q.      Now, these text messages aren't from the 909 number that we've heard attributed to Mr. Camberos thus far in this trial; isn't that right?

A.      Correct.

Q.      What do you notice about the phone number that sent these text messages at the top?

A.      There's a, there's a 52, a 52 number.  A Mexican prefix.

Q.      So what does that mean?

A.      It's being used in Mexico or originated in Mexico.

Q.      All right.  Now I'd like to move onto Government Exhibit 117, or Government Exhibit 117C, which has already been admitted.

        Are you familiar with a phone extraction that occurred of Mr. Come's 909 area code phone?

A.      Yes.

Salvemini - direct

Q.       And is that -- was that extracted because you used that phone for Mr. Camberos?

A.       Yes.

Q.       Have those -- have certain text messages that were found on that phone been translated into English?

A.       Yes, they have.

Q.       And is this the result of that?

A.       Yes.

Q.       So I'd like you to read for me government Exhibit 117C.  Actually, let's start with page 2, please. Let's actually start at the last page of this, please.

         Is it your understanding that this report goes in the order of recent message being first and oldest message being last?

A.       Yes.

Q.       Let's take a look at the oldest message, please.

         MS. WELSH:  Can we please blow up lines 173, 174 and 175.

BY MS. WELSH:

Q.       Okay.  So this is a conversation between the 909 number and what number?

A.       302 -- I'm sorry.  302, 407, 9974.

Q.       And what is the date of, let's say, line 175?  What is the date?

A.       The date is, on 175 is December 26, 2016.

631

Salvemini - direct

Q.   What does that message say?

A.   Listen, let's switch to Telegram, and then there's a URL there listed after it.

Q.   And then on December 26th at 1:10 p.m., the message 174, what does that say?

A.   It says, attention:  Pedrito 20.

Q.   All right.  I'm seeing a message here from January 4th.  What does that message say?

A.   Good afternoon.  This is Pedrito.  When you can, please call me.  Regards.

MS. WELSH:  All right.  So let's move to page 2, please, Ms. Roca, if we could.

Okay.  Could we please blow up -- I'm sorry. Message No. 92 here, the one on the bottom.

Who is the 909 phone number talking to here? What is that phone number?

A.   302-384-1883.

Q.   And is that a number that has been identified in this investigation as target telephone 6?

A.   Yes.

Q.   What does the message say?

A.   It says, we're here, you.  This is a new number.

Q.   And is that an incoming message to 909 or is it outgoing?

A.   It looks like it's -- it's an incoming message to

909.

Q. So this is target telephone 6 saying this is a new number?

A. Correct.

Q. Okay. And target telephone 6 is a phone number that was Mr. Colon's?

A. Correct.

Q. Let's blow up line number 65, please. Was this a message sent by the 909 number?

A. Yes.

Q. It's sent?

A. Yes.

Q. And to that same phone number ending in 1883?

A. Correct.

Q. What does the message say?

A. It says, boss, I left you the truck, in your house, thank you very much and we're waiting on you.

Q. What is the date of that text message, please?

A. It is February 6th, 2017.

Q. All right. Let's go to page 1, please.

Now, again, is the -- which direction does the conversation go in? Which message is first?

A. It starts at the bottom where you see the 15 on the left.

Q. And --

Salvemini - direct

A.    It starts there.

Q.    And who is this conversation between?  909 number and what number?

A.    This number, 302-256-3284 and it's saved as Tigré Tono.

Q.    Is that the target telephone 9 phone number?

A.    Yes.

Q.    The defendant's number?

A.    Yes, it is.

Q.    And what does this conversation -- first of all, when did it occur?

A.    April, April 20th, 2017.

Q.    And what does Mr. Camberos, the user of the 909 number, say to Mr. Colon?

A.    He says, between this Saturday and next, we'll bring you the tables for the party.  Regards.

Q.    And what is Mr. Colon's response?

A.    Okay.

          MS. WELSH:  I have no further questions.

          THE COURT:  Cross-examination.

          MS. CHAVAR:  Yes.  Just a few.

                    CROSS-EXAMINATION

BY MS. CHAVAR:

Q.    Good afternoon.

A.    Good afternoon.

Salvemini - cross

Q.      Throughout your testimony, you referred to target telephones 9 or 6 or 7, various target telephones; is that correct?

A.      Correct.

Q.      And you base your conclusion that those target telephones belong to Mr. Colon on Campbell's analysis that they are his phones?

A.      I didn't hear Campbell's analysis.

Q.      Okay.  So as the case agent, you would have access or you would have knowledge of investigations done on this case; is that correct?

A.      Correct.

Q.      Okay.  Do you know who Agent Campbell is?

A.      There were -- I know who the Intel Analyst Campbell is.

Q.      Okay.  So you know who Mr. Campbell is?

A.      Yes.

Q.      Okay.  And you know that he reviewed the T-Mobile reports?

A.      Correct.

Q.      Okay.  And you're aware that as a result of his review of those T-Mobile reports, he concluded that it's his belief that the target telephones belonged to Mr. Colon?

A.      I can't tell you -- I can't tell you what Mr. Campbell believes or not.  I can -- what I can say is

Salvemini - cross

that I attribute some of these phones to Mr. Colon based on the investigation.

Q.    Okay.  So you are not aware of Mr. Campbell's testimony yesterday?

A.    No, I was sequestered.

Q.    Okay.  And then we heard testimony from you with respect to individuals Brisco --

A.    Yes.

Q.    -- Hackett, and Devin?

A.    Yes.

Q.    Was Brisco arrested in connection with this conduct?

A.    Yes.

Q.    Was Hackett?

A.    Yes.

Q.    And was Devin?

A.    Devin.  It's Devin Hackett.

Q.    I'm sorry.

A.    One person.

Q.    I'm sorry.

A.    That's okay.

Q.    So Devin Hackett was arrested?

A.    Yes.

          MS. CHAVAR:  Okay.  Give me one moment please.

          (The defendant and his counsel confer.)

BY MS. CHAVAR:

Q.      And was Devin Hackett charged with a crime?

MS. WELSH:  Objection.

THE COURT:  Ms. Chavar?

MS. WELSH:  Relevance.

THE COURT:  Do you have any response?

MS. CHAVAR:  I'll withdraw the question.

THE COURT:  Okay.  Anything further?

MS. CHAVAR:  No.  Thank you, Your Honor.

THE COURT:  All right.  Redirect.

MS. WELSH:  No questions, Your Honor.

THE COURT:  Okay.  Thank you, Agent Salvemini. You are free to go.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  The government may call its next witness.

MS. WELSH:  The government calls Mark Lewis, Your Honor.

... MARK LEWIS, having been first duly sworn, whereas examined and testified as follows ...

THE COURT:  Good afternoon, Mr. Lewis.  Thank you for being here.

THE WITNESS:  Good afternoon, Your Honor.

THE COURT:  Do you mind removing the mask for your testimony?

Thank you.

Lewis - direct

You may proceed.

DIRECT EXAMINATION

BY MS. WELSH:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Can you tell the jurors where you work?

A.    I'm currently retired.  I retired October 1st of last year.  Prior to that, I was employed by the State of Delaware for 30 and-a-half years as a probation officer.  My last 20 years, I was assigned to the State Police.

Q.    Sorry for taking away your retirement in the present tense.  That is where you did work?

A.    Yes, it is.

Q.    And when you were with Probation and Parole, near the end of your career, the last several years, what were your day-to-day duties?

A.    I was assigned to the Governor's Task Force.  It's partnership between the Delaware State Police and the Probation Office.  We were assigned to police hotspots in New Castle County, mainly focusing on gun and drug crimes.

Q.    Back in the 2016, 2017 time frame, did you work with the DEA often?

A.    Yes, I did.  I was deputized for this, for the current case.

Q.    For the Omar Colon investigation?

638

Lewis - direct

A.      Yes.

Q.      What was your role on the team that was investigating the defendant?

A.      Surveillance.

Q.      All right.  I'd like to talk to you about a surveillance operation that happened on March 9th, 2017.  Do you recall doing surveillance that day?

A.      Yes, I do.

Q.      When you are doing surveillance for a wiretap generally, how do you know where to go?

A.      You usually directed by the plant, and the plant is the operation center for the wiretap.  They listen to the phone calls, receive the texts, and then they tell you where to set surveillance.

Q.      This March 9th surveillance, did it happen that way, that these agents directed you to go somewhere?

A.      Yes.

Q.      Okay.

A.      They directed us to an address in Middletown.  303 Wilmore Drive, I believe.

        MS. WELSH:  I'd like to display Exhibit 415, which is already admitted into evidence, please.

        If you could please pull up the March 9th, 2017 conversation.

BY MS. WELSH:

Q.    Mr. Lewis, you are not very familiar with these conversations, right?  You were out on surveillance?

A.    That is correct.

Q.    But at 7:41, is it safe to say it appears Mr. Colon said "I'm outside?"

A.    Yes.

Q.    Okay.  What were you doing around this time period?

A.    I was in the neighborhood.  I was parked.

Q.    Let me stop you.  Which neighborhood?

A.    In the neighborhood of wherever 303 Wilmore Drive is, Devin Hackett's residence.

Q.    Which town is 303 Wilmore Drive in?

A.    In Middletown, Delaware.

Q.    And around 7:50 p.m., what did you see?

A.    I was sitting on Sherbourne Drive, which intersects with Wilmore, or Wilmore Place, and I saw the defendant arrive in his green Nissan Armada.

Q.    And as you were driving away from that surveillance operation at 303 Wilmore, what did you see the Armada do?

A.    I followed the Armada out of the area, back out on the main roads and on at least two occasions as we were approaching traffic signals, the operator of the Armada slowed down or almost came to a complete stop at the green lights, and then almost waited for them to turn yellow and turn red before he sped through them.

Q.      Let's talk about a surveillance operation that occurred the next day on March 10th at a different part of New Castle County.  Did you participate in surveillance that day?

A.      Yes, I did.  I was directed to go to the area of Pennewell Drive, which is in New Castle.

MS. WELSH:  I'd like to display, please, Exhibit 416.

If we could blow up the March 10th conversation.

BY MS. WELSH:

Q.      Does it appear, based upon what you see in front of you, that at 2:44 p.m. Mr. Colon sent a text message saying: Here?

A.      Yes, he did.

Q.      What did you see at 2:49 p.m.?

A.      I was conducting mobile surveillance due to the fact that the -- we couldn't get eyes on the area of 109 and 111 Pennewell Drive.

Q.      Let me stop you for a moment.  What does it mean to say "mobile surveillance"?

A.      Mobile surveillance is a technique where you can drive by, slowly drive down the street and hope to catch something as opposed to stationary surveillance where you can sit in a vehicle or sit in a place and you have cover and you can't be seen as easily.

Lewis - direct

Q.    Okay.  So let's get back to this operation on March 10th, 2:49 p.m., you are doing mobile surveillance and what did you see?

A.    I drove down Pennewell Drive and as I approached 109 or the area of 109, 111 Pennewell Drive, I noticed the defendant parked his green Nissan Armada adjacent to the 109, 111 Pennewell Drive.  And as I drove by, I observed an unidentified black male individual walk from the area of those residences and in his hand, he was carrying a black canvas tool bag, maybe, I don't know maybe a foot, foot in length.

Q.    And did you see what that person did with the bag as you were driving by?

A.    No, I did not.  I was -- I just drove by and saw what I could see using my mirrors, in my rearview mirror.

Q.    But where did the person with the bag go?

A.    He went up to the passenger side of the vehicle.

Q.    Of which vehicle?

A.    The defendant's green Armada.

            MS. WELSH:  I don't have any more questions.

            THE COURT:  Okay.  Cross-examination.

            MS. CHAVAR:  Can I just confer with Ms. Welsh for just a moment?

            THE COURT:  Sure.

            (Counsel confer.)

Lewis - cross

MS. CHAVAR:  I have a few questions for you.

CROSS-EXAMINATION

BY MS. CHAVAR:

Q.     On March 9th, 2017, you were conducting surveillance on 303 Wilmore Drive.  Did I get that correct?

A.     Correct.

Q.     Okay.  Where -- and at that point you saw a car drive up and -- with Mr. Colon?

A.     Yes.

Q.     Okay.  Where were you typically in relation to 303 Wilmore Drive?

A.     I pulled past Wilmore Drive.  The first intersection is Sherbourne Drive.  I was parked pretty much at the intersection of Sherbourne and Wilmore.

Q.     Okay.  Like how much feet away would you say that was?

A.     I mean, 75 yards.

Q.     Okay.

A.     It could be 215 feet, if I'm correct.

Q.     Were you situated so that you were looking out your front windshield?

A.     Yes, I was looking out the front.

Q.     Actually, I should back up and ask if you were seated in a vehicle?

A.     Yes, I was seated in a vehicle.

Lewis - cross

Q.      With your surveillance?  Okay.

And do you remember the weather conditions that day?

A.      No, I don't.

Q.      Okay.  You don't -- do you remember any like obstructions or --

A.      No.

Q.      As far as weather would be concerned, that it was, you don't remember it raining heavily?

A.      No, I do not.

Q.      And I believe that your testimony was that you were there, did I get this right, at 7:50 p.m.?

A.      Yes, I believe.

Q.      Okay.  So it would have been dark out?

A.      Dusk, dark.  Maybe dusk turning into dark.

Q.      Do you recall if there was a streetlight?

A.      No, I do not.

Q.      Do you recall if there were any -- if the residence was lit up?

A.      Not more -- not noticeably, not anymore than they would normally be at 7:00 o'clock at night.

Q.      Okay.  And I think your testimony was that you saw Mr. Colon pull up and he went in the house?

A.      Yes.

Q.      And he left a few minutes later?

Lewis - cross

A.      I don't have any idea how, how long he spent in the house.

Q.      Okay.  So you left shortly after he went in the house?

A.      No.

Q.      How long did you remain there?

A.      I remained there in the area long enough to follow him out of the area.  I did not have the primary eye.

Q.      Do you know who did have the primary eye?

A.      I -- off the top of my head, I'm going to say it was Officer Salvemini.

Q.      Okay.  And you never prepared a report on this surveillance, did you?

A.      No, I took notes and one surveillance report was conducted -- I mean completed by Officer Smith.

Q.      Okay.  Do you still have your notes?

A.      If I -- I don't have my notes in my possession.  They would have all been turned over to the DEA.

Q.      Okay.  Moving to March 10th, I just would like to confirm your testimony was that you conducted surveillance of 109 Pennewell Drive?

A.      Yes.

Q.      Were you seated in your car when you conducted it?

A.      I was seated in my vehicle but I was driving at the time.  The vehicle was moving.

Q.      Okay.  And you were behind the vehicle that you were surveilling?

A.      I was moving the entire time.  He was already -- the defendant was already parked on the side of the road in front of the residence.  So as I went past, my surveillance was whatever I could pick up as I drove past.  And what I was able to pick up in my rearview or side-view mirrors.

Q.      Would it be fair to say it took a couple seconds for you to drive past?

A.      Maybe a minute.  Possibly a minute, depending on the drive actually goes from Pennsylvania avenue all the way down to Bassett and there's two, two other intersections there, so the numbers on that street go from, I guess the single digits all the way up to the three hundreds.

Q.      Okay.

A.      300 block.

Q.      So for about a minute as you were driving your vehicle and looking the various windows, your rear-view, your side-view, you conducted surveillance of the area?

A.      Yes.  I was able to see.

Q.      And do you recall what time of day it was?

A.      That was mid-afternoon.  1400, 1500, maybe.  2:00 to 3:00 o'clock.

Q.      And do you recall the weather at the time?

A.      No, I do not.

Kashner - direct

Q.    And, again, you didn't prepare a report?

A.    No, I did not.

Q.    On that day?

A.    No.

Q.    And is it fair to say that whatever notes you would have had on that surveillance, you turned over to DEA?

A.    That's correct.

MS. CHAVAR:  Thank you.  That's all I have.

THE COURT:  Redirect?

MS. WELSH:  Nothing else.

THE COURT:  Thank you very much.  You're free to go.

THE WITNESS:  You're welcome.  Thank you.

THE COURT:  Bye-bye.

(Witness excused.)

THE COURT:  You can call your next witness.

MS. WELSH:  Thank you, Your Honor.  The government calls Thomas Kashner.

... THOMAS KASHNER, having been duly sworn as a witness, was examined and testified as follows ...

THE COURT:  Thank you.  Welcome.  Good afternoon, Agent Kashner.

THE WITNESS:  Good afternoon.

THE COURT:  Would you try to move the microphone a little bit?  We're having a little difficulty hearing you.

Kashner - direct

It should be adjustable.  Hopefully, that will be okay.

Go ahead.

DIRECT EXAMINATION

BY MS. WELSH:

Q.      Good afternoon.  I know you're capable of keeping your voice up, so let's try.  Okay?  Why don't you introduce yourself to the jurors, say who you are and where you work.

A.      Good afternoon.  I'm Thomas Kashner.  I'm employed by the Newport Police Department.

Q.      Okay.  As an employee of the Newport Police Department, what are your day-to-day duties?

A.      I work as a patrol officer and I'm a task officer with the Homeland Security Task Force as well as a part-time task force officer with the Drug Enforcement Administration Task Force.

Q.      Back in the 2016/2017, were you working with the DEA relatively frequently?

A.      I was.

Q.      Were you involved in the case involving defendant Omar Colon?

A.      I was.

Q.      What was your role on the case?

A.      I was assigned as a -- on the surveillance team.

Q.      When you were doing surveillance, were you given photographs of people of interest in the investigation?

Kashner - direct

A.    I was.

Q.    And how did you know where to go if you were told to go somewhere on a surveillance operation?  How did you get that information?

A.    We would be directed by, first monitoring phone calls or case agents that were monitoring the case.

Q.    The photographs that you received of people involved in the investigation, did those include photographs of the defendant, Mr. Colon?

A.    Yes.

Q.    Photographs of someone named William Brisco?

A.    Yes.

Q.    Were there others as well, is it fair to say?

A.    Yes.

Q.    Did you participate in the surveillance operation on March 12th, 2017?

A.    I did.

Q.    And was that at Pennewell Drive?

A.    Yes, ma'am.

Q.    What town is that in?

A.    New Castle.

Q.    All right.  And similarly, the way you just testified, were you called there by surveillance -- by case agents?

A.    Yes.

Q.      Based on intercepted communications?

A.      Yes.

        MS. WELSH:  I'd like to publish, please, Government Exhibit 416, which has already been admitted.

BY MS. WELSH:

Q.      All right.  So let's zoom in on March 12th, please.

        Is it fair to say you're not very familiar with these wire communications; correct?  A correct.

Q.      Okay.  But at 5:07 p.m., does this purport to show the defendant saying, I'm here?

A.      Yes.

Q.      And about 5:15 p.m., were you doing surveillance?

A.      I was.

Q.      Where were you?

A.      I was on the Pennewell Drive in New Castle.

Q.      And what did you see?

A.      Mr. Brisco exited Mr. Colon's Armada from the passenger side.  It was a windy day.  He was carrying a -- an object under his arm.  It was a red blanket that was covering the object.  At some point the, like, I a gust of wind came through and -- which revealed the object he was carrying was like a medium-sized box, black box.

        Mr. Brisco then responds around to the passenger side of his minivan and then puts the box in the minivan and then responds around to the driver's side and then departs

from the area.

Q.      In the minivan?

A.      Correct.

Q.      And when you started, you said that he was carrying an object.  Who was the he that was carrying an object?

A.      Mr. Brisco.

Q.      And where did Mr. Brisco get that object from?

A.      He exited the Armada with it.

Q.      And as Mr. Brisco was pulling away in the minivan -- first of all, were you able to identify that it was Mr. Brisco?

A.      I was.

Q.      How?

A.      We pictured the surveillance package that we had been provided.

Q.      And as Mr. Brisco was driving away, were you having conversations with the case agents about what to do next?

A.      Correct.

Q.      And what was the plan?

A.      We surveilled Mr. Brisco out of the area as he exited Pennewell Drive and onto 141 northbound and ultimately, onto 95 northbound, and he took the Concord Avenue exit from 95 north.  And we were, we were going to attempt to effect a vehicle-related arrest.

Q.      Were you able to do that?

A.      We were not.

Q.      Why?

A.      Shortly thereafter, Mr. Brisco ended up engaging in some kind of surveillance measures.

Q.      Like what?

A.      So we followed him to the City of Wilmington and Mr. Brisco started making some turns.  He essentially started traveling one way and then over a couple blocks and back to the same way he traveled, the same way he came, and eventually pulled over.  Obviously, we believe it was an attempt to identify law enforcement.

Q.      And what's your concern as a law enforcement officer when somebody is doing that?

A.      Obviously, that we've been seen or spotted, so obviously, we made a decision to break it down and end the surveillance.

Q.      Why does it matter if you have been spotted?

A.      I'm sorry?

Q.      Why does it matter if you have been spotted on surveillance?  Why does it matter?

A.      Obviously, our vehicles are going to be recognized again and we're going to be compromised.  It could be a safety issue as well as a case issue.

                MS. WELSH:   Okay.   That's the only questions that I have.

Kashner - cross

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MS. CHAVAR:

Q.     You didn't prepare a report of this surveillance, did you?

A.     I did not, no, ma'am.

Q.     And do you have notes on it, on the surveillance conducted that day?

A.     I didn't prepare a report.  The DEA agent did them.

Q.     I understand.  Did you take notes?

A.     No.  No, ma'am.

Q.     All right.

          MS. CHAVAR:  That's all I have.

          THE COURT:  Okay.  Redirect?

          MS. WELSH:  No, Your Honor.

          THE COURT:  All right.  Thanks very much, Mr. Kashner.  You're free to step down and go.

          THE WITNESS:  Thank you.

          (Witness excused.)

          THE COURT:  The government may call its next witness.

          MS. WELSH:  Your Honor, the government calls Greg Simpler.

          THE COURT:  Okay.

          ... GREGORY SIMPLER, having been duly sworn as a

witness, was examined and testified as follows ...

THE COURT:  Mr. Simpler, thank you.  Good afternoon.

The government may proceed.

DIRECT EXAMINATION

BY MS. WELSH:

Q.     Good afternoon.  Where do you work?

A.     I'm a Delaware State Trooper.

Q.     And what is your position with the Delaware State Police?

A.     Currently, I'm assigned to the criminal investigations unit as a surveillance unit, other detectives with surveillance, and locating subjects to further their investigations.

Q.     What's your rank?

A.     Corporal.  Master Corporal.

Q.     So should I call you Corporal Simpler?

A.     Sure, sure.

Q.     How long have you been employed by DSP, Delaware State Police?

A.     Coming up on 24 years.

Q.     And now you're assigned to an exclusively surveillance unit.  Was that the case in 2016 and 2017?

A.     No.  I was assigned to the DEA Task Force.

Q.     Were you what's referred to as a task force officer

with the DEA?

A.      Yes.

Q.      What does that mean?

A.      It means in that particular task force, we were -- I was to work drug investigations, investigations jointly and with the DEA, and that would include making drug buys, undercover drug buys, surveillance, and confidential informants, things of that nature.  Also, that would include surveillance.

Q.      How long were you a task force officer with DEA?

A.      About four years.

Q.      And that includes the 2016 to 2017 time frame?

A.      Yes.

Q.      Were you involved in the case involving defendant Omar Colon?

A.      Yes.

Q.      What was your role on the team?

A.      Mainly surveillance.

Q.      What sort of information does a surveillance officer generally have when going out to do an operation?

A.      Usually, we're briefed prior to the surveillance operation.  We're given pictures of people that we're going to do surveillance on, possibly pictures of the residence we're going to do surveillance.  If we were doing surveillance of a residence, whatever the location it might

Simpler - direct

be, possibly directions to it, some other -- any information that might be pertinent to that particular operation.

Q.     Were you familiar with what the defendant looks like?

A.     Yes.

Q.     All right.  I'd like to talk to you about some surveillance on February 18th, 2017.  Were you involved in a surveillance operation in Middletown that day?

A.     Yes.

Q.     And were you called there by the case agents based on some wire communications?

A.     Yes.

Q.     Okay.

        MS. WELSH:  If we could please display Exhibit 403.  This is already in evidence.

BY MS. WELSH:

Q.     Is it safe to say you weren't very familiar with the wire communications, you were more focused on surveillance?

A.     Correct.

Q.     Okay.  But does this text message appear to show Mr. Colon sending a text message to Shakira Martinez, and what does that text message say?

A.     303 Wilmore Drive.

Q.     Is that where you were doing surveillance?

A.     Correct.

Q.     At about 3:00 o'clock p.m., what did you see at 303?

Simpler - direct

A.      That a cream colored Chrysler 300 backed up into that residence, 303.  That a tall black male exiting the vehicle and going inside 303.

Q.      Were you able to identify who that person was?

A.      Not at that time.

Q.      What happened next?

A.      I observed a silver Infinity pull up to the residence.  There's a Hispanic female exit the vehicle and walk into 303.

Q.      And what did the Hispanic female do after she went inside?

A.      She went inside.  She had been in there for a few minutes.  After a couple minutes, she left the residence, got back into the Infinity and left the area.

Q.      Were you able to identify who that Hispanic female was?

A.      No.

Q.      Another surveillance operation -- did another surveillance operation occur on March 20th at Wilmore?

A.      Yes.

Q.      Again, were you sent there because the case agents told you there were pertinent communications?

A.      Yes.

Q.      So let's take a look at Exhibit 415, please.  And on March 20th, does this appear to show Mr. Colon saying, I'm

Simpler - direct

outside at about 8:03?

A.    Yes.

Q.    And around 8:03, what were you doing?

A.    I was outside the residence.

Q.    What residence?

A.    303.

Q.    And what did you see?

A.    At that point I observed a green Nissan Armada pull up in front of the residence, 3 Wilmore Drive.  Shortly thereafter, I observed Mr. Colon exit the Armada and Mr. Hackett opened the front door of 303 and Mr. Colon entered the residence.

Q.    How did you know what Mr. Hackett looked like?

A.    Just based on pictures.  That was presented prior to the surveillance.

Q.    What happened after that interaction with Mr. Colon and Mr. Hackett when you arrived?

A.    Once they went inside, they were in for a few minutes.  Then I observed Mr. Colon exit the residence with a light-colored grocery bag, walk back to the green Armada and left the area.

        MS. WELSH:  I don't have any more questions. Thank you.

        THE COURT:  Cross-examination.

        MS. CHAVAR:  Just a few.

Simpler - cross

**CROSS-EXAMINATION**

**BY MS. CHAVAR:**

Q.      **Hi.**

A.      **Hi.**

Q.      **When you were conducting the surveillance of 303 Wilmore Drive at 3:00 o'clock, you testified that a tall black male pulled up and went into the residence?**

A.      **Yes, that was the February 18th date?  Am I correct?**

Q.      **Hold on.  I don't think so.  I thought that was March 12th.  Is that correct?**

(Counsel confer.)

**BY MS. CHAVAR:**

Q.      **You are right.  It was February.  Okay.**

**And you weren't able to identify who that male was?**

A.      **Correct.**

Q.      **Correct?**

A.      **A tall black male.  Correct.**

Q.      **And the same thing with the Hispanic female, you were not able to identify that person?**

A.      **Also correct.**

Q.      **And the second surveillance that you conducted --**

A.      **Yes, ma'am.**

Q.      **-- I think your testimony was that you saw Mr. Colon leaving 303 Wilmore Drive with a grocery bag?**

A.     Yes.

Q.     Okay.  And you didn't stop him?

A.     No.

Q.     Okay.  So you still don't know what was in that grocery bag?

A.     No, I don't.

Q.     Did you prepare any report on those surveillances?

A.     No, I gave the information over to one of the case agents and they prepared a report from that.

Q.     Did you give the information in the form of, like, verbal report or did you just scratch out some notes and hand it over?

A.     Honestly, I can't recall whether I did notes or just spoke to him and gave him the information.

Q.     Okay.

A.     It was quite a while ago.

        MS. CHAVAR:  That's all I have.  Thank you.

        THE WITNESS:  Thank you.

        THE COURT:  Redirect.

        MS. WELSH:  No, Your Honor.

        THE COURT:  All right.

        Thank you very much, Corporal Simpler.  You are excused.

        THE WITNESS:  Thank you.

        THE COURT:  You may call your next witness.

Burris - direct

MS. CLOUD:  Thank you, Your Honor.  We'd like to call Detective Michelle Burris now.

THE COURT:  Okay.

... DETECTIVE MICHELLE BURRIS, having been first duly sworn, was examined and testified as follows ...

THE COURT:  Good afternoon.  Welcome, Detective Burris.  Thanks for being here.

You may proceed, Ms. Cloud.

DIRECT EXAMINATION

BY MS. CLOUD:

Q.     Good afternoon, Detective Burris.  Where do you work?

A.     New Castle County Police.

Q.     How long have you been employed by the New Castle County Police Department?

A.     Since January 2009.

Q.     What is your current position at the New Castle County Police Department?

A.     I'm a detective with the major crimes unit.

Q.     How long have you been with the major crimes unit?

A.     Since February of this year.  And prior to that, I was in the family services unit.  And then prior to that, I was in the drug control squad as detective.

Q.     When you were in the drug control squad, were you a part of the drug control squad during the year 2017?

A.     I was.

Burris - direct

Q.      In your work in the drug control squad, did you ever have occasion to work with the Drug Enforcement Administration?

A.      Yes.

Q.      Did you participate in a case involving the defendant Omar Morales Colon?

A.      Yes.

Q.      And what was your role in that team?

A.      I was just basically doing surveillance.  Mobile surveillance, either following someone or setting up at a location and doing surveillance.

Q.      Do you recall a surveillance operation on or about February 18th, 2017?

A.      Yes.

Q.      Do you remember in what town you were participating in surveillance that day?

A.      Yes.  Middletown, Delaware.

Q.      Okay.  And where were you?

A.      I was positioned at the Wawa, on the side of the Wawa that is closest to the entrance of Route 299 and where it comes into the neighborhood.

Q.      Okay.  Prior to that surveillance operation, did you review a briefing of potential individuals you might see that day?

A.      Yes.

Q.      And you reviewed photographs as part of that briefing?

A.      That is correct.

Q.      Around 3:00 p.m. that day, what did you see?

A.      A silver Infinity.  It was on 299 and made a left-hand turn onto Gloucester Boulevard and then responded into a residence.

Q.      Did you see who was driving that silver Infinity?

A.      I did.  It was Shakira Martinez.

Q.      And how did you recognize her?

A.      From a photo that I saw before the surveillance.

Q.      Did you ever have occasion to see Shakira Martinez again?

A.      Yes.

Q.      In 2017?

A.      Yes.  At her residence.

Q.      Okay.  And where is her residence?

A.      4010 Old Kirkwood St Georges Road.

Q.      Is that only Ms. Martinez's residence or does anyone else live there?

A.      Omar Colon lives there.

Q.      Are you familiar with what the house looks like?

A.      Yes.

Q.      And were you at that house just once or more than once?

A.      Twice.

Q.      Okay.  Was the first time May 6th, 2017?

A.      Yes.

Q.      And was the second time May 9th, 2017?

A.      That is correct.

Q.      Detective Burris, could you please take a look at Government Exhibit 1158 in the binder before you?  And take your time.  The binder is a little difficult to maneuver.

            MS. CHAVAR:  What exhibit number?

            MS. CLOUD:  1158.

BY THE WITNESS:

A.      Okay.

Q.      Detective Burris, have you had an opportunity to look at Government Exhibit 1158?

A.      Yes.

Q.      What is it?

A.      That's the residence.

Q.      Okay.  Does it truly and accurately depict the 4010 Kirkwood St Georges residence as you recognized it on May 6th, 2017?

A.      Yes.

            MS. CLOUD:  Your Honor, at this time we move for the admission of Government Exhibit 1158.

            MS. CHAVAR:  No objection.

            THE COURT:  It's admitted.

(GX-1158 was admitted into evidence.)

MS. CLOUD:  Ms. Roca, if you will display.

BY MS. CLOUD:

Q.    So, Detective Burris, just for the record, what is this in the photograph?

A.    That is the residence.

Q.    Is there a yard on the -- toward the left-hand side of the house, is there a yard on the other side?

A.    Yes, there is.

MS. CLOUD:  Okay.  Ms. Roca, you can bring that down.

BY MS. CLOUD:

Q.    Can we talk about the yard?

A.    Yes.

Q.    So were you in the yard at the side of the house on May 9th, 2017?

A.    I was.

Q.    And what, if anything, did you notice when you were outside in that side yard?

A.    So on the left-hand side, as you were looking at the front of the house, you can't see it in this picture but there is a chimney, a full chimney that goes all the way up. There is also a shed, a full shed in that side yard, in the rear of the yard.

Q.    Okay.  Was there a chimney on the pool house?

A.      Yes, there was.  And when we went inside the pool house, there was actually no fireplace there.

Q.      So there is a chimney but no fireplace?

A.      Yes.

Q.      Okay.  What about -- you mentioned that there is a full chimney on the main residence as well; right?

A.      That is correct.

Q.      What did you notice about the fireplace inside the house?

A.      So when I was inside, I noticed it was a gas fireplace.  Typically gas fireplaces, you don't need a full chimney.  It's just a half chimney that comes out unless you want it for other reasons to have a full chimney, but I thought that was odd.

Q.      Okay.  Did you see Shakira Martinez at the house on May 9th, 2019?

A.      I did.

Q.      Did you ask her about the fireplace?

A.      We did.  And she shrugged her shoulders and said, you know, I don't know.

Q.      Did you explore that fireplace more after that?

A.      Yeah.  So first, at the bottom of the gas fireplace there's like a metal bracket that you pull off and that is usually where the wires that are connected to the mechanism that you turn the gas fireplace on.  So we pulled that off

and they weren't connected at all.  The wires were capped and they weren't -- it was inoperable.

Q.    Okay.

A.    So I thought that was strange as well.

Q.    So you observed an inoperable fireplace?

A.    Yes.

Q.    Okay.  What happened next?

A.    So in that time, we were going back and forth to outside and looking on the inside, there were detectives and other, other people looking in the shed.  They had to take out a whole bunch of stuff from the shed that was piled up, and then they discovered that there was a hole in the bottom of the shed.

Q.    Did you go look at that hole in the bottom of the shed?

A.    I did.

Q.    And when you looked in the hole, what did you see?

A.    It was a room that had fans, lights, ballasts, fans were running, the lights were on, and there was some potted plants down there.

Q.    Could you access that room below from the shed?

A.    You could have, but it was a far drop.  So you probably would have hurt yourself if you had to jump down in there.

Q.    Okay.  So as you're going from the outside back

inside, what happens next?

A.      So I went back inside and looked at the fireplace. And before I went inside, I looked at the chimney and you can see the stucco that goes up and then at the top, you can see like there was a silver piece.  So we went back inside and we decided that, you know, let's take off the mantle.

So we started to remove the mantle and that really wasn't attached very well at all.  So then they started removing the drywall around the fireplace insert. And once you remove the drywall, you can see that on top of the metal box that is the fireplace insert, there was a hook that was hooking onto it.  It looked like a wire that went further up into the wall, like a wench or something like that.

Q.      Okay.  Detective Burris, I'd like you to take a look at about five photos in your binder.  So I'm going to give you the names to read out and if you can look at all five of these?

1083.  They're between 1083 and 1123 if that helps.

A.      Okay.  I'm looking at 1083.

Q.      1083, 1086, 1103, 1115 --

A.      1115.

Q.      -- and 1123.  That is five; right?

A.      1123, yes.

Q.    Can you take a moment to review and tell me when you are ready?

A.    Okay.

Q.    Do you recognize what is in these five exhibits?

A.    I do.

Q.    What are they in general?

A.    Pictures of the residence where the fireplace was. 1123, you can see on the top of the metal insert, the hook on top of the metal insert, as well as the hook that is attached to it with a wire.

Q.    Are these photographs that were taken on May 9th, 2017 or -- to your knowledge?

A.    Yes.

Q.    Do they truly and accurately depict what you saw that day?

A.    Yes, they do.

        MS. CLOUD:  Your Honor, at this time I would like to admit Government Exhibit 1083, 1086, 1103, 1115, and 1123.

        MS. CHAVAR:  No objection.

        THE COURT:  They're all admitted.

        (GX-1083, GX-1086, GX-1103, GX-1115, GX-1123 were admitted into evidence.)

        MS. CLOUD:  Thank you, Your Honor.

        So, Ms. Roca, will you please display Government

Exhibit 1123.

BY MS. CLOUD:

Q.    So, Detective Burris, can you describe what you are seeing in this photo?

A.    So that's the fireplace insert, and on top of it, you can see there is a metal circular hook on top of it, and then there is a wire that comes down with another metal hook that is attached to the one that is on top of the insert.

Q.    So that, that hook and the wire leading up, was that there when you first opened the fireplace?

A.    Yes.  You could barely see it, so then you had to remove more of the drywall.

Q.    Okay.  Can we please look at Government Exhibit 1115?

A.    Yes.

        MS. CLOUD:  Ms. Roca, if you will display. Thank you.

BY MS. CLOUD:

Q.    So what does this picture show?

A.    So that is after, we couldn't figure out how to remove the metal insert to get the wench to like pull it up.  So ultimately they pulled the wire down, removed it from the hook and pulled the insert completely out of the wall.

Q.    Okay.  And when you removed the insert from the wall, behind, behind the portion of the wall in the living room,

Burris - direct

in the exposed area behind, is there anything that you see in that exposed area?

A.      Yes.  On the right-hand side, you can see a metal ladder that is on the inside of the wall of where it is exposed.

Q.      Okay.  Can you take a look at Government Exhibit 1083, and it will also appear on your screen, Detective Burris.

A.      Oh.

Q.      What is this a photo of?

A.      That's inside the wall.  That's the same ladder that was seen on the outside, but the bottom of the ladder, taking it from looking up.

Q.      At some point did you go down this ladder?

A.      I did.

Q.      And what did you see when you went downstairs?

A.      When you first climb down the ladder, to the left there is the first room you go into and the ceiling is actually like a normal ceiling.  You didn't have to really crouch down.  You could just walk right through.

So the first room on the left had some fertilizer, some dirt and stuff like that.  It wasn't lit up.  And as you can see to walk forward, it was another door, door frame, doorway, and you went into these rooms where the lights were on, the fans were on.  It was the room

Simpler - cross

that you could see from the shed.

Q.      Okay.  And can you please take a look at Government Exhibit 1103?  It will appear on your screen.

Detective Burris, what is that a picture of?

A.      That's the room with the lights and the fans and everything that you could see through the shed, through the floor of the shed.

Q.      Okay.  And can you please take a look at Government Exhibit 1086?  1086.

A.      Yes.

Q.      And, Detective Burris, what is this?

A.      That's just another picture of that same room, of the ballasts and the lights.  It looks like it's coming through the door as you're walking through the door.

Q.      Can you --

MS. CLOUD:  One moment.

No further questions Your Honor.

THE COURT:  Okay.  Cross-examination.

CROSS-EXAMINATION

BY MS. CHAVAR:

Q.      Good afternoon.

A.      Good afternoon.

Q.      I just have a few questions.

THE COURT:  Ms. Chavar, I'm not sure we can hear you.

Burris - cross

BY MS. CHAVAR:

Q.    I just have a few questions because it's hard for me to recognize what I'm looking at in some of these photographs.

Okay.  So in 1103, which is the one -- do you have that in front of you?

A.    I do.

THE COURT:  Do you want to put it on the screen as well?

MS. CHAVAR:  Would you mind doing it?

THE COURT:  Sure.  Someone can do that.  Thank you, Ms. Roca.

BY MS. CHAVAR:

Q.    It looks like I think -- let me put it this way.  Is this what you were referring to when you said you saw pots down there?

A.    Yes.

Q.    Okay.  It looks like they have dirt in them to me.

A.    Yes.

Q.    Okay.  And that would be in the same as in the photograph of 1086?

MS. CHAVAR:  Might I impose?  Thank you.

BY MS. CHAVAR:

Q.    The same question.

A.    Yes.

673

Burris - cross

Q.   Okay.  Now, if you look at 1086, and then we look at 1083?  Thank you.

Okay.  So the lighting -- well, first, let me ask you.  It looks like 1083 leads into this area, which is pictured in 1086, or did I -- is that what you testified?

A.   No.  So 1083, you walk down the ladder.

Q.   Okay.

A.   And there is a smaller room that is dark.

Q.   Okay.

A.   You don't see it here.  And then you keep walking straight and there's a bigger room that's lit up.

Q.   That bigger room, what's pictured in 1083?

A.   Yes.

Q.   Thank you.

Did you take these photographs?

A.   I did not.

Q.   Just if you remember, for the lighting purposes in this photograph, in 1086, and you'll agree with me, at least the one I'm looking at has light a yellowish cast?

A.   Yes.

Q.   Okay.  Do you recall if that was from overhead lighting there or is that maybe the flash of the camera, I guess?

Let me ask you:  Do you recall there being lights on?

Burris - cross

A.      Yes, I do.

Q.      All right.  I think I'm done, but let me just look and be sure.

                MS. CHAVAR:  That's all I have.  Thank you.

                THE COURT:  Redirect?

                MS. CLOUD:  No redirect, Your Honor.

                THE COURT:  All right.  Thank you.

                Thank you, Detective Burris.

                THE WITNESS:  Thank you.

                THE COURT:  You are excused and free to go.

                (Witness excused.)

                MS. CLOUD:  Your Honor, our next witness is Special Agent Smith.  It will be slightly longer testimony.

                THE COURT:  It's a good time for a break. Ladies and gentlemen, we'll give you your afternoon break. At this point, no talking about the case.  See you in a bit.

                (The jury was excused for a short recess.)

                THE COURT:  Before we take a recess, I want to make sure we're all clear on Exhibits 415, 416 and 417. That was the initial objection about the summary.  I'm looking at the order that I signed.  The estimated transcript contained in Exhibits 415, 416, 417 are admissible and statements of the party opponent and co-conspirator statement, their summary form is permissible

as an aid to the jury pursuant to Rule 1006.

The full exhibits are each just the one page. Right?

MS. CLOUD:  Yes.

MS. WELSH:  That's right, Your Honor.

THE COURT:  They're a summary because it's dated as pulled from some other voluminous set of records.  Is that right?

MS. WELSH:  Yes.  All of the wire transcripts.

THE COURT:  Okay.  And what the government requested, and I think there was no objection, and my order confirmed, is that each of those three pages, three different exhibits is admissible as evidence if there's a reference to 1006, but I mean it's also an aid to the jury that we've admitted them into evidence.  That's your understanding?

MS. WELSH:  That's my understanding, Your Honor. I will note we did not use Exhibit 417 and don't intend to, but 415 and 416, that's our understanding.

THE COURT:  Okay.  All right.  Ms. Chavar, any more confusion or concerns about that?

MS. CHAVAR:  No, Your Honor.

THE COURT:  Okay.

MS. CHAVAR:  Thank you.

THE COURT:  Thank you.

MS. CHAVAR:  Thank you, Your Honor.

THE COURT:  We'll take a recess.

MS. CHAVAR:  Sorry for the confusion.

(Brief recess taken.)

*    *    *

(Proceedings resumed after the short recess.)

THE COURT:  Did you want to talk about the schedule before I bring the jury in?

MS. CLOUD:  Yes, Your Honor.

MS. WELSH:  I apologize, Your Honor.

THE COURT:  That's okay.  Why don't you tell me where we are from the government's perspective.  I understand there may be a scheduling question.

MS. CLOUD:  So, Your Honor from the government's perspective, we're going to put on Special Agent Smith to testify.  I think it will be somewhere around 45 minutes of testimony, so depending on cross, that may get us to the end of the day, but we also have Sergeant Maurer here to testify and he would be brief, and then we would have two more witnesses, that's right, tomorrow morning.

THE COURT:  Okay.  And how long do you anticipate them being?

MS. CLOUD:  One I would hope would be relatively short, and the final one is our expert witness, resident agent in charge for now, and I would say he is more like an

hour.

THE COURT:  All right.  And, Ms. Chavar, I understand there may be a request for starting at a certain time tomorrow.  Did I understand correctly and what would you like?

MS. CHAVAR:  Thank you, Your Honor.  Yes.  The reason why I'm asking to bring the jury in a little later tomorrow is so that I have the opportunity in the morning to meet with Mr. Colon in the Marshal's holding cell to discuss his decision regarding testifying.

If he were -- you know, if we go today until 5:00 o'clock, say, by the time the Marshals get him back to the Federal Detention Center and he gets processed in, he has to get processed in before he can then be brought down to visitation.  Even if I'm there waiting for him, there wouldn't be enough time because you have to be out by quarter to 8:00.  So it would be helpful if I could meet with him here from like 8:30 to 10:00 o'clock in the morning and the jury would be brought in at 10:00, and if that would be something the Court would consider, I would appreciate it.

THE COURT:  All right.  Does the government have any objection to that?

MS. WELSH:  We don't, Your Honor.

THE COURT:  Okay.

MS. WELSH:  We think it's important for her to have that time to talk with her client.

THE COURT:  I agree with that.  It sounds like we're well within the schedule we've set out for the jury. I think we know the jury is clear through the rest of the week.  At least they should be based on what they've told us at jury selection, so that's fine.

I will let the jury know at the end of the day today that they are not needed until -- we'll just say everything is an hour later tomorrow.  We'll try to get started as close to 10:00 as we can.

MS. CHAVAR:  Yes.

THE COURT:  But I will meet with you all first as close to 9:45 as possible, but take the time you need with your client and then once I know you're all ready, I will come in and see if you have any issues, Ms. Chavar.

MS. CHAVAR:  Thank you.  I will notify the Court as soon as I'm done.  Just one more, like, procedural question.

THE COURT:  Okay.

MS. CHAVAR:  I don't want to cause confusion again this afternoon.  I may refer to the proffer report during Agent Smith's testimony.  I went to the Federal Defender's office and made copies during lunch.  Am I

permitted -- I remember there was a period during COVID where I wasn't allowed to use paper.  Should I use the laptop again?

THE COURT:  Paper is fine.  Special Agent, do you have a concern about paper?

THE WITNESS:  No.

THE COURT:  Is there anything else?

MS. WELSH:  Your Honor, if we could just resolve in advance the evidentiary issue here, I think that would probably be helpful for everybody.

THE COURT:  All right.  What is the evidentiary issue?

MS. WELSH:  So there isn't one right now. Certainly, Special Agent Smith can be confronted with his report and asked about Mr. Valdez's prior inconsistent statements or what the defense is going to say are prior inconsistent statements.

The issue is then we should be permitted under the rules of evidence to introduce statements that Mr. Valdez made in prior proffer sessions.  We obviously wouldn't do all of them because there are several proffer sessions, but some selected content should be admissible under the rules because his credibility is being attacked based on those statements.

THE COURT:  Is there a dispute about that?

MS. CHAVAR:  Yes.  I'm sorry, Jen.  I didn't understand it.  That was something you were looking to do.

It seems to me and I'm being very discreet.  In limiting the inconsistent statements and the proffer, I don't understand the need then to go back through his testimony and confirm what was consistent.

It seems to me that in her closing, she could say, you know, that -- they could discuss then the fact that, however they want to play it, there were only several inconsistent statements, but for the whole, his testimony was consistent.

MS. CLOUD:  There's no evidence right now --

THE COURT:  Hold on.

MS. CLOUD:  Go ahead.

THE COURT:  Anything further, Ms. Chavar?

MS. CHAVAR:  It just seems like it's a back-door way to repeat his testimony.

THE COURT:  All right.  What does either one of you for the government --

MS. WELSH:  Pick one, yes.

THE COURT:  What's the rule, and just briefly, what's your response?

MS. WELSH:  Your Honor, we're looking at 801(d)(1)(B), so (d)(1)(A) relates to inconsistent statements inconsistent with a declarant's testimony that

was given under penalty of perjury at trial.  (d)(1)(B) relates to consistent statements.

So it says a statement that meets the following positions is not hearsay.  Consistent with the declarant's testimony, it is offered either to rebut and express an implied charge that the defendant recently fabricated it or acted from a recent improper influence or motive of testifying or to rehabilitate the declarant/s testimony as a witness and attacks on other ground.

And certainly, the government could say, you'll hear about a little things couple little things that are inconsistent.  There's nothing in the record unless we do this exercise to say when Mr. Valdez was initially interviewed and gave a proffer, he told the same story. That would not be in the record.  Largely, the same story with these couple of exceptions unless we did this, and obviously, we wouldn't want to, you know, repeat all of Mr. Valdez's testimony.  That would be very wasteful of the jury's time, but a couple of little important facts from his proffer or in his post-arrest statement would be non-hearsay statements that would be used to rehabilitate his credibility in light of the inconsistent statements.

THE COURT:  Ms. Chavar, do you have a view on the interpretation of 801(d)(B)(ii) or is your concern more a Rule 403 concern about maybe unfair prejudice or

682

cumulative evidence, waste of time, that sort of thing?  Or is it both?

MS. CHAVAR:  Give me a moment, please.

THE COURT:  Sure.

(Pause.)

MS. CHAVAR:  Okay.  I do not dispute their interpretation.  Here is what is giving me trouble to answer.

As I look at this, and I think the focal point is to rehabilitate the declarant's credibility as a witness when attacked on another ground.

I mean, I would think that it would have to be whatever statement you want to honor has to be in some relationship to the one, the statements that I am saying were inconsistent.

THE COURT:  Ms. Welsh, do you know which statements she is going to challenge as inconsistent and to the ones you would want there are consistent, do they relate to it in some way?

MS. WELSH:  So one of the statements that's she wants -- that she is going to say is inconsistent, which we agree by the way is inconsistent, but there is a prior proffer that is consistent and --

THE COURT:  On that point.

MS. WELSH:  On that topic, and so for that,

683

there is sort of, you know --

MS. CHAVAR:  Well -- no.  I'm sorry.  In both proffers, he says it was at the dinner.  I just showed you that.

(Counsel confer.)

MS. CHAVAR:  Can I just try to make an offer?

(Counsel further confer.)

MS. WELSH:  Yeah.  I mean, I think as to that one, then even Ms. Chavar's concern is addressed, but I think we can go further than that under, under the rule. I'm not talking about going much further, but there are a couple of really important ways in which Mr. Valdez has always said the same things, and I think it would be appropriate for us on a very limited basis to point those out to Special Agent Smith.

THE COURT:  Well, all of you have your rights as this comes out to make further objections or ask for leave to do something further, but at this point, I'm in agreement with the government about what the application of Rule 801(d)(2) -- I'm sorry, 801(d)(1)(B)(ii) is here, meaning as I understand it, the defense intends to, and in fact, already has, suggested an inconsistency in some statements by the witness, Mr. Valdez; evidently is going to do more of that.

And so I do think that makes it non-hearsay for

the government to attempt to rehabilitate the declarant

Mr. Valdez's credibility as a witness including through

submitting consistent statements.

The issue to me is a 403 one, and based on the

representation from the government, that they don't plan to

try to recreate all of or even a significant lengthy portion

of Mr. Valdez's testimony through this mechanism, it seems

likely that the 403 balance is going to allow the government

to do what it wants to do, but that is subject to change and

decisions on the fly.

So, Ms. Chavar, feel free to object if you think

the government is going too far or if any particular effort

to show a consistent statement is inappropriate; okay?

Understood?

Ms. Chavar?

MS. CHAVAR:  Understood.  Thank you, Your Honor.

THE COURT:  Okay.  Ms. Welsh?  Ms. Welsh

understood?

(Counsel confer.)

THE COURT:  Ms. Welsh, do you understand that?

MS. WELSH:  Yes, Your Honor.  Yes.

THE COURT:  All right.  Let's bring the jury in.

MS. CLOUD:  Your Honor, I apologize.  One quick

moment.  This is an exhibit that is going to be introduced

during Special Agent Smith's testimony.  It is incredibly

heavy.  Can he be permitted at the time to come walk over because there is a little bit of actual lifting.

THE COURT:  Yes, and then what would you have him do with it?  Is he going stand there with it or take it all the way back to the witness stand.

MS. CLOUD:  I think it would be easier -- having lugged it, I think it's pretty sure it's at least 50 pounds. He can do it easier than me, but I think it would be easier to take this off here to display what is underneath and then just leave it here.

THE COURT:  Okay.  Any objection to that, Ms. Chavar?

MS. CHAVAR:  I do not.

MS. CLOUD:  Thank you.

THE COURT:  That's fine.

MS. CLOUD:  Okay.

THE COURT:  I don't want anyone to hurt themselves.

MS. CLOUD:  I may have already, but that's okay.

THE COURT:  Well, we can't turn back time.

MS. CLOUD:  That's right.

THE COURT:  All right.  Let's bring the jury in.

(Counsel confer.)

(Jury returned.)

THE COURT:  We are ready to continue.  The

Smith - direct

government may call its next witness.

MS. CLOUD:  Thank you, Your Honor.  Your Honor, at this time, we would like to call to the stand Special Agent Smith.

THE COURT:  Okay.

Special Agent Smith, welcome back to the witness stand.  I remind you that you are still under oath, of course.

THE WITNESS:  Yes, Your Honor.  Thank you.

... SPECIAL AGENT JEREMY SMITH, having been previously placed under oath, testified further as follows  ...

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MS. CLOUD:

Q.     Special Agent Smith, good afternoon.

A.     Good afternoon, ma'am.

Q.     In the first part of your testimony, did you testify that there was a wire intercept on Target Telephone 8?

A.     Yes.

Q.     I think I may have asked you if that number for Target Telephone 8 was 302-230-6186.  Does that sound right?

A.     Yes.

Q.     Was the actual phone number intercepted on Target Telephone 8 302-230-6519?

A.     Yes.

Smith - direct

Q.      Is Target Telephone 8A 302-230-6186?

A.      Yes, it is.

Q.      Okay.  So I now want to turn your attention to May 9th, 2017.  Where were you on May 9th, 2017?

A.      I was here in Delaware.

Q.      Okay.  Any specific location?

A.      Yes.  I participated in a search warrant that was executed at defendant's residence 4010 Kirkwood St Georges Road in Bear, Delaware.

Q.      Okay.  Can you describe generally what you saw when you were at 4010 Kirkwood St Georges Road that day?

A.      Yes.  When I responded to the location, the search was actually partially underway, and so when I arrived there, there were agents, investigators that had been -- had begun the search of the residence.

Q.      Okay.  Special Agent Smith, I'd like you to take a look at a series of exhibits.  One, two, three, four, five ... 11 different pages in your binder, and they start at 1087 and they go to 1162.  So I will read out the list when you are ready.

A.      Okay.

Q.      So 1087?

A.      Yes.

Q.      1091?

A.      Yes.

Smith - direct

Q.      1102?

A.      Yes.

Q.      1107?

A.      Okay.

Q.      1113?

A.      Yes.

Q.      1118?

A.      Yes.

Q.      1119?

A.      Very good.

Q.      1132?

A.      Yes.

Q.      1152?

A.      Okay.

Q.      1156?

A.      Yes.

Q.      And 1162?

A.      Very good.

Q.      Special Agent Smith, are you familiar with these exhibits?

A.      Yes, I am.

Q.      What are they?

A.      These are photographs of -- taken from various locations on May 9th, 2017 at 4010 Kirkwood St Georges Road in Bear, Delaware.

Q.    Do they fairly and accurately depict everything that you saw at 4010 Kirkwood St Georges Road that day?

A.    Yes.

MS. CLOUD:  Your Honor, at this time, I can read them off for the record.

THE COURT:  Are there any objections to them, Ms. Chavar?

MS. CHAVAR:  In looking at them, I think some of them are already admitted, but ...

THE COURT:  What if we read the list?

MS. CLOUD:  Sure, I will read the list.

MS. CHAVAR:  I'm okay, unless Your Honor wants to have them read.

THE COURT:  Tell me which ones are objected to, please.

MS. CHAVAR:  No objection.

MS. CLOUD:  Okay.

THE COURT:  No objection.  Okay.

MS. CLOUD:  Can I read the list out or do you have it?

THE COURT:  I think we have the list.

MS. CLOUD:  Okay.

THE COURT:  Those exhibits are all admitted.

(GX-1087, GX-1091, GX-1102, GX-1107, GX-1113, GX-1118, GX-1119, GX-1132, GX-1152, GX-1156, GX-1162 were

admitted into evidence.)

MS. CLOUD:  Okay.  Thank you.

BY MS. CLOUD:

Q.    Special Agent Smith, there has been some testimony regarding multiple openings to the underground room.  Are you familiar with those openings?

A.    Yes.

Q.    Did you personally see the shed?

A.    Yes.

Q.    In the side yard?

A.    Yes, I did.

Q.    Before we talk about anything further below, did the DEA seize anything out of that shed?

A.    Yes.

MS. CLOUD:  Can you please show Exhibit 1152.

BY MS. CLOUD:

Q.    Special Agent Smith, what is Government Exhibit 1152?

A.    It's a hydraulic press.

Q.    And was that seized into evidence?

A.    It was.

Q.    Is it very large?

A.    Yes.

MS. CLOUD:  Okay.  All right.  Moving back to the ground, Ms. Roca, can you please display Exhibit 1119?

BY MS. CLOUD:

Q.    Special Agent Smith, what do you see here?

A.    It's the floor of the shed in the defendant's backyard.

MS. CLOUD:  And, Ms. Roca, will you please display Exhibit 1113.

BY MS. CLOUD:

Q.    And, Special Agent Smith, what is depicted here?

A.    This is also the floor of the shed in the backyard at a later stage of removing the floorboards and uncovering what was underneath.

Q.    Did you go underground at some point, Special Agent Smith?

A.    Yes, I did.

Q.    How did you get down there?

A.    I climbed down through the defendant's living room, through the ladder in his fireplace area.

Q.    Okay.  Can you please take a look at Exhibit 1087?

A.    (Witness complies.)

Q.    Special Agent Smith, do you recognize what this shows?

A.    Yes.

Q.    What does this show?

A.    This is a photograph taken from the main area of the underground bunker of -- oriented upwards into the hole underneath the shed that is pictured more or less in the

center of the photograph.

Q.    Okay.  And can you please take a look at Exhibit 1102?

A.    (Witness complies.)

Q.    What does this show?

A.    This is a photograph taken of what is described as the main room within the underground bunker.

Q.    At some point, were -- first of all, what are the black containers depicted in the photo?

A.    They're potting plants.  Potting containers.

Q.    Okay.  How many filled -- can you estimate how many filled potting containers there were?

A.    Approximately 155.

Q.    And, Special Agent Smith, can you take a look at Government Exhibit 1091?

A.    (Witness complies.)

Q.    What does this show?

A.    Yes.  This is just another photograph again of the main room of the bunker, showing some of the pots and the other equipment contained therein.

Q.    Okay.  Do you -- can you see from this photo what are the, the mixture inside the pots?

A.    Yes.  What those were are composite stones.  They, they were little rocks.  They weren't actually -- they appear to be artificial in nature.

Smith - direct

Q.      Okay.  And can you please -- actually, let me ask you a question.  Did agents find those stones anywhere else?

A.      Yes.

Q.      Find them outside?

A.      Yes, we did.

Q.      Can you take a look at Government Exhibit 1132?

A.      (Witness complies.)

Q.      And what does this photo show?

A.      This is a photograph taken outside of the defendant's residence depicting some of the artificial stones I described that were contained in the pots in the bunker.

Q.      All right.  So back to the underground area.  Was the only room down there the room with the -- with the pots?

A.      No.

Q.      Were there other rooms?

A.      Yes.

Q.      Was anything found in any of those other rooms?

A.      Yes.

Q.      Do you recall what was found?

A.      Marijuana.

Q.      All right.  But that was not found in the main room; right?

A.      No, it was not.

Q.      All right.  Can you please take a look at Exhibit 1156.

Special Agent Smith, what is this showing?

A.      This is a black garbage bag that contained harvested marijuana.  It was first contained in this black trash bag.

The black trash bag was located on a table within a smaller room that was located adjacent to the smaller room of the underground bunker.

MS. CLOUD:  Your Honor, may I have permission to approach the witness?

THE COURT:  You may.

(Ms. Cloud handed an exhibit to the witness.)

MS. CHAVAR:  I can walk over.

(Ms. Cloud handed an exhibit to the witness.)

BY MS. CLOUD:

Q.      Special Agent Smith, I've handed you what has been marked as Government Exhibit 30?

A.      Yes.

Q.      What is Government Exhibit 30?

A.      This is the marijuana that was seized from the underground bunker pictured in Government Exhibit 1156.

Q.      All right.  Well, government Exhibit 30 doesn't look like government Exhibit 1156.  Can you just explain why?

A.      Sure.  The -- in the process of processing and sealing the marijuana and placing it in evidence, it was placed within a DEA evidence box.  It was taped shut and

also there was a seal placed on where the tape was made and also the evidence label along with the -- this document, the seizure of the evidence.

Q.    Special Agent Smith, is there a sealed seal bearing Maolin Li's signature or initials on there?

A.    Yes, there is.

Q.    Okay.  Did you recover this box when you went up to the lab in New York about ten days ago?

A.    Yes.

Q.    Okay.  Did you label the -- the substance that you seized from the bunkers bunker, did you label that as Government Exhibit 30?

A.    Yes.

Q.    Okay.  Special Agent Smith, can I turn your attention back on the screen at 1118, Government Exhibit 1118.

What does this picture show?

A.    This is a photograph that was taken from the second story of the defendant's residence.  What we attempted to do in this photograph is to more or less lay out an outline of the underground bunker as it would have been below the ground.

So the -- in the far right portion of the photograph, you can see the chimney stack referenced by Detective Burris in her earlier testimony, and you see some two-by-fours for a piece of plank or board that would

designated the initial hallway, which led from where you arrive when you walk down the ladder out the short hallway into the two additional rooms contained within the underground bunker.  And those again are outlined, albeit roughly, with patio furniture, hoses, and the like.

Q.      And Special Agent Smith, there's a larger house towards the back in this photo and a smaller structure about in the middle of the photo.  Can you differentiate which one is which?

A.      Sure.  On the left-hand side, the structure on the left-hand side is the shed, which we discussed at length. And also on the right-hand side is what I would describe as a pool house or an in-law suite that was located in the corner of the property.

Q.      So Special Agent Smith, was there anything found in the house itself during the search of 4010 Kirkwood on May 9th, 2017?

A.      Yes.

Q.      Did you find any additional potential substances?

A.      Yes.

Q.      Special Agent Smith, if I may approach you again?

A.      Yes.

            MS. CLOUD:  Sorry.

            THE COURT:  Feel free to approach.

            (Ms. Cloud handed an exhibit to the witness.)

THE WITNESS:  Thanks.

BY MS. CLOUD:

Q.    Special Agent Smith, I've handed you what has been marked as Government Exhibit 29.

A.    Yes.

Q.    What is it?

A.    This is marijuana.  It's further contained in a black jar.

Q.    And --

A.    I'm sorry.  In a clear jar.  Thank you.

Q.    How do you recognize this?

A.    This is recognized by the evidence label that I completed on May 9th, 2017, depicting myself as the receiving individual and the other party to the sealing of the exhibit.

Q.    All right.  Apart from sending it to the lab for testing, do you see any indications of the jar being altered from what you can see on the outside?

A.    No.

Q.    Okay.  Special Agent --

MS. CHAVAR:  Sorry, Your Honor.  May I confer with her?

THE COURT:  Sure.

(Pause while counsel conferred.)

BY MS. CLOUD:

Smith - direct

Q.      So, Special Agent Smith, government Exhibit 29 and 30, which you've just looked at, were both of those exhibits sent to a lab for testing?

A.      Yes.

Q.      Is a forensic chemist going to testify later in this trial?

A.      Yes.

Q.      All right.  Special Agent Smith, can I -- did you at any point during your search of the residence have occasion to see any books in the residence?

A.      Yes.

Q.      Can you take a look at Government Exhibit 1152. Special Agent Smith, what is this a photo of?

A.      It's a photo of a book entitled Cannabis Indica, An Essential Guide to the World's Finest Marijuana Strain.

Q.      Where was it found?

A.      In the defendant's residence.

Q.      Okay.  Special Agent Smith, I'm going to bring you what has been marked as Exhibit 166 (handing exhibit to the witness).

Special Agent Smith, do you recognize Government Exhibit 156?

A.      Yes, I do.

Q.      What is it?

A.      This is one of the pots that we seized from the

699

Smith - direct

defendant's underground bunker on the May the 9th, 2017.

Q.      Special Agent Smith, where has Government Exhibit 156 been since May 9th, 2017?

A.      It has been in the DEA non-drug evidence room.

MS. CLOUD:  And, Your Honor, I move Government Exhibit 156.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-156 was admitted into evidence.)

BY MS. CLOUD:

Q.      So, Special Agent Smith, since collecting this pot from the bunker, did you have occasion to open the contents of this bag in January 2020?

A.      Yes.

Q.      And can you please put the pot to the side?  And I'm going to have you look at a series of photos.  This time they're in order.  1739 through 1748, if you will look for those.

A.      Yes.

Q.      Okay.  So, Special Agent Smith, can you describe what's in Government's Exhibit 1739 through 1748, roughly?

A.      Yes.  These are photographs that we took in January 2020 of Exhibit No. 166, which was unsealed. Essentially, photos taken, you know, more or less sequentially in the course of the unsealing of the exhibit,

Smith - direct

the removal of the cover over top of the pots and further inspection of the contents of the pots.

Q.    Okay.  Thank you.

Do these photos in Government's Exhibit 1739 through 1748 fairly and accurately depict that process?

A.    Yes.

MS. CLOUD:  Your Honor, at this time we'd move for admission of Government's Exhibit 1739 through 1748.

MS. CHAVAR:  No objection.

THE COURT:  Those are all admitted.

(GX-1739 and GX-1748 were admitted into evidence.)

MS. CHAVAR:  Thank you.

BY MS. CHAVAR:

Q.    Starting with image 1739.

A.    Yes.

Q.    Special Agent Smith, what does this show?

A.    This is the pot contained within Exhibit 166 after it has been removed from the primary evidence bag.

Q.    Okay.  And moving on to Exhibit 1740 -- 1740, what does this show?

A.    Yes.  This is peeling back the additional evidence, bag that was placed on it more or less to keep the contents from spilling out of the pot.

Q.      Do you see anything in the center of the little pot?

A.      Yes.

Q.      What does that appear to be?

A.      It's a -- a -- there's a stem protruding out of the center of a smaller piece of potting or plant container that is more or less immersed or contained with the rocks.

Q.      Okay.  Can you look at Exhibit 1741.  What is this a view of?

A.      Just another closer inspection of the pot and that was the cover completely removed.

Q.      How about 1742?

A.      Again, this is the -- this cleared away some of the artificial stone to get a better picture of the contents of the pot.

Q.      Can we move on to show Government Exhibit 1743?  What does this show?

A.      Yes.  This shows the -- what was removed from inside of the pot.  This is a picture from the bottom side.  It has some of the rocks that are adhered to it.  It appears to be some small roots that are protruding, you know, from the bottom of this pot.

Q.      Okay.  Can you take a look at Government Exhibit 1744.  What does this show?

A.      Again, this is just another detailed photograph of this block that was contained within the pot.

MS. CLOUD:  Okay.  Can we show Government Exhibit 1745.

BY MS. CLOUD:

Q.    What's occurring here?

A.    This is me cutting open the Gro-Block wrapper that's contained around that we removed from the pot.

Q.    And Government Exhibit 1746, what does this show?

A.    Now I peeled back the Gro-Block material away from the block and just again kind of taking a photograph from a side view of block.

Q.    And Government Exhibit 1747, what does this show?

A.    This is me.  I've now peeled open the block to photograph the inside of the block.

Q.    And Government Exhibit 1748, what does this show?

A.    This is me.  I placed my hand around the stem of what appears to be some sort of root system and pulled it away from block.

Q.    Okay.  Thank you, Special Agent Smith.

MS. CLOUD:  And, Ms. Roca, you can bring that down.

BY MS. CLOUD:

Q.    So after the search at 4010 Kirkwood St. Georges on May 9th, did you participate in any other searches later that week?

A.    Yes, I did.

Q.     Did you search any storage units in the New Castle area?

A.     Yes.  Two.

Q.     Okay.  Can you please turn to Exhibit 213 in the binder before you.

A.     Yes.

Q.     What is Government Exhibit 213?

A.     This is a ledger history for Sentinel Self-Storage located at 465 Pulaski Highway, unit 4036.

Q.     And how do you recognize this exhibit?

A.     This is an exhibit that we obtained in the course of our investigation.

MS. CLOUD:  Okay.  Your Honor, I move to admit Government Exhibit 213.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-213 was admitted into evidence.)

BY MS. CLOUD:

Q.     Special Agent Smith, taking a look at page 1, when was this unit first rented?

A.     First rented May 1st, 2017.

Q.     Is it May 1st?

A.     I'm sorry.  March 1st, 2017.

Q.     Okay.  And according to the ledger history, who rented this unit?

Smith - direct

A.      Aixa Figueroa.

Q.      Are you familiar with Aixa Figueroa?

A.      Yes.

Q.      How are you familiar with her?

A.      She's a niece of the defendant.

Q.      Okay.  Can you please turn to page 2.  What is -- what's depicted on page 2, generally?

A.      This is activity -- this is a continuance of the activity report that extends up to and including May 5th, 2017.

Q.      And according to this activity report, when was the last time the unit was entered?

A.      May 5th, 2017 at 1842, which is 6:42 p.m.

Q.      Okay.  Did you search unit 4036 the week or on May 11th, 2017?

A.      Yes, I did.

Q.      I'm going to hand you what has been marked as Exhibit 191 (handing exhibit to the witness.)

A.      (Witness reviews document.)

Q.      Special Agent Smith, what is Government Exhibit 191?

A.      It's a lock and a key that was placed on this storage unit that we just discussed.

Q.      And do you recognize this exhibit from around May 11th, 2017?

A.      Yes.

Smith - direct

Q.      Has it been kept in a safe location since that time?

A.      Yes.

        MS. CLOUD:  Your Honor, we move to admit Government Exhibit 191.

        THE COURT:  Any objection, Ms. Chavar?  Any objection to 191?

        MS. CHAVAR:  No objection.

        THE COURT:  It's admitted.

        (GX-191 was admitted into evidence.)

BY MS. CLOUD:

Q.      Special Agent Smith, is there a key in Exhibit 191?

A.      Yes, there is.

Q.      Where did you get that key from?

A.      From the defendant.

Q.      So the defendant had a key to this storage unit?

A.      Yes, he did.

Q.      Okay.  Can you please take a look at Exhibit -- well, actually, can you tell me what was in this storage unit when you searched it?

A.      Yes, there were two items that were, that were seized.  One of them was a RIDGID brand construction box, a large metal container.  Often you might see them placed in the beds of pickup trucks and used to store tools or other materials and also recovered from the storage unit.

Q.      Can you take a look at Exhibit 192 in your binder?

Smith - direct

A.      (Witness complies.)  Yes.

Q.      What is, what is Government Exhibit 192?

A.      This is the RIDGID brand storage container that we seized from this storage unit.

Q.      Is it, is it quite large?

A.      Yes.

Q.      Is that a photo of the container?

A.      Yes, it is.  Thank you.

Q.      Truly and accurately depict the container?

A.      Yes.

        MS. CLOUD:  Your Honor, we move to admit Government Exhibit 192 into evidence.

        MS. CHAVAR:  No objection.

        THE COURT:  It's admitted.

        (GX-192 was admitted into evidence.)

        MS. CLOUD:  Ms. Roca, if you will just briefly display.

BY MS. CLOUD:

Q.      Is this the container?

A.      Yes, it is.

Q.      Was there anything inside the container when you searched it?

A.      No.

Q.      You mentioned you also found a money counter in the unit; right?

Smith - direct

A.     Yes.

Q.     So I'm going to show you what has been marked as Government Exhibit 193.

Special Agent Smith, what is Government Exhibit 193?

A.     It's the money counter that we seized from the storage unit.

Q.     Okay.  Has it been kept in evidence since approximately May 11th, 2017?

A.     Yes, it has.

MS. CLOUD:  Your Honor, we move to admit Government Exhibit 193.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-193 was admitted into evidence.)

BY MS. CLOUD:

Q.     Special Agent Smith, did you have occasion to search another storage unit in Ms. Figueroa's name on May 11th, 2017?

A.     Yes.

Q.     Was that also a Sentinel Self Storage unit?

A.     Yes but a different location.

Q.     Do you remember the unit number?

A.     No, I do not.

Q.     Sound like 3132?

Smith - direct

A.      Yes, it was 3132.

Q.      Can you look at Exhibit 214 in your binder?

A.      That exhibit number one more time.

Q.      I think it's 214.

A.      (Witness complies.)  Yes.

Q.      Are you familiar with Government Exhibit 214?

A.      Yes.

Q.      How are you familiar with it?

A.      This is records that can be obtained from Sentinel Self Storage in the process of this investigation.

        MS. CLOUD:  Okay.  Your Honor, I move to admit Government Exhibit 214.

        MS. CHAVAR:  No objection.

        THE COURT:  It's admitted.

        (GX-214 was admitted into evidence.)

        MS. CLOUD:  All right.  Ms. Roca, if you will please publish the first page.

BY MS. CLOUD:

Q.      Special Agent Smith, what is on the first page of Government Exhibit 214?

A.      It's an activity report ranking from February 22nd, 2017.  Looks like the report was ran up to May 11th, 2017.

Q.      And what is the date of the last entry?

A.      April 10th, 2017.

Q.      Okay.  Special Agent Smith, did you recover another

lock and key for this unit?

A.      Yes.

Q.      All right.  I'm handing you what has been marked as Government Exhibit 196.

Special Agent Smith, do you recognize Government Exhibit 196?

A.      Yes, I do.

Q.      What is it?

A.      This is the locks that were contained on the exhibit or on the storage unit that -- the second storage unit that we searched that day.

MS. CLOUD:  Okay.  Your Honor, we move to admit Government Exhibit 196.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-196 was admitted into evidence.)

BY MS. CLOUD:

Q.      Is there a key in that bag, Special Agent Smith?

A.      Yes, there is two keys.

Q.      Where, where were the keys found?

A.      The keys were found with the defendant.

Q.      Okay.  What all did you find in this storage unit?

A.      I found three items that were seized from the storage unit.  We found an identical RIDGID brand storage metal container that we discovered in the other unit.  We also

Smith - direct

discovered a quantity of marijuana, along with a press.

Q.      Quantity of marijuana subject to testing by the forensic chemists?

A.      Correct.

Q.      So let's start with the orange storage container, perhaps it's exciting.  Can you go to Government Exhibit 198 in your binder?

A.      Yes.

Q.      What is Government Exhibit 198?

A.      This was the second of the two RIDGID storage containers that were seized on that date, this one being from the second unit.

Q.      Is it a photo of that second orange container?

A.      Yes, we have a photograph of this container.

        MS. CLOUD:  Your Honor, we move to admit Government Exhibit 198 into evidence.

        MS. CHAVAR:  No objection.

        THE COURT:  It's admitted.

        (GX-198 was admitted into evidence.)

BY MS. CLOUD:

Q.      Okay.  So Special Agent Smith, I think you mentioned there was also a press in this unit; right?

A.      Yes.

Q.      So at this time, if you could exit the witness stand and come up to examine Government's Exhibit 197?

A.      (Witness complies.)

Q.      So, Special Agent Smith, before you do anything, Government Exhibit 197, how much would you estimate that weighs?

A.      Approximately 50 pounds.

Q.      And is this an item you recovered from the storage unit on May 11th, 2017?

A.      Yes, it is.

        MS. CLOUD:  Your Honor, we move to admit Government Exhibit 197 into evidence.

        MS. CHAVAR:  No objection.

        THE COURT:  It's admitted.

        (GX-197 was admitted into evidence.)

BY MS. CLOUD:

Q.      Okay.  Special Agent Smith, is there anything about the top of this exhibit that you had occasion to remove before?

A.      Yes.

Q.      Okay.  Can you briefly describe the mechanics of it?

A.      Sure.  There is several wing nuts.  They're placed -- and some washers over the top, the top plate of this press. And once they are removed, you are able to remove this portion of the very top portion of the press.

Q.      Okay.  At this time I would like to ask you to remove the I guess is that called wing nuts and saucers?

712

Smith - direct

A.      Wing nuts or washers.  Wing nuts and washers.

Q.      Wing nuts and washers.  I had something wash related in my head.  Okay.  Please remove that at this time.

A.      (Witness removes wing nuts and washers.  Attempting to remove the top portion of the press.)

It's quite heavy.

Q.      Yes.

A.      Maybe it would be easier if I set it on the ground.

Q.      I think so.

A.      Thank you.

Almost there.

Q.      I'll take your word for it.

A.      I have removed this before, but obviously I'm having a little trouble with it now.

Q.      Yes.  Is there something underneath?

A.      No, it's just --

Q.      Ah.

A.      Thank you.  Whoo.

Thank you.

Q.      No, thank you.  Okay.  Special Agent Smith, with quite a lot of effort, what did you just do if you can describe it for the record?

A.      Yes, just removed the wing nuts and the washers in the top, and then removed this much heavier aluminum plate from the top of the press.

Smith - direct

Q.      Okay.  Is there something on -- could you maybe angle that bottom part for the jury to see?

A.      (Indicating.)

Q.      So, Special Agent Smith, what is depicted on the bottom of the press?

A.      This is a dolphin.

Q.      And what would this plate and press be used -- what kind of substance would this -- material would this be used to press?

A.      Powder.

Q.      And what would happen with the powder?

A.      The powder would be placed into the top of the press. Utilizing the hydraulic gas that is underneath it, it would apply upward pressure from below against the top aluminum plate, therefore compressing or sandwiching the powder material contained within this, between these two plates.

Q.      What is the point of the dolphin?

A.      It's to provide a stamp or impression on top of the powder material.

Q.      Okay. Special Agent --

        MS. CHAVAR:  Objection.

        THE COURT:  What --

        MS. CHAVAR:  Sorry for the delay, but I listened to his testimony.  I don't think that there has been any foundation laid that he is qualified to offer this piece of

Smith - direct

equipment, especially with respect to his opinion that it is used to press powder.

MS. CLOUD:  Your Honor, I think this is within the scope of 701, lay witness opinion, but ...

MS. CHAVAR:  Just give me a foundation for that.

BY MS. CLOUD:

Q.     Special Agent Smith, are you -- in your everyday life, are you familiar with some hydraulic presses?

A.     Yes.

Q.     Are you familiar with potential everyday uses of hydraulic presses?

A.     Yes.

Q.     Are you familiar with hydraulic -- different, different materials that are better pressed through different hydraulic presses?

A.     Yes.

Q.     What is it about Government Exhibit 197 that makes you think it's used to press powder as opposed to something else?

A.     It's is based upon my training, experience and the shape of the press.  There is only -- in my training and experience, again, I would point to, you know, that as being the primary purpose.

THE COURT:  Is there any objection?

MS. CHAVAR:  May I ask a few questions?

THE COURT:  Sure.

MS. CHAVAR:  Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MS. CHAVAR:

Q.    Special Agent Smith, you testified in your everyday experience.  In your everyday experience as what?

A.    As a DEA agent.

Q.    Thank you.  So you said your training and experience?

A.    (Nodding yes.)

Q.    Would you tell us what that training and experience is that allows you to identify this as a hydraulic press?

A.    Yes.  I have seized other similar presses in other cocaine investigations, also received training from the DEA in the identification of these devices and the purposes for which they're used.

MS. CHAVAR:  Okay.  Thank you.

THE COURT:  Any objection at this point?

MS. CHAVAR:  No, Your Honor.

THE COURT:  Okay.  Ms. Cloud.

MS. CLOUD:  Your Honor, I was actually moving on from Government Exhibit 197.

THE COURT:  What do we want to do with the exhibit?  I can't see where it is from here.

MS. CLOUD:  So I think the top plate appears to be off.  I'm happy to put it -- if we put the plate on, I'm

Smith - direct

not sure it's going to come off again.

THE COURT:  Let's leave it apart for now.  I guess, Agent, just, you know, carefully walk back to the stand.  We'll leave it there for now, where it is.

MS. CLOUD:  Thank you.  We can move it at the next break, Your Honor.

(Witness retakes witness stand.)

DIRECT EXAMINATION (Continued)

BY MS. CLOUD:

Q.    Special Agent Smith, I think you testified that you also seized some bags of potential marijuana; right?

A.    Yes.

Q.    Do you remember how many bags?

A.    I don't recall the exact number of bags.

Q.    Okay.  Did you identify these bags with any particular exhibit number?

A.    Yes.

Q.    Government Exhibit 32?

A.    That's correct.

Q.    Does that found familiar?

A.    Government Exhibit 32.

Q.    What did you do with the bags after you seized them?

A.    They were processed into evidence.

Q.    Okay.  And where did they make their way up to?

A.    Ultimately, they made their way up to the Northeast

Smith - direct

lab in New York.

Q.    Okay.  I'm going to handle you boxes marked as Government Exhibit 32 (handing exhibit to the witness).

So, Special Agent, I've handed you what has been marked as Government Exhibit 32.  What does Government Exhibit 32 appear to be?

A.    These are two boxes of DEA evidence boxes that contain drugs.

Q.    Okay.  And are there any markings on the outside of the boxes that you recognize?

A.    Yes.  Similarly -- similar to the other exhibit, it contains my writing on the side of the boxes.  It also contains my evidence, the evidence label that I completed at the time it was seized and also a seal that I placed on top of the box.

Q.    Okay.  And is there a seal for Maolin Li on top of the box?

A.    Yes, there is.

MS. CLOUD:  One moment to confer, Your Honor?

THE COURT:  Sure.

MS. CLOUD:  Those are all the questions I have at this time, Your Honor.

THE COURT:  Okay.  Ms. Chavar, any cross-examination?

Smith - cross

MS. CHAVAR:  Yes, Your Honor.

THE COURT:  Okay.

MS. CHAVAR:  Give me a moment.

THE COURT:  When you are ready.

CROSS-EXAMINATION

BY MS. CHAVAR:

Q.    That hydraulic that is marked as Exhibit 197 was covered, I think you said, in a store shed?

A.    Storage unit.

Q.    Storage unit?

A.    Yes, ma'am.

Q.    And that storage unit was rent to Aixa Figueroa?

A.    Yes.

Q.    Okay.  In your search of what you are referring to as an underground bunker, you did not discover any cocaine there; correct?

A.    No, we did not.

Q.    Okay.  And you did not discover any cocaine in the residence of 4010 Kirkwood St. Georges Road; is that correct?

A.    No, we did not.

Q.    I'm going to direct your attention to -- you will recall interviewing Mr. Valdez as part of a proffer session during the investigation of this matter?

A.    Yes.

Smith - cross

Q.    Okay.  And those investigations took place on August 22nd, 2017?

A.    That sounds correct.

Q.    And December 11th, 2019?

A.    Correct.

Q.    All right.  And you prepared a report of those sessions?

A.    I don't recall if I wrote one or both of those reports.

Q.    That's fair.

        MS. CHAVAR:  May I approach?

        THE COURT:  You may.

        (Ms. Chavar handed exhibits to the witness.)

BY MS. CHAVAR:

Q.    So directing your attention to the report dated August 23rd, 2017 --

A.    Yes.

Q.    Okay.  Do you recognize that document?

A.    Yes, I do.

Q.    And how do you recognize it?

A.    It's a DEA 6 or a report of investigation that I prepared in this case.

Q.    Okay.  And directing your attention to the second report I put in front of you --

A.    Yes.

Smith - cross

Q.   -- dated -- do you recognize that document?

A.   Yes.

Q.   And what do you recognize that as?

A.   Yes.  This is an additional DEA section or report of an investigation that I prepared in this case.

Q.   Okay.  On the proffer interview of Mr. Valdez on December 11th, 2019; is that correct?

A.   Correct.

Q.   Okay.  So when you prepare these reports, you try to be as accurate as possible; is that correct?

A.   Yes.

Q.   Okay.  And by saying that, I mean you want to be -- get as close to verbatim as possible to what the witness said?

A.   Yes, that would be the goal.

Q.   Okay.  On the report dated August 23rd, 2017, if I could just direct your attention to paragraph 17.

A.   Yes.

Q.   Okay.  You would agree with me that you wrote Valdez stated that just prior to the party, he met Aviles Camberos for dinner in Ontario, California, and that Aviles Camberos offered to have Valdez serve as a driver for a cocaine transportation network; correct?

A.   Yes.

Q.   And on that same report, if I could direct your

attention to paragraph 35, I guess it's page 2.6.

A.      Yes.

Q.      Okay.  And you would agree with me that you reported that Valdez advised that following their arrest, Acosta Salazar had used a/k/a El Flaco to place $200 on the commissary of both Valdez and Camberos.

A.      Yes.

Q.      Okay.  And now directing your attention to paragraph 37 of the same report, you would agree with me that you have recorded there that according to Valdez, Acosta Salazar also contacted Valdez's mother following his arrest.

A.      Yes, I reported that.

Q.      Okay.  And you know Acosta Salazar to be a member of the Mexican cartel?

A.      I do not.

Q.      You do not?  Okay.  And do you recall Mr. Valdez telling you that Acosta Salazar was a member of the Mexican cartel?

A.      Yes.  I believe he saw or he believed that he was a member of the cartel.

Q.      Okay.  All right.

        MS. CHAVAR:  I think that's all.  Just let me confer for a moment.

        (Pause.)

BY MS. CHAVAR:

Q.      Okay.  Just one question, Agent Smith.

A.      Yes, ma'am.

Q.      Now, you would agree with me that in the pot discovered in what you are referring to as an underground bunker, there were no leaves on the stems?

A.      No.

Q.      Okay.  That there did not appear to be any live plants?

A.      No.

Q.      Okay.  In other words, you agree with me that there was not any live plants?

A.      Correct.  The tops were cut off.

        MS. CHAVAR:  Okay.  Thank you.  I have nothing more.

        THE COURT:  Redirect?

               REDIRECT EXAMINATION

BY MS. CLOUD:

Q.      Thanks, Special Agent Smith.  Just two questions. Did you meet with Mr. Valdez for proffers at least three to four times?

A.      Yes.

Q.      Did he talk about his activities with Mr. Colon each time?

A.      Yes.

        MS. CLOUD:  Thank you.  That's it.

THE COURT:  That's it?

MS. CLOUD:  That's it for Special Agent Smith.

THE COURT:  Okay.  All right.  Special Agent, you may come back to your other seat and leave the exhibit where it is for now.

(Witness excused.)

THE COURT:  Does the government have another witness?

MS. WELSH:  We do, Your Honor.

THE COURT:  Do you want to call them?

MS. WELSH:  Yes, Your Honor.  The government calls Craig Maurer.

... CORPORAL CRAIG MAURER, having been duly sworn as a witness, was examined and testified as follows ...

DIRECT EXAMINATION

BY MS. WELSH:

Q.    Good afternoon.

A.    Good afternoon.

Q.    What's your rank?  What should I refer to you as?

A.    I'm currently a Detective within the Criminal Investigation Division of the Newark Police Department with the rank of Corporal.

Q.    Corporal.  Corporal Maurer.  You said you work for the Newark Police Department?

A.    I do.  I'm currently assigned in the criminal

Maurer - direct

investigation division within the special investigations

unit.  Additionally, I'm a task force officer with the DEA

over at the Wilmington resident office.

Q.      How long have you been a task force officer?

A.      For the past six years.

Q.      And what are your everyday duties as a task force

officer?

A.      We investigate local and federal drug crimes within

the task force.

Q.      Corporal Maurer, were yu part of the team

investigating the defendant, Omar Colon?

A.      I was.

Q.      Did your involvement in the case start in 2016?

A.      It did.

Q.      Now, we've heard about the fact that the defendant

was arrested on May 6th, 2017.  Is that the right date?

A.      That's correct.

Q.      And in the days after he was arrested and the week

after he was arrested, did agents search a few residences

and other locations?

A.      Yes, they did.

Q.      Was one of those places 4010 Kirkwood St. Georges

Road?

A.      Yes, it is.

Q.      What is your understanding of who lives at that

address?

A.    Omar Colon and Shakira Martinez.

Q.    As of May 6, 2017, that's who lived at that address?

A.    That's correct.

Q.    Did you participate in a search at 4010 Kirkwood St. Georges Road on May 6th?

A.    I did.

Q.    And just so the record is clear, was that home searched more than one time?

A.    It was.

Q.    All right.  So it would just be the first search of the house?

A.    It was.

Q.    Were you present during the initial part of this May 6th search?

A.    Initially, we had surveillance units established in the area to monitor any vehicle coming or going.  That was established somewhere around 11:20 in the morning on the 6th and then ultimately I arrived around 2:00 p.m. at the residence.

Q.    What kind of a search was this?

A.    This was a consent search.

Q.    What does that mean?

A.    Essentially it's a form that we present to defendants requesting their permission to search their residence, their

Maurer - direct

car, their phone, whatever as part of the investigation.

Q.      In your training and experience, is there a difference between what one would normally do during the consent search versus execution of a search warrant?

A.      Yes, I would say a consent search is less intrusive and a search warrant is more intrusive where you're searching like say an area that might be concealed by drywall or, you know, things of that nature.

Q.      Taking down drywall, not the sort of thing you usually do during a consent search?

A.      No, ma'am.

Q.      Did you take custody of the items that were collected at the 4010 Kirkwood property on May 6th?

A.      I do.

Q.      Do you recall generally what those items were?

A.      They were United States currency, marijuana, money counters, a digital scale, some mortgage property information associated with various properties Mr. Colon owned, as well as banking documents.

Q.      Let me stop, let me stop you there because you already said the things I want to show you.  So let me show what has been marked as Exhibit 27.

              MS. WELSH:  If I may approach, Your Honor?

              THE COURT:  You may.

BY MS. WELSH:

Maurer - direct

Q.      Corporal Maurer, do you recognize Exhibit 27?

A.      Yes.

Q.      What is it?

A.      It's marijuana, as well as a black trash bag that contained the marijuana within it.

Q.      Now, you are calling it marijuana.  Are we eventually going to have a chemist come and testify as to what that substance is?

A.      Yes.

Q.      But you are basing your conclusion on your training and experience thus far?

A.      That's right.

Q.      So is it in the same condition that it was when you seized it or is there something different about it?

A.      Other than outside the black trash bag, it's consistent with how we found it.

            MS. WELSH:  Your Honor, I move to admit Government Exhibit 27 into evidence.

            MS. CHAVAR:  No objection.

            THE COURT:  It's admitted.

            (GX-27 was admitted into evidence.)

BY MS. WELSH:

Q.      Corporal Maurer, where was this trash bag containing marijuana found?

A.      It was located in the detached in-law suite on the

Maurer - direct

property, specifically in the freezer, by Detective Burris.

Q.      Which stand-alone property -- piece of the property was it?

A.      The in-law suite located in the back corner of the property itself, detached from the residence.

Q.      I'd like to approach you with what has been marked as Government Exhibit 28.

Do you recognize Government Exhibit 28?

A.      I do.

Q.      What is it?

A.      It is a glass jar that has a clear plastic bag in it, as well as marijuana.

Q.      Is that an item that you seized and processed?

A.      That's correct.

MS. WELSH:  Okay.  Your Honor, I move to admit Government Exhibit 28.

(Counsel confer.)

MS. WELSH:  Oh, let me just clarify.

BY MS. WELSH:

Q.      Throughout your testimony, when you are calling something marijuana, do you actually personally know that it is marijuana or are you basing that on the conclusion of someone who is going to testify at another time?

A.      That's correct.  Suspected marijuana.

Q.      All right.  So if you slip and say marijuana or I do,

what you are saying is there is going to be a chemist that will say that.  That's not your opinion; right?

A.     That's right.

Q.     So with that --

THE COURT:  Is there an objection with that clarification?

MS. CHAVAR:  No.  No, Your Honor.

THE COURT:  The exhibit is admitted then.

(GX-28 was admitted into evidence.)

BY MS. WELSH:

Q.     Where was Exhibit 28 found?

A.     That was found in the laundry room of the residence.

Q.     All right.  Corporal Maurer, I'd like you to turn in your binder please to what has been marked as Exhibit 1022, if you could.

A.     (Witness complies.)  Okay.

Q.     Are you there?

A.     Yes.

Q.     Okay.  Do you recognize Exhibit 1022?

A.     I do.  Money counter that we seized from the residence when we did the consent search.

Q.     It's a photograph of the money counter?

A.     That's right.

Q.     Is it a fair and accurate recommendation of what the money counter looks like that was in the house?

Maurer - direct

A.      Yes.

MS. WELSH:  I move to admit Government Exhibit 1022.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-1022 was admitted into evidence.)

BY MS. WELSH:

Q.      Where was that --

MS. WELSH:  Let's display it, please.  Thank you.

BY MS. WELSH:

Q.      Is this -- does the box say bill counter?

A.      Yes.

Q.      Where was this found?

A.      The master bedroom closet.

Q.      It appears to kind of be up high.  Was it at the top of the closet?

A.      That's correct.

Q.      I would like to approach you with Government's Exhibit 125.

Corporal Maurer, do you recognize that?

A.      Yes.

Q.      What is it?

A.      It's the money counter received from the master bedroom.

THE COURT:  Mr. Maurer, I can't hear you.

THE WITNESS:  I'll move up.

THE COURT:  Thank you.

THE WITNESS:  It's the money counter received from the master bedroom closet.

BY MS. WELSH:

Q.    Is it in the same or substantially the same condition it was when you seized it except that now it's outside the box?

A.    Yes.

Q.    And was it sealed some time after it was recovered?

A.    That's correct.

Q.    And does it remain sealed as it was when you sealed it?

A.    Yes.

MS. WELSH:  Your Honor, I move for admission of Government's Exhibit 125.

MS. CHAVAR:  No objection.

THE COURT:  It's admitted.

(GX-125 was admitted into evidence.)

BY MS. WELSH:

Q.    Corporal Maurer, was any -- I think you mentioned that money was found in the house; right?

A.    That's correct.  There was money found in the kitchen.  There was money found in the master bedroom

closet.  In addition, there was money found in a first floor

bar area, a dresser drawer and it was approximately $9,188.

Q.     Is that the total between all of the money that you

just described?

A.     That's correct.

       (Counsel confer.)

BY MS. WELSH:

Q.     Could you repeat the amount please?

A.     $9,188.

Q.     Corporal Maurer, could you please turn to

Exhibit 1019 in your binder?

A.     Yes, I have it here.

Q.     Okay.  Do you recognize that?

A.     I do.

Q.     What is that?

A.     That is money that was seized from the kitchen.

Q.     Is that picture a fair and accurate depiction of the

money that was seized in the kitchen?

A.     That's correct.

       MS. WELSH:  Your Honor, I move to admit

Government Exhibit 1019.

       MS. CHAVAR:  No objection.

       THE COURT:  It's admitted.

       (GX-1019 was admitted into evidence.)

BY MS. WELSH:

Q.      Did you say just now where it was found?  I'm sorry.

A.      Within the kitchen in the residence.

        MS. WELSH:  All right.  Take it down.  Thank you.

BY MS. WELSH:

Q.      Okay.  Let's move on.  So was there another search that you participated in on May 10th, 2017?

A.      There was.

Q.      Was it of a unit at the -- at Storage Rentals of America?

A.      That's correct.

Q.      Where was that located?  What town?

A.      That is New Castle, Delaware.  It's 950 Red Lion Road.  And specifically it was Unit 5013.

Q.      How did you know to search Unit 5013 or what led you there?

A.      During the arrest of Mr. Colon, there was paperwork associated with that storage rental unit found within his pickup truck.

Q.      And based on what you learned, who was the owner of that storage unit?

A.      Nilsa Martinez.

Q.      Are you aware of what her relationship is to the defendant?

A.      Yes, she is the mother-in-law.

Q.      Before searching the unit, what did you do?

A.      Initially we went out to the Storage Rentals of America, contact the on-site managers.  We obtained some activity records associated with that particular unit and then we had officers conduct an open air scan of the unit, which provided a positive reading for the presence of narcotics utilizing a K-9.  We had officers stand by the storage unit, while myself and another officer responded over to 23 Hillary Circle and contacted Nilsa Martinez at the residence.

Q.      So I think you mentioned one of the things you did was talk to people at the storage facility; right?

A.      That's correct.

Q.      Did you receive documents from them?

A.      We did.

Q.      All right.  So I'd like you to turn in your binder to Exhibit 182 if you could.

A.      182?

THE COURT:  Now, before we get to the document, we call it a day.  We can pick up there tomorrow, Ms. Welsh.  It's almost 5:00 o'clock.

MS. WELSH:  That's fine, Your Honor.

THE COURT:  Ladies and gentlemen of the jury, we're going to finish our day with you for now.

I know it may not seem like it, but we're on

track with the schedule that we anticipated.  In fact, we're going to be giving you an hour off in the morning.  So we're going to get started at 10:00 o'clock tomorrow morning.  You can sleep in or whatever you'd like, but try to be here about 9:45 or so, so you can order lunch and we'll aim to get started right around 10:00.

While you are away from us, no talking about the case, no research or reading anything related to the case.  Please have a good evening.  We'll see you at 10:00 tomorrow morning.

(Jury left courtroom.)

THE COURT:  Corporal Maurer, you may step down.  You are free to go.  I have just a few matters to talk to counsel about.  You can have a seat if you would like.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  In case it's necessary, the forfeiture preliminary instructions, are we going get those?

MS. CLOUD:  Yes, Your Honor.  Actually, so I printed out this morning or actually yesterday, the instructions from the Third Circuit and I'm happy to hand them up.

(Documents passed forward.)

MS. CLOUD:  If I can get around this evidence.  More than one copy?

THE COURT:  I don't know yet what it is.

MS. CLOUD:  These are just the printed-out instructions.

THE COURT:  What I'm looking for is what I will say to the jury if they returned a verdict of guilty and I bring them back in here.

MS. CLOUD:  Yes, Your Honor.  These updated instructions from the Third Circuit are much more specific so -- as to what is said when.  So according to this, the first thing is it does recommend prior to letting the jury go out for deliberations, you just say there may be -- according to the first page, there may be --

THE COURT:  Is this something you have shown and talked to Ms. Chavar about?

MS. CLOUD:  I did speak with Ms. Rossman about it this morning.

THE COURT:  Ms. Rossman?

MS. CHAVAR:  That is correct.

THE COURT:  All right.  Here is what I need.  I need either what you have agreed on or your competing proposals for exactly what I'm going to say to the jury and when you want me to say it.

MS. CLOUD:  We can confer afterwards, and I will prepare a proposed --

MS. CHAVAR:  I'm certain we will agree on something, Your Honor.

THE COURT:  Let's plan to be ready to talk about that tomorrow morning before we start with the jury.

MS. CLOUD:  Okay.

MS. CHAVAR:  Okay.

THE COURT:  I don't want there to be any delay. And if I'm supposed to say something by agreement before we send them out the first time, obviously I'm not prepared for that at this time.

MS. CLOUD:  Okay.  Thank you, Your Honor.

THE COURT:  And we're working on final instructions.  Based on what you have given us previously, there were no objections.  There were some typos and things we're modifying.

MS. CHAVAR:  Right.

THE COURT:  Depending on when the evidence is done, we hope to give you all a chance to at least double-check what we have done to modify that, but that is all going to depend on timing.

I also need the government to be ready with a set of the exhibits to go back to the jury once they start deliberating and you all should be talking about, I assume most, if not all of the physical evidence is not going back to the jury, but you all should figure out what your preference is on that, and how we're going to deal with that.

Anything you want to talk about or any questions about any of that?

MS. WELSH:  No, Your Honor.

THE COURT:  Okay.  Ms. Chavar, anything further?

MS. CHAVAR:  No, Your Honor.

THE COURT:  Okay.  So we'll look for you all roughly 9:45, but take the time you need with your client in the morning.

MS. CHAVAR:  Your Honor, thank you.  I do appreciate that.

THE COURT:  Sure.  No problem.  Okay.  We will be in recess.  Have a good night.

(Proceedings adjourn at 5:00 p.m.)


I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.


                         /s/ Brian P. Gaffigan
                         Official Court Reporter
                         U.S. District Court