Ground - 2



RECEIVED
MAR 16 2026
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

# EXHIBIT - 2

THE COURT:  And it will be granted as unopposed.

Next.

MS. CLOUD:  The next order on page 10 concerns the consciousness of guilt motion in limine that we briefly referenced in our trial memorandum, should that arise.

THE COURT:  Any objection or opposition?

MS. CHAVAR:  No, Your Honor.

THE COURT:  Okay.  That one will be granted. Just resubmit the order with the package tomorrow.

Next.

MS. CLOUD:  The next order on page 11 is a motion to recall Special Agent Jeremy Smith and Special Agent Salvemini during trial.

THE COURT:  Any objection or opposition?

MS. CHAVAR:  Your Honor, I'm in a position where I don't like it, but there is the "you can't object to something just because you don't like it" rule.

I don't, I don't object but I take exception.

THE COURT:  You don't object, but?

MS. CHAVAR:  I'm sorry.  I don't object.  Thank you, Your Honor.

THE COURT:  Okay.  Well, certainly my understanding is that you didn't object.  We got no written opposition at any point.  And I think it will -- it's reasonable, the request, and it will be helpful to the jury

18

to be able to recall the agents. The defendant will be able to cross-examine the agents every time they take the stand, so I don't think it's unfairly prejudicial.

So this motion is granted. And I will sign the order when it comes back in tomorrow.

MS. CLOUD: Thank you, Your Honor.

THE COURT: The next one.

MS. CLOUD: The next order obviously is the subject of the defendant's response. As to forensic chemist Maolin Li, I don't believe there is any opposition.

THE COURT: That is correct; right, Ms. Chavar?

MS. CHAVAR: That is correct.

THE COURT: Let's save --

MS. CLOUD: Come back to this one, yes.

THE COURT: -- this for now and let's jump to the one at page 13.

MS. CLOUD: So this order, Your Honor, concerns, I believe it's block order. It's concerns the forfeiture part of the trial. We have proposed -- and we spoke with Ms. Chavar about this. We have proposed to have a forfeiture proceeding, should the jury convict on Counts 1 or 2 relating to -- well, we are going to have a forfeiture proceeding if the jury convicts at all. But if the jury convicts on Counts 1 or 2, we would like to submit additional evidence concerning one of the properties, 614

Ground - 2

EXHIBIT - 2-A

911

Li - direct

A.       Yes.

Q.       Since 2019, what test do you do to analyze marijuana?

A.       We use the 4-AP color test, microscopic examination and gas chromatography/mass spectrometry.

Q.       Let's start with the gas chromatography/mass spectrometry.  Is that one of the tests we were talking about with respect to the cocaine?

A.       Yes.

Q.       And when you run the gas chromatography/mass spectrometry on suspected marijuana, what are you looking to determine?

A.       We are looking for the THC, which is the active -- one of the active ingredients in -- commonly seen in marijuana.

Q.       So you are looking specifically at the THC ingredient; is that right?

A.       Yes.

Q.       And does the THC ingredient have to have a certain threshold in order to qualify as marijuana?

A.       It has to be over one percent.

Q.       Okay.  You also mentioned a --

        MR. COLON:  I'm sorry.  I didn't hear the last part he said.

        THE WITNESS:  It has to be over one percent.

        MR. COLON:  What percent?

912

Li - direct

THE WITNESS:  One percent.

MR. COLON:  One percent?

THE WITNESS:  Yes.

MR. COLON:  Thank you.

BY MS. CLOUD:

Q.    I think you also mentioned the 4-AP color test; is that right?

A.    Yes.

Q.    Can you briefly explain the 4-AP color test?

A.    The 4-AP color is a test, a color predictive test to identify the concentration of THC or CBD in the marijuana. So when you observe a blue color after additions of reagents A and B, that means that THC is predominant compared to a CBD.

Q.    Okay.  So if, if you are running the 4-AP color test and you have a sample that turns blue, that tells you it's marijuana?

A.    Yes.

Q.    And if it turns pink, what does that tell you?

A.    That means the CBD is predominant compared to the THC.

Q.    Okay.  So then the CBD is more than the THC?

A.    Yes.

Q.    All right.  And you, I think you mentioned a third test that you might run on suspected marijuana; is that

Ground - 2

EXHIBIT - 2 - B

# Part 990 — Domestic Hemp Production Program

Subpart A — Definitions
Subpart B — State and Tribal Hemp Production Plans
Subpart C — USDA Hemp Production Plan
Subpart D — Appeals
Subpart E — Administrative Provisions
Subpart F — Reporting Requirements

**Statutory Authority:**

AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
7 U.S.C. 1639o note, 1639p, 1639q, 1639r.

**NOTES APPLICABLE TO ENTIRE PART:**

[PUBLISHER'S NOTE: For Federal Register citations concerning Part 990 Interim final rule with request for comments, see: 84 FR 69295, Dec. 18, 2019.]

[PUBLISHER'S NOTE: For Federal Register citations concerning Part 990 reopening of comment period, see: 85 FR 55363, September 8, 2020.]

# Subpart A — Definitions

§ 990.1  Meaning of terms.

### § 990.1  Meaning of terms.

Words used in this subpart in the singular form shall be deemed to impart the plural, and vice versa, as the case may demand. For the purposes of provisions and regulations of this part, unless the context otherwise requires, the following terms shall be construed, respectively, to mean:

Acceptable hemp THC level. When a laboratory tests a sample, it must report the total delta-9 tetrahydrocannabinol content concentration level on a dry weight basis and the measurement of uncertainty. The acceptable hemp THC level for the purpose of compliance with the requirements of State or Tribal hemp plans or the USDA hemp plan is when the application of the measurement of uncertainty to the reported total delta-9 tetrahydrocannabinol content concentration level on a dry weight basis produces a distribution or range that includes 0.3 percent or less. For example, if the reported total delta-9 tetrahydrocannabinol content concentration level on a dry weight basis is 0.35 percent and the measurement of uncertainty is 0.06 percent, the measured total delta-9 tetrahydrocannabinol content concentration level on a dry weight basis for this sample ranges

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



from 0.29 percent to 0.41 percent. Because 0.3 percent is within the distribution or range, the sample is within the acceptable hemp THC level for the purpose of plan compliance. This definition of "acceptable hemp THC level" affects neither the statutory definition of hemp, 7 U.S.C. 1639o(1), in the 2018 Farm Bill nor the definition of "marihuana," 21 U.S.C. 802(16), in the CSA.

Act. Agricultural Marketing Act of 1946.

Agricultural Marketing Service or AMS. The Agricultural Marketing Service of the U.S. Department of Agriculture.

Applicant.

(1) A State or Indian Tribe that has submitted a State or Tribal hemp production plan to USDA for approval under this part; or

(2) A producer in a State or territory of an Indian Tribe that is not subject to a State or Tribal hemp production plan and who has submitted an application to USDA for a license under the USDA hemp production plan under this part.

Audit. An official inspection of an individual's or organization's accounts and paperwork or documentation by an independent body. An audit also refers to a compliance audit of States and Indian Tribes with approved hemp production plans by USDA to determine compliance with their approved plan, the regulations in this part, and the Act. For this part, audit relates to documentation related to authorities under the 2018 Farm Bill to produce hemp.

Cannabis. A genus of flowering plants in the family Cannabaceae of which Cannabis sativa is a species, and Cannabis indica and Cannabis ruderalis are subspecies thereof. Cannabis refers to any form of the plant in which the total delta-9 tetrahydrocannabinol concentration on a dry weight basis has not yet been determined.

Controlled Substances Act (CSA). The Controlled Substances Act as codified in 21 U.S.C. 801 et seq.

Conviction. Means any plea of guilty or nolo contendere, or any finding of guilt, except when the finding of guilt is subsequently overturned on appeal, pardoned, or expunged. For purposes of this part, a conviction is expunged when the conviction is removed from the individual's criminal history record and there are no legal disabilities or restrictions associated with the expunged conviction, other than the fact that the conviction may be used for sentencing purposes for subsequent convictions. In addition, where an individual is allowed to withdraw an original plea of guilty or nolo contendere and enter a plea of not guilty and the case is subsequently dismissed, the individual is no longer considered to have a conviction for purposes of this part.

CFR1                                        2

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Corrective action plan. A plan proposed by a licensed hemp producer and approved by the governing entity for correcting a negligent violation or non-compliance with the applicable State, Tribal, or USDA hemp production plan, its terms, the applicable law(s), and/or this part. Also, a plan proposed by a State or Tribal government for correcting violations or non- compliances with USDA-approved State or Tribal hemp programs.

Criminal history report. The Federal Bureau of Investigation's Identity History Summary.

Culpable mental state greater than negligence. To act intentionally, knowingly, willfully, or recklessly.

Decarboxylated. The completion of the chemical reaction that converts THC-acid (THCA) into delta-9 THC, the intoxicating component of cannabis. The decarboxylated value is also calculated using a molecular mass conversion ratio that sums delta-9 THC and eighty-seven and seven tenths (87.7) percent of THC-acid ((delta-9 THC) + (0.877 * THCA)).

Decarboxylation. The removal or elimination of carboxyl group from a molecule or organic compound.

Disposal. An activity that transitions the non-compliant product into a non- retrievable or non-ingestible form. Such activities include plowing, tilling, or disking plant material into the soil; mulching, composting, chopping, or bush mowing plant material into green manure; burning plant material; burying plant material into the earth and covering with soil.

Delta-9 tetrahydrocannabinol or THC. Delta-9 THC is the primary psychoactive component of cannabis. For the purposes of this part, delta-9 THC and THC are interchangeable.

Drug Enforcement Administration or DEA. The United States Drug Enforcement Administration.

Dry weight basis. The ratio of the amount of moisture in a sample to the amount of dry solid in a sample. A basis for expressing the percentage of a chemical in a substance after removing the moisture from the substance. Percentage of THC on a dry weight basis means the percentage of THC, by weight, in a cannabis item (plant, extract, or other derivative), after excluding moisture from the item.

Entity. A corporation, joint stock company, association, limited partnership, limited liability partnership, limited liability company, irrevocable trust, estate, charitable organization, or other similar organization, including any such organization participating in the hemp production as a partner in a general partnership, a participant in a joint venture, or a participant in a similar organization.

Farm Service Agency or FSA. An agency of the United States Department of Agriculture.

CFR1                                                                 3

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Gas chromatography or GC. A type of chromatography in analytical chemistry used to separate, identify, and quantify each component in a mixture. GC relies on heat for separating and analyzing compounds that can be vaporized without decomposition.

Geospatial location. A location designated through a global system of navigational satellites used to determine the precise ground position of a place or object.

Handle. To harvest or store hemp plants or hemp plant parts prior to the delivery of such plants or plant parts for further processing. "Handle" also includes the disposal of cannabis plants that are not hemp for purposes of chemical analysis and disposal of such plants.

Hemp. The plant species Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a total delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.

Immature plants. A cannabis plant that is not flowering.

Indian Tribe or Tribe. As defined in section 4 of the Indian Self- Determination and Education Assistance Act (25 U.S.C. 5304).

Information sharing system. The database that allows USDA to share information collected under State, Tribal, and USDA plans with Federal, State, Tribal, and local law enforcement.

Key participants. A sole proprietor, a partner in partnership, or a person with executive managerial control in a corporation. A person with executive managerial control includes persons such as a chief executive officer, chief operating officer, and chief financial officer. This definition does not include non-executive managers such as farm, field, or shift managers. This definition also does not include a member of the leadership of a Tribal government who is acting in their capacity as a Tribal leader except when that member exercises executive managerial control over hemp production.

Law enforcement agency. Any Federal, State, Tribal, or local law enforcement agency.

Liquid chromatography or LC. A type of chromatography technique in analytical chemistry used to separate, identify, and quantify each component in a mixture. LC relies on pumps to pass a pressurized liquid solvent containing the sample mixture through a column filled with a solid absorbent material to separate and analyze compounds.

Lot. A contiguous area in a field, greenhouse, or indoor growing structure containing the same variety or strain of cannabis throughout the area. The term lot also means the terms "farm," "tract," "field," and "subfield" as these are terms used by FSA in 7 CFR 718.2 to define lot.

CFR1                                                    **4**

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



Marijuana. Or "marihuana", as defined in the CSA, means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. The term "marihuana" does not include hemp, as defined in section 297A of the Agricultural Marketing Act of 1946, and does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination (7 U.S.C. 1639o). "Marihuana" means all cannabis that tests as having a THC concentration level of higher than 0.3 percent on a dry weight basis.

Measurement of Uncertainty (MU). The parameter, associated with the result of a measurement, that characterizes the dispersion of the values that could reasonably be attributed to the particular quantity subject to measurement.

Negligence. Failure to exercise the level of care that a reasonably prudent person would exercise in complying with the regulations set forth under this part.

Phytocannabinoid. Cannabinoid chemical compounds found in the cannabis plant, two of which are delta- 9 tetrahydrocannabinol (delta-9 THC) and cannabidiol (CBD).

Plan. A set of criteria or regulations under which a State or Tribal government, or USDA, monitors and regulates the production of hemp.

Post-decarboxylation. In the context of testing methodologies for THC concentration levels in hemp, means a value determined after the process of decarboxylation that determines the potential total delta-9 tetrahydrocannabinol content derived from the sum of the THC and THCA content and reported on a dry weight basis. The post-decarboxylation value of THC can be calculated by using a chromatograph technique using heat, gas chromatography, through which THCA is converted from its acid form to its neutral form, THC. Thus, this test calculates the total potential THC in a given sample. The post-decarboxylation value of THC can also be calculated by using a liquid chromatograph technique, which keeps the THCA intact. This technique requires the use of the following conversion: [Total THC = (0.877 x THCA) + THC] which calculates the potential total THC in a given sample. See the definition for decarboxylation.

Produce. To grow hemp plants for market, or for cultivation for market, in the United States.

Producer. A producer as defined in 7 CFR 718.2 specifically of hemp.

Remediation. Remediation refers to the process of rendering non-compliant cannabis, compliant. Remediation can occur by removing and destroying flower material, while retaining stalk, stems, leaf material, and seeds. Remediation can also occur by shredding the entire plant

CFR1                                                    5

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

into a biomass like material, then re-testing the shredded biomass material for compliance.

Reverse distributor. A person who is registered with the DEA in accordance with 21 CFR 1317.15 to dispose of marijuana under the Controlled Substances Act.

Secretary. The Secretary of Agriculture of the United States Department of Agriculture.

State. Any one of the fifty States of the United States of America, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

State department of agriculture. The agency, commission, or department of a State government responsible for agriculture in the State.

Territory of the Indian Tribe.

(1) All land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, including rights-of-way running through the reservation;

(2) All dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State;

(3) All Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same; and

(4) Any lands title to which is either held in trust by the United States for the benefit of any Indian Tribe or individual or held by any Indian Tribe or individual subject to restriction by the United States against alienation and over which an Indian Tribe exercises jurisdiction.

Total THC. Total THC is the value determined after the process of decarboxylation, or the application of a conversion factor if the testing methodology does not include decarboxylation, that expresses the potential total delta-9 tetrahydrocannabinol content derived from the sum of the THC and THCA content and reported on a dry weight basis. This post-decarboxylation value of THC can be calculated by using a chromatograph technique using heat, such as gas chromatography, through which THCA is converted from its acid form to its neutral form, THC. Thus, this test calculates the total potential THC in a given sample. The total THC can also be calculated by using a liquid chromatograph technique, which keeps the THCA intact. This technique requires the use of the following conversion: [Total THC = (0.877 x THCA) + THC] which calculates the potential total THC in a given sample.

Tribal government. The governing body of an Indian Tribe.

CFR1                                          6

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

08929015

USDA licensee. A person, partnership, or corporation licensed under the USDA plan to grow hemp under the terms established in this part and who produces hemp.

**HISTORY:** [84 FR 58522, 58554, Oct. 31, 2019; 86 FR 5596, 5680, Jan. 19, 2021; 88 FR 82230, 82236, Nov. 24, 2023]

**[EFFECTIVE DATE NOTE:**

86 FR 5596, 5680, Jan. 19, 2021, revised Part 990, effective Mar. 22, 2021; 88 FR 82230, 82236, Nov. 24, 2023, amended this section, effective Nov. 24, 2023.]

CFR1                                                                    7

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Ground 2

EXHIBIT - 2 - C

**§ 990.25  Standards of performance for detecting total delta-9 tetrahydrocannabinol (THC) concentration levels.**

Analytical testing for purposes of determining total THC in cannabis plants shall meet the standards in this section.

(a) Laboratory quality assurance must ensure the validity and reliability of test results.

(b) Analytical method selection, validation, and verification must ensure that the testing method used is appropriate (fit for purpose), and that the laboratory can successfully perform the testing.

(c) The demonstration of testing validity must ensure consistent, accurate analytical performance.

(d) Method performance specifications must ensure analytical tests are sufficiently sensitive for the purposes of the detectability requirements of this part.

(e) Laboratory must have an effective disposal procedure for non-compliant samples that do not meet the requirements of this part.

(f) Measurement of uncertainty (MU) must be estimated and reported with test results. Laboratories shall use appropriate, validated methods and procedures for all testing activities and evaluate measurement of uncertainty.

(g) At a minimum, analytical testing of samples for total THC must use post-decarboxylation or other similarly reliable methods approved by the Secretary. The testing methodology must consider the potential conversion of THCA in hemp into THC and the test result must reflect the total available THC derived from the sum of the THC and THCA content. Testing methodologies meeting the requirements of this paragraph (g) include, but are not limited to, gas or liquid chromatography with detection.

(1) The total THC shall be determined and reported on a dry weight basis. Additionally, measurement of uncertainty (MU) must be estimated and reported with test results. Laboratories shall use appropriate, validated methods and procedures for all testing activities and evaluate measurement of uncertainty.

(2) Any sample test result exceeding the acceptable hemp THC level shall be conclusive evidence that the lot represented by the sample is not in compliance with this part.

(3) After December 31, 2022, USDA licensees may only use laboratories registered with the DEA to conduct testing under this section.

CFR1                                                   1

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**HISTORY:** [84 FR 58522, 58554, Oct. 31, 2019; 86 FR 5596, 5680, Jan. 19, 2021]

**[EFFECTIVE DATE NOTE:**

86 FR 5596, 5680, Jan. 19, 2021, revised Part 990, effective Mar. 22, 2021.]

CFR1                                                    2

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Ground - 2

EXHIBIT - 2 - D

933

Li - cross

A.      Yes, but I don't memorize that.

Q.      And I understand that.  I'm not requesting that.

What happened, what I'm trying to figure out is that, and this is the last thing that I would want, is that you received almost 17 kilos, so there is a disparity here.

Ms. McBride received almost 17 kilos, so what this is saying is that the DEA didn't recover 17 kilos in this operation?  Ms. McBride, as you stated, received almost 17 kilos?  That's what you said; is that correct?

A.      Yes.

Q.      Now I'm going to move on with this marijuana issues now.

You did, you testified that you did some analysis on the marijuana.  I guess we all understood.  You said one percent only of THC is needed to detect that is marijuana.

A.      That is one of the requirements.

Q.      That is one of the requirement.  Is hemp the same thing?

A.      Can you repeat the question?

Q.      Hemp, hemp.

A.      It's not applicable this analysis.

Q.      Well, as we all know, does hemp have THC?

A.      Yes.

934
Li - cross

Q.    So can we say that the marijuana that you received or -- I'm sorry.  Let me back, let me back there.  Let me back on that.  How much percent of THC does marijuana have?

A.    We, we estimate the purity of the THC, but we didn't test the exact purity of the THC.

Q.    Hmm.  So government says it recovered marijuana.  Because is only one percent of THC, you said that is marijuana?

A.    As long as is over one percent of THC, which is the one of the three requirements to confirm marijuana.

Q.    To confirm marijuana.

      Now, first, we were talking about tests that you do a THC test, with some chemicals, it turns blue, you got THC.  If it is pink, it is CBD.  Have you got plants besides in a straight out CBD plant, I guess, right?, that has no THC?

A.    Yes, but not in this case.

Q.    Okay.  So my question to you is how much percentage of THC and CBD does marijuana have?

A.    We don't, we don't determine the actual purity of the THC or CBD in the marijuana.  We only estimate the purity of the THC.

Q.    Well, I'm trying to figure out because per medical reasons or something, right?, you can get some marijuana, it has CBD and it has some THC in it?

Li - cross

A.    Yes.

MS. CLOUD:  Objection.  Relevance.

THE COURT:  Overruled.

Go ahead, Mr. Colon.

MR. COLON:  I can get the answer?  That is what the ruling is.

THE COURT:  That's what it is, yes.

BY MR. COLON:

Q.    So I want to ask, I want you to tell me how much percentage of CBD does this marijuana have?

A.    We didn't test the purity of the CBD in this case.

Q.    But you also didn't test it for CBD?

A.    We estimated purity of the THC in the active agent.

Q.    I'm sorry, Mr. Li.  That wasn't my question.  My question was you didn't test this marijuana for CBD?

A.    We didn't test the purity of CBD in the active agent, but we also identify the CBD in the active agent.

Q.    Mr. Li, I'm going to ask the question for the third time.  Because the jury is here, and I'm confused.  My question was did you test this marijuana for CBD?

A.    No.

Q.    Okay.  So you testified today that you did an assessment on this marijuana and because it is only one percent, what you require, then you did an assessment that said this is marijuana?

936

Li - cross

A.      Over one percent THC is one of the three requirements to confirm marijuana.  There are also two separate tests to confirm marijuana.

Q.      We're not questioning that, Mr. Li.  What I'm questioning is this marijuana could be, let's say, 10 percent CBD, 2 percent marijuana.  That is my question.  That was my question.

A.      All the CBD detected is less than the concentration of THC, so it's less than 10 percent of CBD.  All the THC are over one percent.

Q.      Mr. Li, you just testified here, right?, that CBD plants, that they are -- CBD plants, that they only have CBD.  And then I said to you for medical reasons, there are marijuana that have higher CBD than THC and you answered yes.

So my question to you is, the government give you some evidence to test it.  Because you test it over one percent, you say it's marijuana.  But then I asked you, did you test it for CBD?  And you say no.  But then you say that you did an assessment only on the CBD or the THC.

So how -- I don't want to endeavor to say, but I don't think that you did a proper analysis of what this -- of this marijuana, because if you do a proper analysis on this marijuana, you would have said let's test CBD because --

937

Li - cross

MS. CLOUD:  Objection.

THE COURT:  Mr. Colon, we're not at the time of closing argument.  Do you have a question?

MR. COLON:  Oh, I didn't know that was part of -- I'm just, that is my question, Your Honor.

THE COURT:  Well, then ask him the question, please.

BY MR. COLON:

Q.    So we don't know how much percentage of THC have and how many percentage of CBD have?

A.    All THC has over one percent.

Q.    You did an assessment, you said?

A.    That's the estimation.

Q.    But you don't know how much THC you have?

A.    No.

Q.    And you don't know, and you didn't test for CBD?

A.    All were over one percent.

Q.    Now my last question for you is going to be:  Does hemp have THC?  Does hemp have THC?

A.    It should.

Q.    It should.  Does hemp have CBD?

A.    Possibly.

Q.    Possibly.  You are -- what kind of chemist are you?

A.    I'm a forensic chemist.

Q.    And you have never done a testing on hemp before?

938

Li - redirect

A.      I don't recall.

MR. COLON:  That's all I'd got to say.

THE COURT:  Thank you.

Any redirect?

MS. CLOUD:  Yes, Your Honor.  A few questions, Mr. Li.

REDIRECT EXAMINATION

BY MS. CLOUD:

Q.      In Government Exhibit 26, when you received the substance for reanalysis, did it weigh over 10 kilograms?

A.      A little bit over 10 kilos.

Q.      And when it came into the lab, did it weigh a little under 17 kilos?

A.      Much less than 17 kilos.

Q.      Much less?

A.      When I received it.

Q.      When you received it.  Okay.  But that -- you weren't the first one who received it; right?

A.      No.

Q.      Okay.  And on to the discussion for Mr. Colon about -- the last part of the discussion.  Was this, the substances that you tested, were they some form of legal CBD?

A.      I'm sorry.  Can you repeat?

Q.      The substances that you tested in connection with

Ground - 2

EXHIBIT - 2 - E

## § 885.  Burden of proof; liabilities

### (a) Exemptions and exceptions; presumption in simple possession offenses.

(1) It shall not be necessary for the United States to negative any exemption or exception set forth in this title in any complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under this title, and the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit.

USCS                                            1

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

1147

every element of the offense charged in the indictment or of any lesser included offense.

Counts 2, 3, and 4:  Knowingly, Or Intentionally Defined.

To act knowingly, as used the offenses charged, means that Mr. Colon was conscious and aware that he was engage in the act charged and knew of the surrounding facts and circumstances that make out the offense.  Knowingly does not require that the defendant knew that the acts charged and surrounding facts amounted to a crime.

To act intentionally, as used in the offenses charged, means to act deliberately and not by accident. Intentionally does not require that a defendant intended to violate the law.

The phrase knowingly or intentionally, as used in the offenses charged, requires the government to prove beyond a reasonable doubt that the defendant knew that what he manufactured or possessed with intent to distribute was a controlled substance.  In addition, for Counts 2 and 3, the government must also prove the identity of the controlled substance (cocaine and marijuana, respectively) and the weight of controlled substance (over 5 kilograms and over 100 plants, respectively).  However, as long as you find that the government proved beyond a reasonable doubt that the defendant knew that what he distributed or manufactured

1148

was a controlled substance, you need not find that the defendant knew the identity or weight of the controlled substance.

In deciding whether the defendant acted knowingly or intentionally, you may consider evidence about what he said, what he did and failed to do, how he acted, and all other facts and circumstances shown by the evidence that may prove what was in his mind at that time.

Counts 1, 2, 3, and 4:  Controlled Substance Defined.

You are instructed that, as a matter of law, cocaine is a controlled substance -- that is, some kind of prohibited drug.  You are further instructed that marijuana is a controlled substance.

It is solely for you, however, to decide whether the government has proved beyond a reasonable doubt that Mr. Colon conspired to distribute a controlled substance (Count 1), attempted to possess with intent to distribute a controlled substance (Count 2), manufactured a controlled substance (Count 3), or possessed with intent to distribute a controlled substance (Count 4).

All right.  I think I'm going to stop there. I'm up to stop one, the conspiracy instruction, page 38.  I think that's a good place to stop.  It's pretty close to 5:00 o'clock at this point.

Ground - 2

# EXHIBIT - 2 - F

## § 990.29  Violations.

Violations of this part shall be subject to enforcement in accordance with the terms of this section.

(a) Negligent violations. Hemp producers are not subject to more than one negligent violation per calendar year. A hemp producer shall be subject to enforcement for negligently:

(1) Failing to provide an accurate legal description of land where hemp is produced;

(2) Producing hemp without a license; and

(3) Producing cannabis exceeding the acceptable hemp THC level. Hemp producers do not commit a negligent violation under this paragraph (a) if they make reasonable efforts to grow hemp and the cannabis does not have a total **THC concentration** of more than 1.0 percent on a dry weight basis.

(b) Corrective action for negligent violations. For each negligent violation, USDA will issue a Notice of Violation and require a corrective action plan from the producer. The producer shall comply with the corrective action plan to cure the negligent violation. Corrective action plans will be in place for a minimum of two (2) years from the date of their approval. Corrective action plans will, at a minimum, include:

(1) The date by which the producer shall correct each negligent violation;

(2) Steps to correct each negligent violation; and Steps that will be taken to correct each negligent violation; and

(3) A description of the procedures that will demonstrate compliance must be submitted to USDA.

(c) Negligent violations and criminal enforcement. A producer who negligently violates this part shall not, as a result of that violation, be subject to any criminal enforcement action by any Federal, State, Tribal, or local government.

(d) Subsequent negligent violations. If a subsequent negligent violation occurs while a corrective action plan is in place, a new corrective action plan must be submitted with a heightened level of quality control, staff training, and quantifiable action measures.

(e) Negligent violations and license revocation. A producer that negligently violates the license 3 times in a 5-year period shall have their license revoked and be ineligible to produce hemp for a period of 5 years beginning on the date of the third violation.

CFR1                                                    1

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

08929015

(f) Culpable mental state greater than negligence. If USDA determines that a licensee has violated the terms of the license or of this part with a culpable mental state greater than negligence:

(1) USDA shall immediately report the licensee to:

(i) The U.S. Attorney General; and

(ii) The chief law enforcement officer of the State or Indian territory, as applicable, where the production is located; and

(2) Paragraphs (a) and (b) of this section shall not apply to culpable violations.

**HISTORY:** [84 FR 58522, 58554, Oct. 31, 2019; 86 FR 5596, 5680, Jan. 19, 2021]

**[EFFECTIVE DATE NOTE:**

86 FR 5596, 5680, Jan. 19, 2021, revised Part 990, effective Mar. 22, 2021.]

CFR1                                           2

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

08929015

**6.21.841-4 Controlled Substances Offenses—Knowingly or Intentionally Defined**

**To act knowingly, as used in the offense**(s) **charged, means that** (name) **was conscious and aware that** (he) (she) **was engaged in the act**(s) **charged and knew of the surrounding facts and circumstances that constitute the offense** (s)**. Knowingly does not require that** (name) **knew that the acts charged and surrounding facts amounted to a crime.**

**To act intentionally, as used in the offense**(s) **charged, means to act deliberately and not by accident. Intentionally does not require that** (name) **intended to violate the law.**

**The phrase "knowingly or intentionally," as used in** (count no.)**, requires the government to prove beyond a reasonable doubt either that**
(1) (name) **knew that what** (he) (she) (distributed) (possessed with intent to distribute) (manufactured) (possessed) **was a controlled substance under federal drug abuse laws, even if** (he) (she) **did not know which particular controlled substance it was, OR**

(2) (name) **knew what** (he) (she) (distributed) (possessed with intent to distribute) (manufactured) (possessed) **was in fact** (identity of the specific controlled substance alleged) [and that the weight of the controlled substance was (X grams or more)]**, even if** (he) (she) **did not know that it was a controlled substance.**

**In addition, the government must prove beyond a reasonable doubt that what** (name) (distributed) (possessed with intent to distribute) (manufactured) (possessed) **was in fact** (identity of the specific controlled substance alleged) [and that the weight of the controlled substance was (X grams or more)].

**In deciding whether** (name) **acted "knowingly or intentionally," you may consider evidence about what** (name) **said, what** (name) **did and failed to do, how** (name) **acted, and all the other facts and circumstances shown by the evidence that may prove what was in** (name) **'s mind at that time.**
**Comment**

The language of this instruction is based on the general definitions of knowingly and intentionally, stated in Instructions 5.02 (Knowingly) and 5.03 (Intentionally), modified in accordance with the Supreme Court's opinion in *McFadden v. United States*, 135 S. Ct 2298 (2015) and the Third Circuit's opinion in *United States v. Barbosa*, 271 F.3d 438, 457–58 (3d Cir. 2001).

**No Need to Prove Awareness of Specific Type of Controlled Substance or Weight. In** *McFadden v. United States*, 135 S. Ct 2298 (2015), the Supreme Court held that the knowledge requirement under § 841(a)(1) can be met by proving either (1) that "defendant knew he possessed a substance listed on the schedules, even if he did not know which substance it was,"

485                                          1

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

08929015

or (2) "that the defendant knew the identity of the substance he possessed." With respect to the first method, the Court explained "the defendant may know that the white powder is listed on the schedules even if he does not know precisely what substance it is. And if so, he would be guilty of knowingly distributing "a controlled substance." 135 S. Ct. at 2304. With respect to the second method, the Court posited, "a defendant who knows he is distributing heroin but does not know that heroin is listed on the schedules … . Because ignorance of the law is typically no defense to criminal prosecution, *Bryan v. United States,* 524 U.S. 184, 196, 118 S. Ct. 1939, 141 L.Ed.2d 197 (1998), this defendant would also be guilty of knowingly distributing 'a controlled substance.' " 135 S. Ct. at 2304. In either case, the proof may be through direct or circumstantial evidence. Circumstantial evidence might include "a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a "high" similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure at customs." 135 S. Ct. at 2304 citing *United States v. Ali,* 735 F.3d 176, 188–189 (C.A. 4 2013).

In *United States v. Barbosa,* 271 F.3d 438, 457–58 (3d Cir. 2001), the Third Circuit held that although the identity and quantity of the specific controlled substance alleged must usually be treated as an element of the offense, which must be found by a jury beyond a reasonable doubt under Apprendi v. New Jersey, 530 U.S. 466 (2000), the mental state requirements knowingly, intentionally, and intent to distribute in 21 U.S.C. § 841(a) do not require the government to prove that the defendant was aware that he possessed, etc., the specific substance alleged. That is, although the government must prove the identity and quantity of the controlled substance in order to increase the available maximum sentence, as to the defendant's mental state, the government only needs to prove beyond a reasonable doubt that the defendant knew that he or she was possessing, etc., a controlled substance generally. Thus, in *Barbosa* the evidence was sufficient to sustain the defendant's conviction of possession with intent to distribute, even though it was essentially undisputed that the defendant honestly believed that the cocaine he possessed was in fact heroin. Similarly, the Third Circuit has held that the government need not prove that the defendant was aware of the weight of the mixture or substance containing the controlled substance. *United States v. Williams,* 974 F.3d 320, 363 (3d Cir. 2020) ("It is enough that that the knowing or intentional distribution or possession occurred; the quantity is a factual finding that goes to the sentence to be imposed … In the context of § 841(a) and (b), the defendant need not consciously cognize the amount he is distributing in order to violate the law.")[.]

**Controlled Substance Analogues.** In *McFadden,* the Supreme Court addressed the issue as to the knowledge necessary for conviction under § 841(a)(1) when the controlled substance at issue is in fact an analogue drug covered by the Controlled Substance Analogue Enforcement Act of 1986 (Analogue Act), which sets forth a category of substances substantially similar to those listed on the federal controlled substances schedules, 21 U.S.C. § 802(32)(A), and, pursuant to § 813, treats those analogues as controlled substances under § 841(a)(1). The Court held:

That knowledge requirement can be established in two ways. First, it can be established by evidence that a defendant knew that the substance with which he was dealing is some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance. Second, it can be established by evidence that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue. The

485                                    2

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

08929015

Analogue Act defines a controlled substance analogue by its features, as a substance "the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II"; "which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than" the effect of a controlled substance in schedule I or II; or which is represented or intended to have that effect with respect to a particular person. § 802(32)(A). A defendant who possesses a substance with knowledge of those features knows all of the facts that make his conduct illegal, just as a defendant who knows he possesses heroin knows all of the facts that make his conduct illegal. A defendant need not know of the existence of the Analogue Act to know that he was dealing with "a controlled substance."

135 S. Ct at 2302.

*McFadden* makes clear that it is not enough that the government prove that defendant believed he was dealing with an illegal regulated substance "under some law." 135 S. Ct. at 2306. Rather, the government must show "that a defendant knew he was dealing with 'a controlled substance.' That term includes only those drugs listed on the federal drug schedules or treated as such by operation of the Analogue Act. §§ 802(6), 813. Thus, in cases involving controlled substance analogues, it might be appropriate to insert the following language for the third paragraph of the model instruction:

**The phrase "knowingly or intentionally," as used in (count no.), requires the government to prove beyond a reasonable doubt either that**
**(1)    (name)       knew that what (he) (she) (distributed) (possessed with intent to distribute) (manufactured) (possessed) was a controlled substance analogue under federal drug abuse laws, even if (he) (she) did not know which controlled substance it was an analogue of, or**

**(2)    (name)       , knew the substance (he) (she) (distributed) (possessed with intent to distribute) (manufactured) (distributed) (possessed)**

**(a)    had a chemical structure of substantially similar to the chemical structure of [identity of controlled substance] and**

**(3)    (b) had a stimulant, depressant, or hallucinogenic effect on a person's central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of [identity of controlled substance or the defendant represented or intended it to have such effect.]**

**In addition, the government must prove beyond a reasonable doubt that (name) knew that what (he) (she) (distributed) (possessed with intent to distribute) (manufactured) (possessed) was intended for human consumption. and that the controlled substance was in fact (identity of the specific controlled substance analogue alleged) [and that the weight of the controlled substance analogue was (X grams or more)].**

485                                              3

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

08929015

**Knowing or Intentional and the "Except as Authorized" Defense.** 21 U.S.C. § 841 provides that "except as authorized" it is a crime for a person to knowingly or intentionally distribute a controlled substance. When the defendant produces evidence that he or she was authorized to distribute controlled substances, the Supreme Court has held that the government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner. In *Ruan v. United States*, 597 U.S. 450 (2022), the Supreme Court held that once the defendant produces such evidence, the government must prove that the "except as authorized" exception does not apply. 597 U.S. at 456 That is, the government bears the burden to prove that the defendant did not subjectively believe the distribution was authorized. 597 U.S. at 456–458. Thus, the jury instructions as a whole and any good faith instruction must clearly require the government to prove that the defendant "knowingly or intentionally acted in an unauthorized manner." 597 U.S. at 468. In *Ruan*, the defendant, a physician, produced evidence that the prescriptions were written as part of a medical practice to show that they were authorized. The trial court gave a good faith instruction which stated that the government was required to prove the defendant wrote the prescriptions not "in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States." It further instructed that a doctor violates § 841 when "the doctor's actions were either not for an appropriate medical purpose or were outside the usual course of professional medical practice." 597 U.S. at 455–456. The Supreme Court reversed. By incorporating an objective reasonableness standard into the consideration, the instruction did not require the government to prove that the defendant subjectively believed the prescription was unauthorized.

**Alternatives When Government Seeks Enhanced Sentence Thresholds.** Consistent with United States v. Apprendi, 530 U.S. 466 (2000) and *United States v. Alleyne*, 570 U.S. 99 (2013), when the government seeks an enhanced statutory mandatory or the statutory mandatory minimum sentence, the bracketed language in the third paragraph can be used when the indictment charges one of the weight thresholds that would authorize the higher maximum penalties and the court follows the alternative of instructing that weight of the controlled substance is an element of the offense, and/or the jury can be asked to make a finding on weight through special interrogatories after it has found the defendant guilty of the offense. See Comment to Instruction 6.21.841A.

**Fifth Amendment Concerns.** Although this instruction provides that the trial court may instruct that the jury can consider, among other things, "what *(name)* said, what (name) did and failed to do," the court should be careful not to instruct in a way that suggests that the jury can consider what the defendant failed to say in a context that implicates a defendant's Fifth Amendment right to remain silent. An instruction that invites the jury to infer intent from a defendant's silence in that context may be a violation of the Fifth Amendment. *United States v. Waller*, 654 F.3d 430 (3d Cir. 2011). See discussion in Comment to Instruction 5.01(Proof Of Required State of Mind—Intentionally, Knowingly, Willfully).

(Revised 1/2024)

485                                4

© 2025 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

08929015